# EXHIBIT A

# Part 1 of 4

Machine Translated by Google

Texts with a black border correspond to information considered confidential, in accordance with Article 116 of the General Law on Transparency and Access to Public Information; Article 113 of the Federal Law on Transparency and Access to Public Information; and Sections Thirty-eighth and Fortieth of the General Guidelines on the Classification and Declassification of Information, as well as for the Preparation of Public Versions.



INSIITLJTO HI)[fÿAI DI:
H,i ÿCOMUNICACIOI\J[:S

**RESOLUTION BY WHICH THE PLENARY OF THE FEDERAL TELECOMMUNICATIONS INSTITUTE AUTHORIZES THE CONCENTRATION -**

**FILED UNDER CASE NO. UCE/CNC-001-2018, NOTIFIED BY THE WALT DISNEY COMPANY AND TWENTY-FIRST CENTURY-FOX, INC.** SUBJECT TO )
**COMPLIANCE WITH CONDITIONS** -" i

I. BACKGROUND ................................................................ ;-;-,-•........................................................ 6 11.

CONSIDERATIONS ... :. ..................................... , 15 ............ / ..........................................................

FIRST. FACULTIES OF THE INSTITUTE ........... : ...................................... -, ........................................ 15

SECOND. COMPETENCE OF THE INSTITUTEÿ ......................................... ...................................... 15

THIRD. THE PARTIES INVOLVED IN THE OPERATION ........................................................... 17

( 3.1. Purchaser ........... 17 ................................................................. -z: .............................................

TWDC ......................................................... .., ••• ' .................... .: ••••••••••••••••••••••••••••••••••••••••••

J 7 TWDC Holdco 613 Corp. (New Disney) ............................................................... f. ................. 17 WDC Merger

Enterprises 1, Inc. (Delta Sub) ............................ '..'.-'--'-.......................................................... 17

WDC Merger Enterprises 11, Inc. (Wax Sub) ................................................................ 1 3.2. Adquirido ................. 17

........................................................, ..... 18

21 CF        -.•............................................................... 18

FOURTH. THE OPERATION ....... :-:. ............ 1 ................ \ 18 ................... _,_,ÿ ...................................... ),,; .................

4.1. Description of the Transaction - Information provided by the Parties .......................................... l ÿ 1 4.1. l. Acts prior to the

Transaction ..................................................................................... 18 4.1.2. Acts and assets that are part of the.................

Operation ....................................................................... 19 4.1.3. Result of the Operation ..................................... '-'.. ......... , 20

( .................................................................

4.1.4. TWDC's Alonnar Structure after Operation ......................................................... 21

4.1.5. Shareholders with stakes exceeding 5% (five percent) in New Dlsney ................... 21

4.1.6. Members of the Board of Directors and Principal Officers of TWDC after the .'

Operation .................................... (. ........................................... ............... :................. .. ...................22

4.2. Decisions of other competition authorities ......... :-: ...................... ,1..: ................................. _..... 22

4.2.1,.-,USA ..................................................................................................... 23 4.2.2. EU 25

4.2.3. Brazil ........................................................................................................................................................... 27 4.3. Updating the

notification thresholds established in the ,LFCE.. ................................................... 28 4.4. Evaluation of the timeliness of the

notification .......... ,.,. ............ : ................................................. 29 :'.30 ÿ 4.5. Benefits expected by the

Parties .................................................................................................

4.6. Regulatory Criteria for Evaluating the Operation ................................................................................. 30

FIFTH. ANALYSIS OF THE OPERATION IN THE FIELD OF ECONOMIC COMPETITION ........................... 32

5.1. Identification of economic interest group (EIG) ........................................................................... 32

J>. ll TWDC Group .................................................................................................. \ ................ 33-

5.1.2. Relationship between pn.lpo TWDC and AETN ............................................................................................... .l. ............... 36

5.1.3. Group 21 CF ........ / .............................................................................. 41

5.2. TWDC Group's Business in Mexico ............................................................................................. 44 5.3. 2lCF Group's

Business in Mexico ............................................................................................. 46 5.4. Audiovisual Content ........

•ÿÿ,'._',•• ................................ ÿ ..: · ............................. 47

5.4.l. Use of audiovisual content transmission rights.f ............. : ............................... 48

5.4.2. Transmission Media Involved in the Operation ................ ,; ................................................ 51 50

5.4.3. Distribution of Audiovisual Content through the STAR .......................................................

5.5. Economic coincidences between the TWDC Group and the 21CF Group ......................................................... 61

5.5. l. Identification of economic activities ............................................................................ 61 5.5.2. Similarities in the

telecommunications and broadcasting sectors ......................................................... 63 5.6. Activities with high participation -

Susceptible to competition risks - ................................. 67 SIXTH. RELEVANT AND RELATED

MARKETS ...................................................................... 67

Economic Activities analyzed J 6.1. Provision and licensing ................................................... ................................................... 69

of audiovisual content to STAR suppliers 6.1 .1 Product dimension .................................... ·ÿ .............................................:;........................ 69

." ...................................... 70

Anal(sls of substitution .............................................................................................................................. 70
Basic Channels ........................................................................... .\ .............. ;'•.................... .. ......................71

Programmatic Categories (CP) ........................................................................................................ 72

Premium Channels 75 .......................................................................................................

STRD Channels or Open N Channels Advertising ........ o'............................................................... 77

Revenue ................................................................... 1 ......................... .I. .......................... 77 78 Audience of Open N

Channels ......... ..\ ........................... ( ........................................ ,,ÿ ............ : ...

Must Offer and Must Carry Obligations ........................................................... 81

Acquisition of Restricted Channels ................................... I .................................... ..,. ........................ !34

Regulatory provisions 85 .......................................................................................................

Type of content l. ....... ............................................................................. .......................... 86

6.1.2. Geographical dimension ....... , ................ ................................................................... ........................ 87

6.2. Provision and licensing of sports audiovisual content to OTT distributors 6.2.l Product ............... 88

dimension ..................................................................................................................... 90

6.2.2. Geographic dimension ....................................................................................... 90

6.3. Acquisition of rights for the broadcast of sporting events in Mexico - 1Mercado

Related ......................................................................... :'>. ................................................................... 90

6.3. l Substitution analysis .:. ............................................................................ \ ............................... , ......: 95

National CADs ................................................................................................... 95

International CADs ........................................... ................................ ..:: ............................................... 95

National and International CADs 6.4. ................................................................. in. ................................ 96

Competitors, market power and concentration in relevant and related markets 6.4.l Provision and licensing of audiovisual .... 97

content to STAR providers a) Aggregate Level - All CPs b) Programmatic Category ........................ 99

Level ................ : .................... _.<' , ........................ , ................................................. ............................... 99

•••••••••••••••••••••••••••••••••••••.•••••••••••••••••••••••••••••••••• l 03

6.4.2 Related Market -- Rights for the transmission of sporting events in Mexico a) Sports Audiovisual ....... 112

Content (CAD):.' ................ b) Transmission .................................................................... 113

Contracts .: ............................................... .' ................................................................... 115

ÿ:/iÿÿÿcÿÿÿn ÿ;lÿÿ· ÿ;ÿ·. d·ÿ. · ÿÿÿÿl;ióÿ. ·v. ¡¡¿ÿ·ÿ·;¡;ÿ¡ÿ·ÿ·t;·. dÿ. ·;;ÿ;ÿÿldÿ·ÿ. ·;ÿdiÿÿ¡;ÿÿ·1ÿ·ÿ. ·cÿÿÿÿ·1ÿ·ÿ l ÿÿ

programming and channel packages ) to STAR providers, in CP Deportes ......................... 128

Participations ............................................................................................ ·;, T erms and conditions of the contracts for ...................................... 128 \

the distribution of programming channels .................... 130 6.4.4 Provision and licensing of audiovisual content (programming channels and channel packages )to

STAR providers, in the Factual CP 6.4.5 Provision and licensing of sports audiovisual content to service providers

....................................................... 1. ................ l 33

OTT distribution of audiovisual content ........................................................................... 133

1 A) Information received from Third Parties in the provision and licensing of audiovisual content to

STAR suppliers B) Information ................................................................. '. ...................................... 134

received in terms of article 70, section V, of the LFCE 6.4.6 Barriers to entry, existence and power of ......................................... 137

competitors and access to inputs SEVENTH. RISKS OF CONCENTRATION IN RELEVANT AND RELATED ....................... 140
MARKETS ..... 159,

7 .1. Legal Framework ........................................................................................... 155 7 .2. Risk

Agreement notified to the Parties 7 .2.1. Relevant Market for ................................................................... 156

the provision and licensing of audiovisual content to suppliers

of the STAR in the CP Sports ........................................................... , ..................................... 157

7 .2.1. 1. Identified Risks 7 .2.1.2. ............... , ...................................................................... 157
Representations by the Parties 7 .2.1.3. ..... :............................................................... ' ............................. 157

Response to representations 7.2.2. Relevant ........................................................................... 160

market for the provision and licensing of audiovisual content to STAR providers in the CP Factual

162 ..................................................................... :-................ , ·ÿ; ., .. ........................

7.2.2.1. Identified Risks ................ -:-................................................................. 1 ............ 192



INSfITUTO H:Df:IU\L rx
Ift.f:COMMUNICATIONS

7.2.2.2. Representations of the Parties ....................................................... 162

17.2.3. Relevant market for the supply and licensing of sports audiovisual content to
OTT distribution service providers for audiovisual content ..... : 7.2.3. l. Identified risks ......................................... 162
ÿ ........................................................................ 162
7.2.3.2. Representations of the Parties ............................................................ 163 7.3. Analysis of Sectionl of
Article 64 of the LFCE 167 ........ ;;, .................................................... providers in this Sports programming audiovisual content to STAR
category ..................................................................................... .(, ......................... 167 7.3.2. Provision and licensing of audiovisual
content to STAR providers in the CP Factual l69

section 11 of article .... \ ..................................................................................... ..."..................: 7.4. Analysis of
64 of the LFCE 7.5. Analysis of section 111 of article 64 of the LFCE 7.5.l.        ............................................................ 169
Coordinated effects in a concentration ............. i. .....................        ............................................................ 170 \
ÿ ................................................ 170 EIGHTH. CONDITIONS TO CORRECT THE RISKS OF THE OPERATION ...................................... 172 8.1. Proposal
of Conditions presented by the Parties ....................................................... 172 8.1.2. Relevant Market for the provision and licensing of audiovisual
content to ST AR providers in the CP Factual - Proposal of Conduct Conditions ................................................

173

8.1.3. Relevant market for the provision and licensing of audiovisual content to STAR providers in the Sports CP - Proposal for
Structural Conditions ................................................. 179 8.1.4. Legal provisions and applicable criteria for analyzing a proposal for
conditions ....... 8.1.4. l. Legal provisions and criteria .................................................................... 7 ...................... 202   202
8.1.4.2. Criteria for accepting or establishing conditions ................................................. \ .................... 203 Acceptance of proposed
conditions ...................................................................................... 203 :-:C ........•.......................•..........................................

Imposition of conditions ................................................................ 204 8.2. Analysis of the Proposed
Conditions ....................................................................................... 204 8.2. l. Provision and licensing of audiovisual
content to STAR providers in the CP Factual \ _ 204

..................................................................................................................................
8.2. Il Deflnlclones .......               ::. .. -;.f. ........................................................................................               ( ...............   205
-8.2.1.2. Conditions for the Independence of TWDC Directors in AETN ............... \               ..................   208
8.2.1.3. Separation methods in channel distribution .............................................................. 210 8.2.1.4. Validity of the conditions
and the possibility of requesting their review .........................................   21 l
8.2.1.5. Obligations to report the accreditation of the separation of the TWDC Group/ICF Group's activities from the A&E Group's activities...
                                    ÿ .................................      ..-:...... \ ........................ 213   212
8.2.1.6. Reporting mechanisms 8.2.1.7. ··in·· ...................................................................................................
Verlfl   214
8.2.1.8. Modifications of form and structure ...... Calculation of Compliance by the Institute ..................................... T \........................   214
8.2.2. Provision and licensing of audiovisual content to STAR providers in 1CP 214
The Sports .....       .......................................................................................................               (
Scope    and ..................................................................:And ··········ÿi··································:·····················214
/ 8.2.2. l. Definitions ......................................................................................               .........................   216
                                                                                                  216"
Proposals that are not accepted within the terms proposed by the Parties .........................................

Proposals accepted on the terms proposed by the P;3TTes, with modifications that do not change the
substance .............................................................................. .,_,_. .........................   216
Definitions imposed, taking into consideration the proposal of the Parties ....................... 219 ÿ
8.2.2.2. Conditions for Disincorporation ...........       ....................................................................................   221
Of the Obligation of the Parties ............................................................................................................ 221 Of the Period of
Disincorporation .\ ........................................... /.       ........................................................   221
8.2.2.3. Condition of keeping the Business to be Divested Separate ................................................. 222 8.2.2.4. Independent
Auditor ..................................................................................................... 222 8.2.2.5. Monitoring and Compliance with the
Structural Conditions .......................................................... 225 8.2.2.6. Obligation to
divest ................................................................................................. 228 8.2.2.7. Structure and definition of the Business to be
Divested ...................................................... 229 8.2.2.8. Preservation of the viability, commercial value and competitiveness of the
Business to be Divested 232
       ..................................................................................................               .J. ................
8.2.2.9. Separation Obligations ...................................................................................... 234

8.2.2.10. Safeguards (Ring-fencing) ......................................................................................................... 237 8.2.2. I l. Non-recruitment clause ............................................................................................................... 237 8.2.2.12. Due diligence ................................................... '> ...................................................... .............................. 239

8.2.2.13. Reporting ................................................................................................................... 240 8.2.2.14. Buyer Characteristics and Purchase and Sale Procedure ......................................... 24 l ::: 8.2.2.15. Disincorporation Agent ....... ...................................................... , ...................................... 243

8.2.2.16. Instruments to verify compliance ................................. ::; ........................................... 249 8.2.2.17. Grouping and Organization of the content of the Proposed Conditions .. \ .............. 250_ 8.3. Conditions established in the relevant market for the provision and licensing of audiovisual content to STAR providers in the CP Factual ................................................................. 251 8.3. l. Object .......................................................................................... ,.-: ...................................... 251 8.3.2. Definitions .................................................................................................................... 251

8 .3 .3. Obligations ........... · ¡ .................. ::. .................................................... i' ............................................. 253 8.3.4. Transparency and Verification Mechanisms ...................................................................... \256 ÿ... 8A Conditions established in the relevant market for the provision and licensing of audiovisual content to STAR suppliers at CP Deportes ................................................... 257 8.4. l. Objeto ................................................................................................ -"--........................... 257 8.4.2. Definitions ...................................................................................................................... 258 8.4.3. Obligations of the Parties ........................... •:• ............................................................................... 262 8.4.4. Independent Auditor ........................................................................................................... 262 Eligibility Criteria .............................................................................................................. 262 Proposal of Candidates ....................................................................................................... 263 Evaluation of Proposals and Approval by the Institute ........................................................ 263 Mandate of Independence ........................................................................................................ 264 Obligation of Proposals ...................................................................... 264 , ÿ ....................... -.................................. Presentation of a Work Plan ................................................. : 264 ........................ , .......................... Payment of costs and considerations ............ 264 Supervision and surveillance functions ............................................... \ ........................................................................................ ._,.264 Information to the IFT 265 ................................................................................ ;-:-: ...................................

8.4:5. Obligation to Disincorporate ....................................................................................... · / · .... 266 Disincorporation Agent ....................................................................................... 266 Order ................................................................................................................................. 266 Obligations of the Parties ........................................................................................................... 266 Compliance with the obligation to Disincorporate. ......................................... \............................................... 267 Separation, Independence and Viability of the Business to be Divested ................................................. 267 Before the Closing Date of the Transaction ............................................................................ 267 : As of the Closing Date of the Transaction ......................................... 268 Obligation not to hire the same person for the provision and licensing of the IWDC Sports Channels and the 21CF Sports Channels ........................................................................ 270

8.4.6. Independent Administrator ..................................................... 1 ............................................................ 271 27 l Eligibility and Appointment Criteria ................... Commission ...................................................................................................................... .(. ...................................................... -...... 271 Functions ··········¡························, (.·······················=·········· ···············;-···············································271 8.4. 7. Potential Buyers ............................. .f. ................................................. 272 .:. ...................... Eligibility Criteria ....... ._,_ ..... -.................................................. i Information to be provided to the Institute ........................................................................... 273 Availability of information ........................................................................................................ 27 4/ 8.4.8. Obligations of Independence after d ÿ Disincorporation ................................ :ÿ ............. 275

) Obligation not to finance the Disincorporation ....................................................................... 275 Obligation not to repurchase within a specified period ........................................................... 275 Obligation not to recruit personnel from the Assets ........................................................................... 275

Obligation not to affect the viability of the Disincorporation ......................................................... 275 8.4.9. Disincorporation Agent ............................. ........................................................................ 276 Proposal of candidates ................................................................................................................. 276 Designation ............................................................................................................. : ............ 277



Machine Translated by Google



INSrITUTO 1'1:DEfV\L DE
IJ ECOIVIIJI\IICACIOf\If'S

Commission ...................................................................................................... 278 Payment
of costs and consideration ........................................................................ :,...................278
Functions .................................................................................................... 278
Reporting to the Institute ............................................................... ( ....................... 280 Providing Information to Potential
Buyers ....................................................................... 28 I
Duties and Obligations of the Parties 8.4.1íO. ......................................................... <.:............................... 281
Causes for Removal and Replacement Process of the Decommissioning Agent, the Independent Auditor and the Independent
Administrator ................................................................. \ ............. 282
Remoc1on ........................................... :.................. \ 1 ................................................................................. 282
Sustltuclqÿ .................................... ............................... ) ................................................................ 282
8.4.11. Impact of the Business to be Disincorporated on a Forfeiture .................................................. 283 8.4.12. Business to be
Disincorporated. ........................................................ ...................................................... 283 : 8.5. Entry into Force and
Effects ............................................................................... 292 8.6. Verification of Compliance with the Conditions imposed in sections 8.3 to
8.5 of this Resolution ............................................................ :'. ................... , . , ........................................ ·. 292
\ ............................................................................................................... : ... 293 111. RESOLUTIVES .....

ANNEX 1. MEMBERS OF TWDC GROUP AND 21 CF GROUP ................................................................. 296

# I. BACKGROUND

**First. The** document with attachments submitted on August 6, 2018 (Notification Document) - to the official office of the Federal Telecommunications Institute (Instityto) by the CC.                                                                              on behalf of and representing Twenty-First Century Fox, Inc. (21 CF), and

(i)          name and representation of The Walt Disney Company (TWDC, and jointly with 21 CF, the Promoters or the Parties), by means of which they notify this Institute of a concentration consisting of the acquisition by TWDC of assets of 21 CF that includes _ _?film and television studios, cable entertainment channels and international television businesses (Transaction, Notified Operation or Notified Concentration).

Second. The (:!9Prevention Agreement dated August 17, 2018, signed by the Head of the Economic Competition Unit (UCE), in terms of article 90, section I of the Federal Economic Competition Law (LFCE or Law), personally notified on the same date, through

which the Notification Document was filed in the government book of the Unit of Ecological Competition under file number CNC-001-2018 (File) and the Parties were warned to, within ten (I O) business days, submit various missing information related to article 89 of the LFCE (Prevention Agreement).

In this Prevention Agreement, C. was considered accredited.          (i)
                                    as a joint representative of TWDC and 21 CF.

**Third.** The document and attachments submitted to the Institute's Official Records Office on August 29, 2018, by C.                          (i)
                    by means of which the Parties informed this Institute that they had notified the Federal Economic Competition Commission (COFECE Notification Letter) of the part of the Notified Operation that corresponds to products and services that, in their opinion, they considered not to belong to the telecommunications and broadcasting sectors.

Fourth. The document and attachments submitted on August 29, 2018, by means of which the Parties submitted in a timely manner the information requested in the "Prevention Agreement" (Prevention Response Document).

Fifth. The agreement dated September 5, 2018 (Reception Agreement), signed by the Head of the UCE/ and personally notified on the same day, by means of which the matter was considered to have been settled in a timely manner information and documents that were required by the Agreement Prevention, /And for receiving the notification -QCión of the concentration with date



INSfITIJTO Il'[füÿAI I.X
·11:I.ECOIVIlJNICACIONl'S

,,....'-twenty-ninth of August of two thousand eighteen, day on which the Parties will present the information required in the 1st Agreement of Prevention, at the same time that the file was forwarded for processing to the General Directorate of Concentrations and Concessions (DGCC),

**Sixth.** The agreement requesting additional information issued by the Head of the DGCC on- dlecislete of September of two thousand eighteen, notified/ 1

personally to the Parties on the same day, based on article 90 section

111 of (the Federal Law on Economic Competition (LFCE), through the c_yal is required the Parties to do so within 15 (fifteen) business days

They will provide information and/or documentation relevant to the analysis of the concentration (Request for Additional Information).

**Seventh.** The agreement issuing a request for information to other economic people agents (Third Parties) issued by the Head of the DGé'c on the twenty-fourth

September 2018, notified by list on the llth day, with

based on article 90 section 111 paragraphs three and four of the LFCE_!__for

that within 10 (ten) business days they will provide the information and/or

documentation that this authority considered necessary to evaluate the elements and effects of the concentration (Third Party Information Request Agreement).

**Eighth.** The issuance of 40 (forty) official letters1 notified to Third Parties in accordance with the provisions of the Agreement on Request for Information from Third Parties indicated in the Seventh Background, as well as their respective verification procedures carried out between September 27 and October 24, 2018, of which there is reliable evidence in this file.

**Ninth.** The receipt of various requests for extensions from Third Parties required between

October 10 and November 12, 2018, by means of which they requested an additional period of ten days to respond to the information requests made to them, as well as the positive agreements in this regard issued by the Head of the DGCC and notified by list between October 12 and November 13, 2018 (Extensions to Information Requests to Third Parties).

**Tenth.** The address nfidialiacompetelectai@fti.org.mx, on Received, 2018, as well as the document and attachments contained in electronic format (USJ3 report) submitted by the Parties to the official parts office of the Institute on October 9, 2018, by means of which: i) they submitted information in order

\ ·>


---

1 Two additional documents were cancelled for not containing the correct addresses, one of which was issued through a different trade.

Machine Translated by Google

to comply with the Additional Information Request; ii) requested that various persons be considered authorized; and 111) requested that various information be classified as confidential (Additional Information Release Document).

**Eleventh.** The document submitted to the Institute's official office on October 9, 2018, by means of which the Parties clarified the Additional Information Release Document (Clarification Document).

**Twelfth.** The document and annexes submitted on October 18, 2018, in which the Parties submitted additional information in scope to the Additional Information Release Document (First Scope to the Additional Information Release Document).

**Thirteenth.** The agreement dated October 19, 2018, notified by list on the same day, which considered the Request for Additional Information that was formulated to the certifiers of the concentration to be resolved, as well as the presentation of the Clarification Document and the First Scope of the Document for the Relief of Additional Information.

By means of this agreement, the Parties were informed that, in accordance with the first paragraph of Section V of Article 90 of the LFCE, the sixty-day period that this Institute has to resolve the concentration runs from October 8, 2018, the day on which all the information and documents requested through the Request for Additional Information were submitted.

**Fourteenth.** On various dates between October 9 and November 22, 2018, the requested Third Parties fully complied with the requests made by the Head of the DGCC, who issued the corresponding agreements (Resolution of Information Requests to Third Parties), which were notified by list between October 19 and November 29, 2018.

**Fifteenth.** The agreement dated November 5, 1918, personally notified on the same date;, by means of which information was requested from A&E Ole Servicios, S. de RL de CV - based on article 90 section 111 paragraphs three and four of the LFCE - so that, in its capacity as economic agent and interest group to which it belongs, it provides information to this Institute (A&E Request Agreement).

**Sixteenth.** The document submitted by A&E Ole SeNicios, S. de RL de CV on November 15, 2018, requesting an extension in order to comply with the A&E Requirement Agreement.

Machine Translated by Google



If\JSTITIHO Ff'DI'RAL IX
Itlf'COMIJi\!IC/\('.101\!E:)

**Seventeenth.** The document and annexes submitted on November 15, 2018, by means of which the Parties submitted information complementary to the scope of the Document for the Release of Additional Information (Second Scope of the Document for the Release of Additional Information).

**Eighteenth.** The agreement dated November 22, 2018, published in the lists of agreements on the 28th of the same month and year, through which the ÓGCC, based on article 90, section 111, third paragraph, of the LFCE, ordered a letter to be sent to the Media and Audiovisual Content Unit (UMCA) of the Institute so that, in its capacity as a technical area, it would provide various information (Request Agreement to UMCA).

**Nineteenth.** The agreement dated November 23, 2018,

notified by list on the same date, by means of which an extension of ten additional days was granted in relation to the A&E Requirement Agreement.

**Twentieth.** The agreement dated November 30, 2018, notified by list on the same day, which considered the Second Scope to be presented to

-Written Release of Additional Information.

**Twenty-first.** The writing and attachments presented on the fourth day of December two thousand and eighteen by A&E Ole Servicios, S. de RL de qN., through the cupl vents 10 information requested in the A&E Requirement Agreement and points out that, for some of the questions, it will be A&E Television Networks, LLC. will appear separately to respond to the matter (Written Response to A&E requirement).

**Twenty-second9C1.** The document and annexes presented on December 7, 2017 thousand eighteen, through which A&E Television Networks, LLC submitted information corresponding to the A&E Requirement Agreement, considering that Servicios, S. de RL c:Íe   A&E None CV does not have access to the information requested in said agreement.

agreement (AE1N's Letter in Response to A&E Request).

**Sixteenth and third.** The draft and annexes submitted on December 7, two thousand eighteen, by means of which the Parties        they sent information supplement the scope of the Written Release of Additional Information (Third Scope of the Additional Reform Release Writing).

**Twenty-fourth.** The document was entered into the Institute's official office on the date December 12, 2018 from the General Directorate of Analysis of Media and Audiovisual Content of the UMCA, through which - He provided various information that was requested in his capacity as technical area by the UMCA Requirement Agreement (UMCA Requirement Agreement).



Machine Translated by Google

**Twenty-fifth.** The agreement dated December 13, 2018, personally notified to A&E Ole Serviciÿs, S. de RL de CV on December 14, 2018 and by list on December 19, 2018, by means of which it is requested to complete the missing information and documentation in relation to the A&E Requirement Agreement within a non-extendable period of five days (First Agreement i.e. Completion of A&E Requirement).

**Twenty-sixth.** The agreement dated December fourteen, two thousand eighteen, personally notified to A&E Television Networks, LLC on December eighteen, two thousand eighteen and by mail on December nineteen, two thousand eighteen, by means of which you are requested to complete the information and

Missing documentation in relation to the A&E Requirement Agreement for a period of time non-extendable for five days (Second Agreement to Comply with A&E Requirements).

**Twenty-seventh.** The agreement dated December 17, 2018, notified by list on the same day, which prefaced the Third Scope of the Additional Information Release Document.

**Twenty-eighth.** The agreement dated December 18, 2018, published in the agreement lists on the 19th of the same month/year, by means of which the DGCC considered the requirement formulated through the Requirement Agreement to UMCA to be fully resolved . **Twenty-ninth.** The documents and attachments submitted on January 7 and 9, 2019, by means

of which A&E Television Networks, LLC sent

information corresponding to the Second A&E Requirement Compliance Agreement (AETN Writings).

**Thirtieth.** The document and attachments submitted on January 8, 2019, by which A&E Ole Servicios, S. de RL de CV submitted information corresponding to the First Agreement to Comply with the A&E Requirement (A&E Ole Document).

**Thirty-first.** The agreement dated January 9, 2018,

published in lists of agreements on the tenth of the same month and year, through which the DGCC made a new request to the UMCA so that, within ten business days, it would provide additional information (New UMCA Request).

**Thirty-second.** The agreement dated January 16, 2019, personally notified to the Parties on the same day, signed by the Head of the UCE, by which it is determined to extend the term of 60 (sixty) business days with

Machine Translated by Google



INSHfUTO FEDfJ AI. DAY: /
.-- 'fEIJ:COIVIU\IICATION[:S

that the Institute can resolve the Operation, in accordance with section VI of article 90 of LFCI: and for a period of 40 (forty) additional business days.

Thirty-third. The written and electronic attachments dated January 17, 2019, by means of which the UMCA issues the New UMCA Requirement (Release of the New UMCA Requirement).

Thirty-fourth. The document and annexes submitted on January 18, 2019, by means of which the Parties submitted information complementary to the scope of the Additional Information Release Document (Fourth Scope of the Additional Information Release Document).

Thirty-fifth. The document submitted on January 18, 2019, by means of which the Parties submitted additional information in scope to the Document for the Release of Additional Information (Fifth Scope of the Document for the Release of Additional Information).

Thirty-sixth. The agreement dated January 18, 2019, notified by list on the same date, signed by the Head of the UCE, through which, based on,.,article 1115 fourth paragraph of the LFCE; 19 first paragraph, and 20 section XXIV of the Organic Statute of the Federal Telecommunications Institute, the schedule that runs from nineteen hours (19:00) to ten hours and fifty-nine minutes (23:59) of the day of January 18, 2019, was enabled in order to carry out the necessary procedures for the personal notification of the Risk Agreement that this UC carried out in the File, in accordance with article 90 section V second paragraph, of the same LFCE.

Thirty-seventh. The agreement dated January 18, 2019 signed by the Head of the UCE, and personally notified on the same day, by means of which the Parties were notified of the possible existence of liberties to the process of competition and free concurrence in the markets analyzed, derived from the Operation, in order that they could present conditions that allow correcting the risks indicated, in accordance with article 90 section V second paragraph of the LFCE and its correlated 21 of the Regulatory Provisions (Agreement of Risks)"" and, where applicable, prove efficiency levels, in terms of the provisions of article 63 section V of the LFCE and its correlate 14 of the Regulatory Provisions of the Federal Law on Economic Competition for the telecommunications and broadcasting sectors (Regulatory Provisions).

Pursuant to these provisions, the Risk Agreement issued and notified by UC:E to the Parties is not binding on the Plenary and does not prejudge the resolution of the concentration,

Thirty-eighth. The agreement dated January 21, 2019, notified by list on the same day, which considered the AÿTN Documents to be submitted.

Thirty-ninth. The agreement dated January 21, 2019, notified by list on the same day; which considered the A&E Ole Document to be submitted.

Fortieth. The document and annex submitted on January 22, 2019, by means of which the Parties submitted additional information

(in scope of the Additional Information Release Document (Sixth Aléance al Additional Information Release Document).

Forty-first. The email received at the address oficialiacompetencia@ift.org.mx, on January 23, 2019, as well as the document and annex submitted by the Parties to the Institute's official office on January 24, 2019, through which they offer proposed conditions to which the Operation would be subject, with the purpose of offering measures to mitigate the risks identified in the Risk Agreement (Initial Proposal of Conditions).

Forty-second. The agreement dated January 24, 2019, notified by list on the same day, which considered the written submission of -

Initial Proposal of Conditions in accordance with the third paragraph of Article 90 of the LFCE for the purposes set forth in the fourth paragraph of this provision. That is, the Initial Proposal of Conditions submitted voluntarily by the Parties was deemed to have been submitted and, since it was not submitted with the Notification Letter,

The 60 (sixty?) day period that the Institute has to resolve was interrupted and began counting again from its beginning on January 23, 2019, the date on which the aforementioned proposal was presented.

Forty-third. The email received at the address oficialiacompetencia@ift.org.mx, on January 24, 2019, as well as the document and annex submitted by the Parties to the Institute's official parts office on January 25, 2019, by which they submitted additional information in scope to the Additional Information Release Document (Seventh Scope of the Additional Information Release Document).

- 1

Forty-fourth. The agreement dated January 25, 2019, notified by list on the same day, which was presented on the Fourth

Scope of the Additional Information Relief Letter.

Forty-fifth. The agreement dated January 25, 2000

Dec. nineteen, notified by list on the same day, which considered the Fifth Scope of the Additional Information Release Document to be presented.



INSTITUTO Ff:DHV\I. Dr
HJ.1,COIVIUÑICACICIÑES

**Forty-sixth.** The agreement dated January 25, 2019,

notified. by list on the same day, which was considered presented on the Sixth Scope of the Additional Information Release Document.

**Forty-seventh.** The decree dated January twenty-fifth, two thousand nineteen, presented by ██████ (ii) ████████████

██████ ██ , respectively) by means of which they request that it be glossed

File various information that they presented to the Authority

Researcher of the Institute as whistleblowers, in relation to Operation

Notified (Written ████████

This information was filed by the Investigating Authority in file AI/DE-004-2018 of its index, which the authorities refer to. It was rejected because the concentration notification file was being processed before the UCE.

**Forty-eighth.** The agreement dated January 28, 2019, published in the lists of agreements on the 29th of the same month and year, by means of which the DGCC considered the requirement formulated through the New UMCA Requirement to have been fully resolved.

**Forty-ninth.** The agreement dated January twenty-ninth, two thousand nineteen, published in lists of agreements on the same day, by means of which the EGCC considered the Information of the Writing to be presented and ordered to gloss it to (ii) ██████

ÿ File, the information and attachments that they present.

It was also agreed to send a letter to the Institute's Research Authority requesting that it send a certified electronic copy of the records contained in file AI/DE-004-2118 of its index, in order to corroborate the information contained in this matter. This is for the purposes of Article 70, Section V, of the LFCE.

**Fiftieth.** The agreement of February 5, 2019,
notified the PGr list on the same day, which considered the Seventh AIGance to the Additional Information Release Document to be presented.

*Fifty-first.* The agreement dated February 5, 2019, through which the electronic copy of the

evidence) of file AI/DE-004-2018/ provided by the Institute's Investigating Authority.

**Fifty-second.** The document and annex submitted on February 7, 2019, by means of which the Parties submitted complementary information in scope to the document for the release of additional information (Eighth Scope of the document for the release of additional information).

**Fifty-third.** The agreement dated February 8, 2002

nineteen, notified by list on the same day, which was considered as presented ÿl Eighth Scope to the Written Relief of Additional Information.

**Fifty-fourth.** The document and annex submitted on February 18, 2019, by means of which the Parties submitted additional information in scope to the *9th* Document for the Release of Additional Information (Ninth Scope of the Document for the Release of Additional Information).

**Fifty-fifth.** The agreement dated February 18, 2019, notified by list on February 20 of the same year, which considered the Ninth Scope of the Additional Information Release Document to be presented.

**Fifty-sixth.** The document and annexes submitted on February 20, 2019, by which the Parties submitted modifications to the Initial Proposal of Conditions (Modification to the Initial Proposal of Conditions).

**Fifty-seventh.** The agreement dated February 20, 2019, notified by list on the same day, which considered the written document to be presented Modification to the Initial Proposal of Conditions in terms of article 1 sections II and 111 of the Regulatory Provisions.

**Fifty-eighth.** The document and annex submitted on February 21, 2019, by means of which the Parties submitted additional information in scope to the Document for the Release of Additional Information (Tenth Scope of the Additional Information Release Document).

**Fifty-ninth.** The agreement dated February 26, 2000 nineteenth. Notified by list, the same day, that the Tenth was considered presented Scope of the Additional Information Release Document.

**Sixtieth.** The document and annex submitted on March 1, 2019, by means of which the Parties submitted additional information in scope to the Modification of the Initial Proposal of Conditions (First Scope of the Modification of Conditions).

**Sixty-first9.** Agreement dated March 6, 2019, notified by list on the same day, which considered the First Scope of the Modification of Conditions to be presented in terms of article 21 of the Provisions Regulatory.

**Sixty-second.** The document and annex submitted on March 7, 2019, by means of which the Parties submitted additional information on the scope of the Amendment to the Initial Proposal of Conditions (Second Scope of the Amendment to Conditions).

**Sixty-third.** The agreement dated March 8, 2019, notified by list on March 11 of the same year, which presented the Second Scope of the Modification of Conditions in terms of Article 21 of the Regulatory Provisions.

Machine Translated by Google



INSTITUTO FléDtlV\LDÿ
FOR! HX)IVllH\IIÇ :ACIOl\Jf,S

. In vIrtuGI of *the* aforementioned Background and the following, \

## 11. CONSIDERATIONS

### FIRST. FACULTIES. OF THE INSTITUTE

In accordance with the provisions of article 28 paragraphs fourteen, fifteenth and sixteenth of the Political Constitution of the United Mexican States (CPEUM); 5 first paragraph of the LFCE and 7 third paragraph of the Federal Law of Telecommunications and Broadcasting (LFTR), the Institute is an autonomous body, with legal personality and its own assets - whose purpose is the efficient development of radio broadcasting and telecommunications, ... and for such purposes - is in charge of the regulation, promotion and supervision, among others, of access to passive infrastructure and other essential inputs; and is the authority in matters of telecommunications / economic competence in the broadcasting and

Therefore, the Institute is authorized to process, evaluate and resolve the Operation, since it constitutes a concentration that involves economic and market agents that are part of the telecommunications and radio broadcasting sectors.

### SECOND. JURISDICTION OF THE INSTITUTE

As indicated in the first and third background of this Resolution, the Parties intend to carry out an operation with effects in markets that are part of the telecommunications and broadcasting sectors, in which the IFT is the competent authority in matters of economic competition and has the exclusive powers to apply the LFCE, but also in markets that are not part of these sectors, in which the competent authority is the COFECE.

Previously, the Parties notified one part of the concentration to the IFT and the other part to the COFECE. [2]

The Institute is the competent authority to process, evaluate and resolve the Notified Concentration, since it involves: (i) Audiovisual

contents (programming channels, channel packages and programs, which includes movies and series) and audio in respect of which the TWDC and 21 CF subsidiar_lgs grant licenses in Mexico, which constitute inputs within the telecommunications services production chain and broadcasting and are distributed and exploited through services

tei, economies - including those operating on the Internet - and broadcasting.

---

\ 2 As referred to in the Third Background and section 5.5, l of this resolution, the Operation is part of a International concentration whose effects in Mexico include economic activities that fall within the jurisdiction of COFECE, on which that authority resolved on January 31, 2019.

(11) Time or space for commercial messages or advertising on channels programming and online, for which the TWDC subsidiaries and 21 CF They are sold in Mexico, which are exploited through networks and services telecommunications.

Thus, all the elements of the Operation are part of the telecommunications and broadcasting sectors, in which this institute is the competent authority in matters of economic competition to hear and decide on this concentration before it is carried out, and that, with respect to it, there is an obligation to notify prior to its realization, given that it updates the thresholds established in article 86 of the LFCE.

',In this act, it is the responsibility of the Institute's Plenary to issue the resolution on the Operation, based on articles 28 paragraphs fourteen, fifteenth and sixteenth of the CPEUM; 58, 59, 61, 63, 64, 86 section 111, 87, 88, 89, 90, 91 and 120, third paragraph, of the LFCE; 7 of the LFTR; and 6, 7, 8, 14, 15 , and 21 of the Regulatory Provisions.

In this specific case, the information provided by the Parties and the facts noted by this authority are analyzed . Likewise, the following are taken into consideration: (1) the information required from third parties in terms of article 90 section 111, third paragraph of the LFCE, referred to in the seventh to ninth and fourteenth background; (11) information added to the file, in terms of article 70, section V, of the same regulation originating from a complaint dismissed by the Investigative Authority, as referred to in the forty-ninth background; and (111) the Risk Agreement issued and notified by the UCE to the Parties, without

---

³ The following constitute well-known facts for the purposes of this compliance: events in the public domain, the content of the websites of various economic agents, and the documentation contained in the files held in their archives. The following theses serve as the basis for the above: \ • WELL-KNOWN FACTS. GENERAL AND LEGAL CONCEPTS. Period: Ninth Period. Registry: 174899. Instance: P,leno. Type of Thesis: Jurisprudence: Source: - Judicial Weekly of the Federation and its Official Gazette, Volume XXIII, June 2006. Subject(s): Common. Thesis: P./J. 74/2006. Page: 963. • NOTORIOUS FACTS, THE JUDGES MEMBERS OF THE CIRCUIT COLLEGIATE COURTS THEY CAN INVOKE IN THAT CHARACTER THE EXECUTIVES THAT THEY ISSUED AND THE DIFFERENT DATA AND INFORMATION CONTAINED IN SUCH RESOLUTIONS AND IN THE MATTERS BEFORE THEM OWN BODIES. Ninth Period, Registry number 164049, First Collegiate Court in Criminal Matters and Labor" of the Nineteenth Circuit, Jurisprudence Thesis, Judicial Weekly of the Federation and its Newspaper, Volume XXXII, August 201 O, Common Matter, Thesis: XIX, lo, PTJ/4, page: 2023. • NOTORIOUS FACT. IT IS CONSTITUTED BY THE RESOLUTIONS OF THE BODY OF THE DJ COUNCIL: THE JUDICATURE/FEDERAL THAT ARE REGISTERED IN THE INTEGRAL CASE TRACKING SYSTEM. Tenth Period, Registry 2009054, Tenth Collegiate Court in Civil Matters of the First Circuit, Thesis Isolated, Gazette of the Judicial Weekly of the Federation, Book 18, May 2015, Volume 111, Common Matter, Thesis I.lOo.C.2 K (lOa.), page: 2187. • WEBSITES OR ELECTRONIC PAGES. THEIR CONTENT IS A NOTORIOUS FACT AND SUSPECTS TO BE EVALUATED IN A JUDICIAL DECISION. 'Era: Tenth Era. Registry: 2004949. Instance: Collegiate Courts of Circuit. Thesis Type: Isolated. Source: Judicial Seminar of the Federation and its Official Gazette Book XX\fl, November 2013, Volume 2. Subject(s): Civil. Thesis: I.3o.C.35 K (I 0a.). Page: 1373.



INSTITUTO r:rnl:f(/\L    DE
fH ÿCOIVIIJf\!ICACIC)ÿJr'S

that such act is binding or prejudges the substance of the matter, as referred to in the thirty-seventh antecedent.

### THIRD. THE PARTIES INVOLVED IN THE TRANSACTION

#### 3.1 . Acquirer

**WDC**

TWDC is a public company, incorporated under the laws of the State of Delaware, United States of America (USA) and listed on the New York Stock Exchange under the symbol "DIS".

Based on the     Information provided by the PartiesShareholders with more than 5% (five percent) of its share capital, before the Operation, are presented in Table 1

**Table 1. Shareholders with more than 5% of TWDC's share capital, prior to the Transaction (June 2018)**

| .Acconlistas | Partition (%) (iii) |
|---|---|
| Cede & Company | |
| The Van¡:iuard Growp | 6.94 |
| BlackRock, Inc. | 5.91 |
| Other shareholders with less than 5% of its share capital | 38.45 |
| Total | 100.00 |

Source: Prepared by the authors with information provided by the Parties in the Prevention Response Letter/

In this regard, the Parties state that "Cede & Company is the name used

\ to refer to the central securities depository/clearing house, Depository Trust Company, which is the one that banks, brokers or intermediaries, and financial institutions participants. ( ... )

\ (. . .) Accordingly, although Cede & Company is the registered owner  (iii) of

Neither the shares of 7WDC, nor Cede & Company, nor its participants have the power to control 7WDC." (sic) (

#### IWDC Haldeo 613 Corp. (New Disney)

New Disney is a corporation incorporated under/in accordance with the laws of the state of Delaware in the USA, subsidizing it 100% (100%) of TWDC.

#### WDC Merger Enterprises 1, Inc. (Delta Sub)

Delta Sub is a company incorporated under the laws of the State of Delaware in the USA, a 100% (one hundred percent) subsidiary of New DIsney.

#### WDC Merger Enterprises 11, Inc. (Wax Sub)

Wax Sub is a corporation incorporated under the laws of the state of Delaware in the USA, subsidize it 100% (one hundred percent) of New Disney.

### 3.2. Acquired

**21CF /**

21 CF is a company incorporated under the laws of the State of Delaware, USA, whose Class A and B shares are listed on the Nf,SDAQ Global Select Market respectively, under the ticker symbols "FOXA" and "FOX".

Based on the information provided by the Parties, the shareholders with more than 5% (five percent) of its share capital, prior to the Transaction, are presented in Table 2.

**Table 2. Shareholders with more than 5% of the share capital of 21 CF, before the Transaction (February 2018)**



| Jointly C. Murdoch Family (MFD) | he | K. | Rupert | Murdoch | and the Trust | of the | | (iii) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| (i) | (and) | benefit of the | Group | ValueAct | Capital | Groo | | |
| Other shareholders of 5% of the company with less their | | | capital | | | | | 47.70 |
| | | | | | | Total **100.00** the Parties in the Writing of | | |

Source: Prepared by the authors with     information provided by / ÿ
Response to Prevention.

In this regard, the Parties state that although *"(. . .) K. Rupert Murdoch together with James R. Murdoch and Lachlan K. Murdoch are directors and officers of 2 7 CF, nor K. Neither Rupert Murdoch nor MFT have any right to appoint members to the Board."*

## 1 QUART. THE OPERATION

### 4.1 . Description of the Operation - Information provided by the Parties

### 4.1.1. Acts prior to the Operation

Prior to the Transaction, 21 CF will form a new company, owned by 21 CF's current shareholders, called New Fox, Inc. *(New Fox),* which will remain the property of its current shareholders and will transfer to the company a portfolio of assets (Separate Assets), including:

I    Fox News Channel, a major news channel in the USA.

2. Fox Broadcasting Company, a television network broadcast in USA.

3. Fox Business Network, a relevant business news channel in the USA.

4. Fox Television Stations Group, consisting of 28 television stations broadcast in the USA.





INSTIHJTO 11:DI:R/\L IX
li:li:COIVItJ\IICACI<)I\IÉ!,

5. Canales radiodifundidos de Fox Sports en EUA, Fox Sports I, Fox Sports 2, Blg
   Ten Network and Fox Deportes *SN.*

6. 21 CF film studio in Los Angeles, California in the USA.

The Separate Assets transferred to New Fox are not part of the Transaction.
Notified. In this document, current 21 CF shareholders who will remain shareholders of New Fox
will be referred to as "Former 21 CF Shareholders."

## 4.1 .2. Acts and assets that are part of the Operation

The Transaction involves TWDC's acquisition of 21CF's assets, including film and television
studios, cable television channels, and international television businesses.

The terms of the Transaction were initially documented by the Parties in an agreement and
plan of merger *dated* December 13, 2017, entered into by and among 21 CF, TWDC, Delta
Sub, and Wax Sub (Merger Agreement).4 Subsequently, on June 20, 2018, TWDC and 21

CF announced the execution of an amended and restated agreement and plan of merger
(Amended Merger Agreement).5 As part of the Transaction, the parties will:

1. Delta Sub, a 100% (one hundred percent) subsidiary of New Disney, will merge
   with TWDC, the latter being the company that subsists, becoming
   a 100% (one hundred percent) subsidiary of New Disney (Delta Merger),

2. Wax---Sub, a 100% (one hundred percent) subsidiary of New Disney, will merge
   with 21 CF <21Ue will persist as a 100% (one hundred percent) wholly-owned subsidiary of
   *L* Nÿ Disney (Wax Fusion).

3. Each issued and outstanding share of 21 CF, unless the agreement between
   the Parties establish any exception, it will represent the right to receive
   either 38.00 (thirty-eight) United States dollars (USD
   (in cash, or New Disney common stock),
   Subject to 50/50 proration and possible adjustments.

Since Delta Sub and Wax Sub, prior to the Transaction, are 100% (one hundred percent)
subsidiaries of New Disney, after the Delta Merger and Wax Merger, New Disney will become
the holding company of both TWDC and 21CF.

---

4 The Parties submitted a simple copy of the Merger Agreement together with a translation into Spanish of what they considered to be the main terms and conditions, carried out by an expert translator, which is included in file CNC-001-2018.

5 The Parties submitted a simple copy of the Amended Merger Agreement together with a translation into Spanish, carried out by a professional translator, which is recorded in file CNC-001-2017.

Figure 1 illustrates the actions to be performed by the Parties, described in the previous points, in order to carry out the Operation.

### Figure 1. Acquisition of 21 CF by TWDC



Source: Information provided by the Parties in Annex 1 of the Prevention Response Script.

### 4.1.3. Result of the Operation

In accordance with the information provided by the Parties (. the Transaction will allow TWDC to acquire control of 21 CF and the businesses it operates directly and indirectly, which are listed below: Film Production: Twentieth Century Fox, Fox Searchlight

1. Pictures,',
Twentieth Century Fox Animation y Fox 2000.

2. Television production: Twentieth Century Fox Television (20CF), FX Productions and Fox 21. 3. 50% (fifty percent)

of the share capital of Endemol Shine Group (Endemol).

4. Fox Networks Group International (FNG).

5. Star India.

6. 73% (seventy-three percent) of the share capital of National Geographic Partners.

7. 30% (thirty percent) of the capital stock of Hulu, LLC.

8. 39% (thirty-nine percent) of Sky's share capital, Ple.

Machine Translated by Google



INSIIILHO FIDHMI DE
1HI:COIVIIINICACIÿ)fI!E5

### 4.1.4. WDC's Shareholding Structure after the Transaction As

a result of the Delta Merger, the Wax Merger and WDC's consideration to current 21 CF shareholders (referred to as former in the chart) in common stock or cash, WDC's corporate structure after the Transaction is presented in Figure 2.

**Figure 2. Operation** corporate g_e ;rwoc after the
**Diagram**

Antiguos accionistas de Disney

Antiguos accionistas de 21CF

Antiguos accionistas de 21CF

New Disney

New Fox, INC.

The Walt DIsney Company

Twenty First Century Fo:,¡ Inc.

Subsidiaries of NewFox

Other retained subsidiaries

T nectors of hookstock shares

Source: Information provided by the Parties in Annex 1 of the Prevention Response Letter.

### 4.1.5. Shareholders with stakes exceeding 5% (five percent) in New Disney

According to the Parties' estimates, after the Transaction, shareholders who could have a stake exceeding 5% (five percent) in the equity capital of New Disney - in case they decide to receive only

shares as consideration for the total number of shares they currently hold in 21 CF- would be:

1 1) Cede & Company, and ii) "K. Rupert Murdoch and the MFT.

In this regard, the Parties note:

1 "However, no shareholder of New Disney, individually or jointly,
will have the ability to appoint Board members, because no one person will control New Disney.

### 4.1.6. Members of the Board of Directors and Principal Officials of TWDC after Operation 16

Pursuant to the agreement entered into by the Parties, TWDC and New Disney shall take all necessary corporate actions to ensure that the directors of TWDC become directors of New Disney, until their successors are appointed, in accordance with the articles of incorporation and bylaws of New Disney.

Thus, at the time of its incorporation, the board of directors of New Disney would be composed of the following people: Susan E. Arnold; Fred H.
Langhammer; Mary T. Barra; Aylwin B. Lewis; John S. Chen; Mark G. Parker; 1Robert A. war; Maria Elena Lagomasino; Safra A. Catz; and Francis A. de Souza.

Likewise, New Disney officials would also include people who are identified in Table 3.

**Table 3. New Disney officials after Operation**

| Funcionario | Position/Load |
|---|---|
| Robert A. 1 er Alan | President Director Executive |
| N. Braverman Kevln A. | Senior Executive Vice President, General Counsel Secretary |
| , Ma er Clirlstine M. | Vicepresidente Ejecutivo Senior y Director de Estrategia |
| McCarth M. Ja ne Parker    y | Vicepresidente Ejecutivo Senior y Director Financiero |
| y | Vicepresidente Ejecutivo Senior y Director de Recursos Humanos |

Source: Information provided by the Parties in the Prevention Response Letter.

### 4.2. Decisions of other competent authorities

The Parties reported that the Transaction was notified in other jurisdictions. The same international transaction was notified in each of these jurisdictions, and in each of them, the effects may vary depending on the entities and activities carried out by TWDC and 21 CF. This authority is aware of the decisions issued to date in the United States of America (USA), the European Union (EU), and Brazil, which imposed conditions on the concentration. However, as specified by the Parties, compliance with these conditions has no effect on the Transaction notified in Mexico. Therefore, the analysis is carried out on the Transaction originally notified by the Parties.

The meaning of the decisions adopted in these jurisdictions is presented below - for reference purposes only.

22/305



INSTITIllO FI:DErU\L IX
ꞏIIcl.ECOIVIIJNIC/\Clrn\Jf:S

### 4.2.1. USA

The concentration analyzed in the USA corresponded to the Agreement and Plan of Merger eon dated December 13, 2017, as amended June 20, 2018, whereby the WDC agreed to acquire certain assets, including ownership of 21 CF or its interests in twenty-two regional sports networks ( 11 RSNs), the channels they license for pay television *(cable*

*networks)* FX and National Geographic, as well as the television and film studios, Hulu, and international television companies for approximately $71.3 billion. Fox assets do not include Fox Business Network, Fox Broadcasting Company, Fox Sports, Fox Television Stations Group, FS1, FS2, Fox Deportes, or the Big Ten Network.6

On June 27, 2018, the U.S. Department of Justice's Antitrust Division (DOJ) determined that the proposed acquisition would combine two of the nation's most valuable pay-television sports businesses: lWDC's ESPN and 21 CF's portfolio of twenty-two RSNs. Accordingly, they determined that the proposed merger, by combining 21 CF's operations with ESPN, would increase lWDC's market share, end direct competition between them, and likely result in higher prices for sports programming on a per-channel basis in each of the Designated Market Areas ("DMAs") in which lWDC and 21 CF compete to license their channels to Multi-Channel Video Distributors.

Consequently, a Southern District Court of New York issued a resolution granting the Parties the possibility of carrying out the concentration subject to ~1a condition of selling all interests of 21 CF in **22 (twenty-two) regional networks** **de deportes** (RSNs, siglas del inglés Regional Sports Network): (i) Fox Sports Arizona; (ii) Fox Sports Carolinas; (iii) Fox Sports Detroit; (iv) Fox Sports Florida; (v) Fox Sports/ Indiana; (vi) Fox Sports Kansas City; (vii) Fox Sports Midwest; (viii) Fox Sports New Orleans; (ix) Fox Sports North; (x) Fox Sports Ohio; (xi) Sports Time Ohio; (xii) Fox Sports _____ Oklahoma; (xiii) Fox Sports $an Diego; (xiv) Fox Sports South; (xv) Fox Sports Southeast; (xvi) Fox Sports Southwest; (xvii) Fox Sports Sun;1xviii) Fox Sports Tennessee; (xix) Fox Spÿ :xts West; (xx) Prime Ticket; (x)d) ÿox Sports Wisconsin; y-(xxii) YES Network.




---

[6] Competitive impact statement issued by a Court of the Southern District of New York, based on the analysis of the DOJ-Antitrust Division, page 4.
Available at: https://www.iustice.gov/atr /case-document/flle/l 085951 /download.
7 Public/DOJ information, available at: https://www.iustice.gov/atr/case/us-v-walt-dlsney-company-and-twenty-first-century-fox-inc.

---

8 Competition Impact Report published by the DOJ on August 7 , 2018, sections 2 "Harm to the Competition" and 3 "Entry", available at: https://www.iustice.gov/atr/case-document/file/l08595l/download.





"'the foregoing, including all assets, tangible or intangible, necessary to make its operations viable, which includes ongoing video networks or programming assets; all real property (owned or leased); all transmission equipment; office furniture, fixtures,

materials, supplies and other tangible property; all licenses, permits and authorizations issued by any party to the operation of the assets; all contracts (including content, Related government organization programming and distribution contracts and rights); agreements (including transition services agreements); leases, commitments and understandings of the defendants; all trademarks, service marks, trade names, copyrights, patents, slogans, programming materials and promotional materials related to each video network; and all lists of

customers, contracts, accounts, credit records and all records maintained by 21 CF in connection with each      by video network. /The conditions exclude trademarks, trade names, service marks or service names containing the name 11Fox11 , [9]

In the USA, the authority required that before the closing of the transaction the Parties must accept specific commitments to 'guarantee obligations to keep the assets to be divested separate and independent (hold separate and ring-fenced). [10] Following the closing of the Transaction, the Parties also have a specified period to divest the assets, during which time they must comply with their obligations to maintain those assets as separate and viable going concerns. TWDG is first granted a period of 90 calendar days following the closing of the transaction to divest, extendable for up to a total of 90 additional days (e.g., for a maximum of 180 days).11 If Disney is unable to sell all of the assets directly, an agent or trustee will be appointed *who* will have the authority to sell at a price and on terms obtainable through reasonable sales efforts. If the *trustee* is unable to sell within 6 months, the agent will make recommendations to the relevant authorities, who will make the appropriate decision.12

The competition authority in the USA considered that the commitments presented ensure that: (i) the assets will remain economically viable and

_____

9 The parties will only grant an exclusive license to use the trademark "Fax" for Channels Sports, for a period of at least 3 (three) months.
10 The conditions imposed are public and available, in their original language, at: https://www.justice.gov/atr/case-document/file/1075191/download
11 Section IV. Appointments of the Proposed Final Judgment of the United States Department of Justice, available at: https://www.iustice.gov/atr/case-document/file/1075176/download. 12 Section V. Appointment of Trustee of the Proposed Final Judgment of the United States Department of Justice, available at: https://www.iustice.gov/atr/case-document/file/1075176/download.
Joined.







INSTITUTE FFDI:IV\L DI.:
11:IECOMIJI\IICACIONI:S

independent, without influences from Disney or Fox, or (ii) competition is maintained while the ordered divestments are pending.

### 4.2.2. UE

The Directorate General for Competition of the European Commission was informed that TWDC and 21 CF announced the signing of an agreement for TWDC to acquire assets of 21 CF, including its film and television studios and its cable television and international businesses, thereby eliminating Fox's stake in Sky. This agreement was amended and restated on June 20, 2018. Immediately prior to the acquisition, 21 CF will spin off the Fox Broadcasting Corporation network and stations, Fox News Channel, Fox Business Network, the sports networks FS1, FS2, Fox Deportes and Big Ten Network, and other assets into a new publicly traded company that will be sold to its stockholders; these assets are not part of the proposed transaction.13 -On September 4, 2018, 21 CF received notice of this draft

concentration pursuant to Article 4 of Regulation (EC) No. 139/2004 dercorísejo.14 In the European Union, it was identified that the Parties' activities were They overlap mainly in the audiovisual sector, where they were identified horizontal and vertical effects on: (a) the production and distribution of films for exhibition in theaters; (b) the Distribution of entertainment content domestic; (c) the Licensing of audiovisual content for services of television; (d) the wholesale supply of television channels; and (e) the provision of retail audiovisual services.16 After analyzing these effects, the authority of European competition determined that the concentration would generate risks in the market corresponding to the wholesale provision of television channels pay, in the factual category in 8 (eight) countries.

In the EU, this risk arises because indirectly Á&E Televisipm Networks, LLC (AETN), through one of its 100% (one hundred percent) subsidiaries,

distributes its channels to television and audio service providers

---

13 Public information from the DGC-EC on the Description of the Concentration, available at: http://ec.europa.eu/competition/mergers/cases/addltional data/m8785 790 3.pdf.
14 Available at: https: // eur-lex.europa .eu/legal-content /ES/TXT/PDF /?uri-OJ :C:2018:338: FULL&from-EN.
15 Additional overlaps and vertical relationships arise in other areas, including advertising space, merchandising, live entertainment, music, theme parks, and travel. No competitive risks were identified in these activities.

16 In particular, the Commission considered that the merged entity would not gain the ability to exclude the competitors from accessing the market for the retail supply of television services, and more specifically to Disneylife's subscription video on demand (SVOD) service, and TWDC. This is because TWDC has a market share of less than that of the EU as a whole through the supply of ESPN Play. As a result, and given that numerous competit(we)ill remain in the market, TWDC will not be able to exclude competitors from accessing the market for the retail supply of television services.

Restricted (STAR). In other cases, they do so through *joint ventures* between AETN and third parties. There is no analogous figure to HBO LAG in the EU (as defined in section 5.1.2 of this Resolution).17

The European Commission, in resolving the operation notified in that jurisdiction, determined that, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ are

In this way, on November 6, 2018 [19] the condition imposed by the Commission European to carry out the first transaction notified in that jurisdiction co (responds to the divestment of TWDC's direct and indirect stakes in the legal entities that have the channels called "factual", and which include the channels History, H2 and the investigative channels Crime + Investigation ("Divestment Business"). This condition

to remedy the effects on competition in one of the markets involved In the concentration, this is because TWDC participates in the share capital of the entity that directly operates the factual channels.

The Divestment Business must include all assets and personnel necessary to ensure its viability and competitiveness, in particular, all tangible and intangible assets, including intellectual property rights; all licenses, permits, and authorizations issued by any government organization for the benefit of the Divestment Business; all contracts, leases, commitments, and customer orders of the Divestment Business; all customer, credit, and other records of this business; and key personnel for decision-making on content acquisition, channel distribution, and other strategic activities.20

competition authority's decision in November 2018, the    As of the notification of the Parties have received purchase offers that may be finalized before the closing of the transaction. Therefore, the Parties did not propose any additional conditions to the authority.

---

17 Information provided by the Parties in the /Fourth Scope to the Information Release Document Additional.
18 lb.
19 Public information from the European Commission, available at:
http://ec.europa.eu/competition/elojade/isef/case details.cfm?proc code-2 M 8785
'20 Information provided by the Parties in the Fourth Scope to the Information Disclosure Document Additional.




Machine Translated by Google



INSTITUTO JTDI::IML IX
TEI[:COIVIIJi\ICACIOI\Jf:!1

The existing content supply agreements between A&E LLC and the Business of

Divestiture Agreements will remain in effect for a period of at least 10 years after the transfe (we) estiture

Business to the buyer and on terms and conditions equivalent to those currently granted to these Divestiture

Agreements.

entities. The Divestiture Business will have access to A&E LLC's trademarks, channel names, and logos free of

charge and for as long as necessary to ensure the continued viability and competitiveness of the business.21

### 4.2.3. Brazil

In 1Brasil, TWDC and 21 CF notified the concentration to the competition authority - the Administrative Council

for Economic Defense (CADE)

consisting of TWDC's acquisition of 21 CF assets, including television and film studios and international

television businesses.

Prior to the merger, 21 CF will spin off in the United States a portfolio of news, sports, and broadcasting

businesses, including the Fox Broadcasting, Fox News Channels, Fox Business Network, Fox Sports 1, Fox

Sports 2, and Big Ten Network channels and stations, which will be spun off to a company owned by 21 CF's

current shareholders. 22 In this jurisdiction, the merger also resulted in TWDC acquiring 21 CF's stake in Sky

Brasil, which is related to Sky Brasil. 23 The notice was filed on July 20, 2018.

This authority analyzed seven relevant markets. In the sector of

Telecommunications identified risks in the one corresponding to the programming of basic sports channels for

Pay TV, where it was identified that the operation would increase the levels of consumption.24

On February 27, 2019, a resolution was issued in which

approves the acquisition of 21 CF by TWDC, subject to the condition of selling the Fox Sports channel.

To address the risks identified by the authorities, *TWDC* offered commitments to divest the Fox Sports channel

business. The assets to be divested include all sports event broadcast rights.

---

21 lb.

22 In terms of the Amended and Restated Agreement and Concentration Plan, dated June 20, 2018, the same as referred to in the other Jurisdictions.

23 This relationship does not exist in Mexico, where Sky is owned by Grupo Televisa (59%) and AT&T (41%).

24 Section VI.5. Conclusions of the Competition Analysis.

belonging to Fox Sports, contracts with pay-TV operators, key employees, real estate and broadcast equipment.

It also agrees not to contract the broadcast rights for sporting events currently broadcast by the Fox Sports channel, not to reacquire the assets or to invest or to license the Fox brand for free.25

### 4.3. Updating the notification thresholds established in the LFCE

Article 86 of the LFCE establishes thresholds from which economic agents are obliged to notify the Institute of concentrations and obtain authorization before carrying them out.

> *"Article 86. The following concentrations must be authorized by the Commission before they are carried out:*
>
> *(.' .)*
>
> *111. When the act or succession of acts that give rise to them imply a accumulation in the national territory of assets or share capital greater than the equivalent of eight million four hundred thousand times the minimum wage current daily general information for the Federal District and the concentration two or more Economic Agents participate whose annual sales originating in the national territory or active in the national territory jointly or separately, amount to more than forty-eight million times the general daily minimum wage in force for the Federal District.*
>
> *(.. .)."*

In this provision, the reference to the *current general daily minimum wage* must be understood as referring to the Measurement and Update Unit (UMA) in accordance with the provisions of the Third Transitory Article of the *"DECREE by which various provisions of the Political Constitution of the United Mexican States* are declared reformed and added, in the matter of deindexation of the minimum wage."26

The Operation updates section 111 of article 86 of the LFCE, as follows:

---

25    See:    http://www.cade.gov.br/noticias/cade-aprova-compra-da-fox-pela-disney-com-restricoes, http://sei.cade.gov.br/sei/modulos/pesquisa/md pesa manuscript consulta external.php?mYbVb954ULaAV-MRKzMwwbd5g PuAKStTINgP-ltcH5MdmPeznqYAOxKmGO9r4mCfJITXxQMN0I p TgFwPLudA9Qsdk6NMg-8YqlU3flsWUFNcnL-4VVíya I6DvWYf5B# Toc2037570

26    Published in the Official Gazette of the Federation on January 27, 2016 and available at: http://www.dof.mx/nota detalle.php?c0digo=5423663&fecha=27 /01 /2016, whose Third Article establishes:

> *"Third.- As of the date of entry into force of this Decree, all references to the minimum wage as a unit of account, index, base, measure or reference to determine the amount of the obligations and assumptions provided for in federal, state, and Federal District laws, as well as in any legal provision emanating from all of the above, shall be understood to refer to the Unit of Measurement and Update."*

The UMA used to calculate the threshold corresponds to that in effect for the year 2018, which is equivalent to $80.6 (eighty-six pesos). See information available on the INEGI website, available at: http://www.beta.inegi.org.mx/temas/uma/.



( *INSTITUTO* ITIXIV\I. f)
[ IHI:COIVIUI\IICA< :IONU,

a) The act that gives rise to it implies an accumulation in the national territory of, among others, the assets of the company **Fox-International Channels Mexico, S. de RL de CV,** the amount of which is greater than the equivalent of eight million four hundred thousand times the UMA which is equivalent to 677,040 (six hundred seventy-seven point zero forty) million pesos. In this regard, the assets of this subsidiary owned by 21 CF in Mexico amount to thirty-one million pesos.

December two thousand seventeen, (iv)

(iv)

and:

b) In concentration two or more economic agents participate whose assets In the national territory, jointly or separately, they import more than forty and eight million times Ja UMA, equivalent to 3,868.8 (three thousand eight hundred sixty-eight point eight) million pesos. The above, since by the year ended December 31, 2018 TWDC and 21 CF, through **Fox International Channels México, S. de RL de** CN., **The Walt DIsney Company (Mexico), S. de RL de CV, WDC (Mexico), S. de RL de CV and ESPN Mexico, SA de CV,** which are just some of its subsidiaries respectively, they have assets that are imported jointly

(iv)

## /4.4. **Evaluation of the opportunity for notification**

In accordance with article 87 of the LFCE, the IFT will consider the notification of a concentration to be opportune when the following is met:

> *"Article 87.- Economic Agents must obtain authorization to carry out the concentration* referred *to in the previous article before any of the following situations occur: 1. The legal act is perfected in accordance with the legislation*
>
> \ *applicable* or, *where appropriate, the suspensive condition to which it is subject is met subject to said act;*
>
> *(. '.),,,*

Additionally, the first paragraph of article 16 of the Regulatory Provisions1 establishes the following:

> "Article 16. For the purposes of Articles 86 and 87,        Section 1 of the Law, Economic Agents may agree to subject the execution of a transaction to the condition precedent of obtaining an Institute and must state that the acts   the authorization of the related to the transaction will not produce any effect until an authorization is obtained from the Institute or, where appropriate, it is understood that there is no objection in terms of the Law and the respective certificate is issued. (...)"

-i

According to information submitted by the Parties, the closing of the Transaction has not been completed as it is subject to conditions precedent, including obtaining the Institute's authorization.

Thus, in terms of article 87, section 1, of the LFCE, the Operation was notified in a timely manner.

Furthermore, to date it has not been verified that TWDC has exercised de facto or de jure control over the intended acts, in compliance with Article 16.

first paragraph of the Regulatory Provisions.

### 4.5. Benefits expected by the Parties

In the Notification Letter the Parties point out the objective and rationale of the Oÿeraclón in the following terms:

l) The OpJ'íación will allow "TWDC to increase its capacity to serve the consumers, through:

"( ''' ) f.

    i.    *the expansion of TWDC's creative capacity to create and tell stories;*

    Hey.    *the expansion of TWDC's global presence, particularly in its direct-to-consumer offerings, enabling it to deliver engaging entertainment experiences when and* how *they want them; and*

    íií.    *the diversification of TWDC's presence in rapidly developing regions growth worldwide.*

2) Cost savings, derived from the efficiencies generated by the business combination, with an expected return of 2,000 (two thousand) millions of USD.

3) It will increase its international presence and expand its content and distribution of its direct-to-consumer offerings, which include, among others:

    • "ESPN+" for sports fans, and

    • An on-demand video streaming service that will launch in end of 2019 and will feature TWDC films as of 21 CF, along with a lot of original content exclusive and catalogs.

### 4.6. Regulatory Criteria for Evaluating the Operation

Article 63 of the LFCE establishes that the following elements will be considered to determine whether a concentration should not be authorized:

"(. . .)



I.    **The relevant market,** *in the terms prescribed in this Law;*

11.    *The identification of the* **main economic agents** *that supply the market in question, the analysis of their power in the relevant market, in accordance with this Law, the degree of concentration in said market;*

111.    **The effects of the concentration in the relevant market** *with respect* to *other competitors and demanders of the good* or *service,* **as well as in other markets/ and related** *economic agents ;*

IV.-    **The participation** *of those involved in the concentration* **in other agents economic** *and the participation of other economic agents in those involved e;:;- the concentration,* **provided that** *said economic agents* **participate directly** *or* **indirectly in the relevant market or in related markets.**

1 *When it is not possible to identify such participation, this circumstance must be fully justified;* "

(Emphasis added) *(. .. ).*

In correlation with section 111 of article 63 of the LFCE, article 64 of the same regulation establishes that the following will be considered as indications that a concentration is illicit : *"(, . .)*

I.    *Confers* or *may confer on the merging party, acquiring party* or *Economic Agent resulting from the concentration,* **substantial power** *in the terms of this Law,* or *increases* or *may increase said substantial power, thereby hindering, diminishing, damaging* or *impeding free competition and economic competition;*

11.    *Has* or *may have the object* or *effect* **of establishing barriers to entry,** *prevent third parties from accessing the relevant market, related markets* or *c r essential inputs,* or *deglaze other Economic Agents,* or

III.    *Has the purpose* or *effect of substantially facilitating the participants in said concentration in the exercise of... conduct prohibited by this Law, and particularly,* **monopolistic practices."** *(Emphasis added)*

Administering both provisions, the analysis of the effects of the Operation must identify whether any of these assumptions are met. --

The following sections present the analysis of these elements, in order to identify the effects that the Operation may generate in the process of economic competition and free competition in the relevant markets and related,

# FIFTH. ANALYSIS OF THE OPERATION IN ECONOMIC COMPETITION MATTERS

**Identification of economic interest group (GIE) 5.1 .**

Two GIE would participate in the Operation:

**A. The** GIE controlled by TWDC (TWDC Group or Disney Group), and

**B, The** GIE controlled by 21 CF (21 CF Group or Fox Group).

The identification of the economic interest groups and related economic agents, in the present analysis of the Operation is carried out in a manner consistent with the provisions of the LFCE and previous decisions of the judiciary.27

---

27 The following serve as a reference: 1.

Court of the First Chamber of the Supreme Court of Justice of the Nation (SCJN), when resolving the Questions about the constitutionality of Article 3 of the repealed Federal Competition Law Economic published in the Official Gazette of the Federation on December 24, 1992, formulated in the protection in the protections in revision 169/2007, 172/2007, 174/2007, 418/2007 and 168/2007.

2. PROCEDURE FOR INVESTIGATING MONOPOLY PRACTICES. WHEN THE CONDUCTS ATTRIBUTED TO A COMPANY WERE DEPLOYED BY THE ECONOMIC INTEREST GROUP TO WHICH IT BELONGS, THE FEDERAL COMPETITION COMMISSION MUST BIND BOTH THE INVESTIGATED AGENT AND THE

VERTICAL INTEGRATION OF THE OPERATION OF THE AFOREMENTIONED GROUP. Jurisprudence Thesis by reiteration 1.4º .ÿ. J/67, with registration number 168587, issued by the Fourth Collegiate Court of the First Circuit, located in the Judicial Weekly of the Federation, 9th Period, Volume XXVIII, page 2,286, October 2008. Available at: http://slf.scjn.gob.mx/sjfsist/CF(xS70ZEAywGYwKxrXGWhR8zOvlhDpFBLSKcCv9rmCPPUweBeaJ2-Ff1M8ekZ3pJlp l rrqg9H9TEoM2HLlpMWIB7C9Uumkpdnb42p 1 R9xal54-fUA D4s 1 Xp6mKjOGIWh 1 xeKNuAWdb7YHKcHJFoMgUOKpZSmBl451 Fl E-kJ8L3ol l ))/paglnas/DetailGeneralV2.aspx?Class=Detail TeslsBL&ID= 168587 &Weekly=O=

3. ECONOMIC AGENTS. THEIR CONCEPT (HISTORICAL THESIS)), Registry No. 008260. 280 (H). Collegiate Courts Circuit. Ninth Period. Appendix 1917-September 2011. Volume IV. Administrative Part Three - Historical / Second Section - TCC, page 163 l. Available at: http://ius.scjn.gob.mx/SJFSist /Documentos/Tesis/ l 008/ 1008260.pdf.

4. FEDERAL TELECOMMUNICATIONS INSTITUTE. IT MAY DECLARE EITHER AN AGENT OR AN AGENT AS PREPONDERANT. ECONOMIC'. AS AN ECONOMIC INTEREST GROUP. Isolated Thesis l.lo.AE57 A (lOa.), Registration No. 2009320. Available in: http://sjf.scjn.gob.mx/SJFSem/Paglnas/DetalleGenera1V2.aspx?ID=2009320&Clase=DetalleSemanarioBL.

5. ECONOMIC INTEREST GROUP. ITS CONCEPT AND ELEMENTS THAT COMPOSE IT IN MATTERS OF ECONOMIC COMPETITION. Jurisprudence thesis by reiteration 1.4º .A. J/66, with registration number 168470, issued by the Fourth Collegiate Court of the First Circuit, available in the Judicial Weekly of the Federation, 9th Era, Volume XXVIII, page 1,244, November 2008.

6. Jurisprudence Thesis 1.40.A. J/70, with registration number 168410, issued by the Fourth Collegiate Court of the First Cjr:cult, located in the Judicial Weekly of the Federation, 9th Era, Volume XXVIII, page 1,271, November 2008.

7. ECONOMIC COMPETENCE. IT IS UP TO THE SANCTIONED COMPANY TO DEMONSTRATE THAT IT IS NOT PART OF THE ECONOMIC INTEREST GROUP TO WHICH THE INSTRUMENTATION AND COORDINATION OF CONDUCTS CONSIDERED MONOPOLY PRACTICES. Jurisprudence Thesis l.4o.A,J/69, with number Registration number 168497, issued by the Fourth Collegiate Court of the First Circuit, available in the Weekly Judicial of the Federation, 9th Era, Volume XXVIII, page 1,227, November 2008. Available at: http://sjf.scjn.gob.mx/slfslst/Paginas/DetalleGeneralV2.aspx?Epoca= l e3e 1 OOOOOOOOO&Appendice= l 00000000 OOOO&Expression=GROUP0%2520OF%2520INTER%25c3%2589S%2520ECON%25c3%2593MICO&DomInio-Heading&T A TJ=2&0rden= 1 &Class=Detail TeslsBL&NumTE=5&Epp=20&From=-l OO&To=-1 OO&Index=O&ID= l 68470&Hit=2&IDs= 168497, 168470, l 68496 168494, 168587 &type fosis=&Weekly=O&table=



INSTLFUTÓ HDI R/\L IJI:
TEU:C:OIVIIJN\ICI\CION\ES

In J:ÿl Annex I part   Detailed information about the people who make up the company is presented of each Group.

### 5.1.1. IWDC Group

In this Resolution, the TWDC Group is referred to as the economic interest group headed by TWDC, which includes a group of companies, which are part of

Internationally, they participate in various businesses related to the provision and licensing of **Audiovisual Content,** a term used in this Resolution to refer to programming channels, channel packages and audiovisual programs, including films and series. This GIE is a

agent

economic in terms of article 3, section 1, of the LFCE.

In Mexico, the TWDC Group has controlling interests in various companies, including: • The Walt Disney Company (Mexico), S. cte RL de

CV **(Disney Mexico)**

• WDC Mexico, S. de RL de CV **(WpC Mexico);**

• Walt Disney Studios Sony Pictures Releasing de .México, S. de RL de CV ; **(WDSSPR);**

• Mobilis Produeions, S. de ÿL. of CV **(Furniture);**

• ESPN Mexico, SA de CV **(ESPN Mexico)28 ,** and

• ESPN International México, SA de CV **(ESPN Internatlonal).29**

In addition, TWDC indirectly participates in the share capital of the following legal entities:

i) Disney Enterprises Inc. **(Disney Enterprises),** is a subsidiary **(iii)** owned by TWDC;

ii) Buena Vista International Inc. **(BVI).** Disney Enterprises owns the (iii) of the share capital of BVI;

iii) ESPN Inc. **(ESPN).** ESPN Holding Company **(ESPN Holding)** owns 80% of the company. (eighty percent) of the share capital of ESPN30                    In turn, TWDC is the owner - from 100% (one hundred p9)r cent) of the share capital of ESPN Holding;

---

28 According to the Notification Letter, through ESPN Mexico, Grupo IWDC offers the sports channels of the "ESPN" network in Mexico.

29 It is understood that the identification of the TWDf Group in this Resolution does not prejudge the dimension and members of such Economic Agent in other decisions or resolutions issued by the Institute.
30 The remaining share capital of ESPN is held by Hearst Brazil Inc., a subsidiary (iii) property the Hearst Corporation. \

iv) Disney Music Group, ndmbre comercial de Hollywood Records, Inc. **(Hollywood Rycords).** Disney Enterprises owns the ▇▇(iii)▇▇ of capital Hollywood Records social media;

v) **AETN.** TWDC indirectly owns 50% (fifty percent) of the AETN's s cigl capital.31 This stake gives TWDC the right to \designate ▇(vi)▇ ers wh ▇(we)▇ the board of AETN administration.

AETN owns the channels A&E, History, H2 and Lifetime (jointly **A&E Channels).** ',,

In Figure 3 below, RWPC subsidiaries with activities are identified, directly or indirectly, in the Mexican Republic.

---

The remaining share capital of AETN is indirectly held **by Hearst Corporation.**

Machine Translated by Google

## Figure 3. Corporate Diagram of Grupo IWDC (includes companies with activities, directly or indirectly, in Mexico)



Source: Prepared by the authors with information provided by the Parties.
Note: Blue outline boxes identify companies that are not part of the transaction.

### 5.1 .2. Relationship between TWDC Group and AETN

**Statements by the Parties**

The Parties state that (i) the A&E Channels are distributed in Mexico by HBO LAG, a member of the economic interest group of which Time Warner Inc. (Time Warner Group or Time Warner) is a part; (ii) in the "RESOLUTION BY WHICH THE PLENARY OF THE FEDERAL TELECOM INSTITUTE AUTHORIZES THE CONCENTRATION FILED UNDER FILE NO. UCE/CNC-004-2016, NOTIFIED BY AT&T INC., WEST MERGER SUB INC. AND TIME WARNER INC. SUBJECT TO COMPLIANCE WITH CONDITIONS" (AT&T/TW Resolution) the Institute accounted for such channels to Time Warner when analyzing said concentration, and (iii) the

The conditions analyzed by this Institute in this resolution have not been modified, so the A&E Channels should not be taken into account when analyzing the present Operation.

A&E Ole Services states that A&E Ole Networks, LLC (AEON) is responsible

(we)

It also points out that HBO LAG is responsible

(we)

The Parties declare that

(we)

*"In this sense,* the influence that *TWDC executives1* have on the ordinary course of business *of AETN is limited.* [34] Also, AETN receives a licensing fee from regional level for the use of A&E Channels content throughout Latin America.

The Parties specify that TWDC "(...) does not intervene, directly or indirectly through AETN, in the provision and licensing of AETN channels and/or programs that are distributed by HBO LAG to pay television distributors." Likewise, TWDC does not participate, at all, in the licensing activities carried out by AEON, nor in the distribution activities carried out by HBO LAG of the Channels.

---

32 Information provided by A&E Ole SeNicios in the Written Response to A&E Request.
33 Information provided by A&E Ole SeNicios in the Response to A&E Request.
34 Information provided by the Parties in the Sixth Scope to the Additional Information Release Document.





INSTITLJfO Fi=DiJML m,
IEI.ECOIVII Jl\IICACIOMf:f,

A&E, A&E Ole Services also states that ▓▓▓▓ (we)
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

### Elements contained in the File

In this regard, in accordance with article 63, sections 111 and IV, of the LFCE, the following elements exist: [36]

a) TWDC, has an indirect shareholding of 50% (fifty percent).

percent) in the share capital of AETN.[37] This stake gives TWDC the

– have the right to appoi▓▓ (vi) (v ▓▓ of ▓▓▓▓ members who make up the council AETN's management.[38] AETN is the owner of the **A&E Channels.**

b) Through "(,, .) its representation on the AETN Council, TWDC has

certain veto rights over some AETN decisions, since the

A quorum for making certain decisions requires the presence of

at least one member of the Council appointed by each party, i.e.

TWDC and Hearst. As a result, TWDC has the ability to "veto" certain

AETN shares, including AETN's acquisition of

▓▓▓▓▓▓▓▓▓▓ (we) ▓▓▓▓▓▓▓▓▓▓

c) The appointment of the President and the Chief Financial Officer of AETN requires;

the unanimous consent of the AETN board of directors, while

that the rest of the members of the management team are appointed

directly by the President.[40] d) AETN is

the owner of America, LLC. ▓▓ (iii) ▓▓ ) of the social capital of A&é Latin

**(AELA).** ! ÿ

e) AE[f, has a stake of ) in the ▓▓ (we) ▓▓
AEON 's share capital . AELA's stake in AEON gives it the
right to appoint members of th▓ (we) ▓▓ (we) ▓▓
AEON's board of directors. **A&E Channels are operated in
Latin America through AEON.**

---

35 Information provided by A&E Ole Servicios in the Response to A&E Request.
3 6 Information provided by the Parties in the Notification Letter and in Annex 5 of the same letter, the Letter of Additional Information Release, the A&E Request Response Letter and the AETN Letters.
The remaining share capital of AETN is indirectly held by **Hearst Corporation.**
38 These directors only participate in matters that require the approval of the board of directors, such as such as: (i) hiring, firing and compensation of key executives, (ii) approval of the annual operating plan, (iii) acquisition of programming (greater than 5 million dollars) and marketing strategies, (iv) initiatives strategic material, and (v) material decisions regarding the format or nature of the services of programming operated by AETN.
39 Information provided by the Parties in the Sixth Scope to the Additional Information Release Document.
40 Information provided by the Parties in the Sixth Scope of the Additional Information Release Document.

Machine Translated by Google

(iii) ███████████████ d/ ÿl remaining share capital of AEON, it is held by Olé
Channels, LLC                                                                    Be
Communications, Inc.        (iii)

respectively, which, according to the information provided by the Parties, are third-party economic agents
indirectly controlled by C.                                                     (i)

███ that do not belong to or are linked to the TWDC Group.

f)" The individuals who make up the board of directors of AEON, as well as the positions they hold in
AETN, are identified in the following Table 4: Three individuals hold management positions in
AEON and also in AETN

### Table 4. Cross-management at AEON and AETN



| Agentes ... decisión ... su nombramiento | Persona física / Fecha de nombramiento | Cargo en AETN / Fecha de nombramiento |
|---|---|---|
| | (i) | (i) |
| Directors of AEON appointed by OKAY | (i) ██████████████ | |
| AEON of Directors by Appointed Ole Communications Inc. and Be ChannJls, LLC | ██████████████ | |

Source: Prepared by the author with information from the A&E Request Response Letter and the AETN Letter in
Response to A&E Request,



INSTIIIJTO FED[IU\L Dro
H:U:COMUN!ICACI(I\I'S

g) AEON through its subsidiaries A&E Ole México LLC and MÿS Latln Amerlca LLC, [41]    Controls A&E Networks Publicidad México, S. de RL in Mexico CV **(AB<E Networks Publicidad México)** and A&E Ole Servicios, S. de RL de CV **(A&E** Ole **Services);**

h) AETN and jointly with AELA, AEON, A&E Ole México LLC, MMS Latln Amerlca LLC, A&E Networks Publicidad México and A&E Ole Servicios, are They were called **A&E Societies.** The most relevant entities that The A&E Societies are identified in the following Figure 4. [42]    · and_

**Figure 4. Control structure of the A&E Societies**

Source: Prepared by the authors with information provided by the Parties.

---

41 Subsidiarl     (iii)            property of AEON.

42 In the entity         The A&E Companies' position in this Resolution does not prejudge the dimension and members of such Economic Agent in other decisions or resolutions issued by the Institute.

ii) The A&E Channels,1 owned by AETN, in Latin America are operated by AEON which has an agreement with HBO Latin America Group **(HBO LAG)**

for the exclusive distribution of these channels. The current validity of the last signed contract ended and

and, according to what ~~e̶ÿp̶u̶e̶~~ ████████████████████████

years more, until the ████ (vii) ████████████████

j) On the other hand, the distribution contract between AEON and HBO LAG,

Regarding A&E Cards, it does not limit AEON to make decisions about the A&E Channels. For example, AEON: subject to existing agreements with the STAR operators ████ (vii) ████████████████████████

k) Likewise, there is ████ (vii) ████████████████████

1) In case of accepting that the distribution of the A&E Channels is separate (functionally) of TWDC, AETN and AEON, it is observed that the ownership of These channels remain with AETN. In that case, at any time, after the Operation and the completion of the distribution agreement that AEON has a LAG with HBO, AETN could recover the distribution of the Canale.s A&E and the effects on competition of the Concentration Operation that will be observed later would materialize.

m) The structure through which AETN's channels operate in Europe has a distribution similar to that observed in Mexico. In some cases, AETN, indirectly through one of its 100% (one hundred percent) subsidiaries, distributes its channels to STAR providers, while in other cases, *joint ventures* between AETN and third parties carry out said distribution (it does not operate through a distributor like HBO LAG in Europe).46

n) The European Commission, when deciding on the transaction notified in that jurisdiction, determined that while AETN has an independent J:liaria operation 1b TWDO, TWDC has veto rights over activities that may limit their ability to compete.47

---

43 According to the information provided by the Parties in the Notification Letter and the Sixth Scope to Additional Information Release Document, the original agreement was signed on ████████████████████ It is renewable for consecutive periods of 5 (vii) years, unless either party chooses not to do so, prior to any renewal period.
44 Information provided by All<E Ole SeNicios in Annex 2 of the A&E Request Response, 45 Information provided by AETN in the AETN Writings. ,u, Information provided by the Parties in Scope Six to
the Additional Information Release. i 4 7 Information provided by the Parties in Scope Six to the Additional Information Release.

Machine Translated by Google



FIDEIML DI INSTITUTE:

H:Uf<WIIJNICACION['S

**Conclusions -Cars A&E are considered part of the TWDC Group**

Based on the above elements, this authority concludes that TWDC has the ability to exercise joint control over AETN, the owner of the A&E Channels.

In turn, AETN has joint control of tEON. In each case, joint control
It grants them the right to appoint half of the members of the board of directors of said

companies.

Consequently, the A&E Channels, owned by AETN—which in Latin America are operated by AEON and distributed by HBO LAG—are considered part of the TWDC Group for the purposes of assessing the Transaction's effects on the national territory.

### 5.1 .3.1 Group 21 CF

21 CF is a US company that owns/controls a group of subsidiaries known as Grupo 21 CF, which participate internationally in various businesses related to the provision and licensing of **audiovisual content.** This GIE is an economic agent within the meaning of Article 3, Section I, of the LFCE.

In Mexico, 21 CF has controlling interest in various companies, including but not limited to the following :

- D2C international, S. de RL de CV **(D2C Internatlonal);49**
- Estudios Teleméxico, S. de RL de CV **(Estudios TeleméxIco) /•** Fox
International Channels México, S. de R.ÿ de CV **(Fox International Channels Mexico);**
- Fox International Productions México, S. de R.L. de C.V. **(Fox International ProductIons México);**
- Twentieth Century Fox Film de México, S. de R.L. deÿ V. **(20CF FIlr(l);**
- Twentieth Century Fox Home Entértainment México, S. de R.L. de C.V. **(20CF Home Entertalnment);**
- Twenty-First Century Fox México, si.A de C.V. **(Twenty-FIrst Century Fox Mexico);**

In addition, 21 CF indirectly participates in the share capital of the following companies, through which it offers, among others, services related to the provision and licensing of Audiovisual Content:

i) Fox Networks Group International **(FNG),** is the name            what does it refer to international business operated by Fox International Channels (US), Inc., and Fox International LLC., indirect subsidiary companies 1

(iii)

---

48 It is understood that the identification of Group 21CF in this Resolution does not prejudge the dimension and Members of such Economic Agent in other decisions or resolutions issued by the Institute.

4 9 According to the information provided by the Parties, this company currently does not carry out activities in Mexico.



owned by 21 CF. According to information in the Notice of Notice, !FNG owns and operates the sports content channel chains

called "Fox Sports" in Latin America.

ii) Endemol Shine International Ltd., Endemol Shine IP BV, y Endemol USA

Holdings Inc. (collectively, **Endemol Companies),** subsidiary companies

indirectly ow█ █(iii) █████████.ÿ., a joint venture

venture between 2 F and Apolló50•

iij) Fox International Channels México, S. de RL de CV (FIC), indirect subsidiary

████ ████████ Owned by 21 CF. According to information in the

Notification Letter, FIC operates the business of providing and licensing audiovisual content to STAR providers in Mexico.

iv)Fox Sports en Eÿpañol, LLC **(Fox Sports en Español),** S.L., Ltd.

hint ██████ (iii) ██████ property of 21 CF.

v) National Geographic Partners, LLC **(Natlonal Geographlc).** 21 G;F tiene

indirectly .73% (seventy three percent) of the shares of this

society. NGC Network Latin America, LLC is a subsidiary company ▇(iii)▇

(iii) ██████ property of National Geographic.

vi) Star India Private Limited **(stadndla),** indirect subsidiary company ██ (iii)██

(iii) ████ property of 21 CF.

In Figure 5 below, the subsidiaries of 21 CF with activities, directly or indirectly, in the Mexican Republic are identified.

---

50 The Parties state that they do not have information related to Apollo's shareholders, since This is a company unrelated to 21 CF.

Machine Translated by Google

ÿÿCorporate chart of 2lCF Qncluye Group indirectly, in Mexico)

to companies with activities, directly or indirectly,



Source: Prepared by the authors with information provided by the Parties.

Note: Includes only Grupo 21 CF subsidiaries that operate directly or indirectly in Mexico. Companies incorporated in Mexico are highlighted.

\* These companies have an indirect stake in these businesses.
¨  The shareholders of this company are not identified.

\*\*\* These companies are not part of Grupo 21 CF's GIE

Machine Translated by Google

### 5.2. IWDC Group Business in Mexico

**In Mexico,** Grupo TWDC carries out economic activities through **BVI, AETN,**

**ESPI'J, Hollywood Recorÿs,** Disney México, WDC Mé1 ico, WDSSPR, Mobilis, ESPN Mexico, ESPN International, A&E Networks Publicidad México and A&E Ole Servicios\

**In the telecommunications** and **broadcasting sectors,** through its subsidiaries, TWDC Group participates in the following activities:

I. Provision and licensing of audiovisual content (channels of programming, channel and program packages, which includes movies and series) to providers of restricted television and audio service **(STAR);**

2. Provision and licensing of audiovisual content (programs, which includes films) to STAR providers, for the Pay-Per-View service. Evento (PPV);51

3. Provision and licensing of audio)visual content (programs, which includes movies) to STAR providers, for video service under demand (VOD from English *Video on Demand).52* 4.

Provision and licensing of audiovisual content (programs) to channel aggregators (programmers) for the STAR;

5. Provision and licensing of audiovisual content to providers of the commercial digital broadcast television service **(STRD comercial! or TV - open trade!);**

6. Provision and licensing of audiovisual content (channels of programming, channel packages and programs, which includes movies and series) to distribution service providers to end users of audiovisual content through internet platforms ( OTT -over the top- distribution of audiovisual content);

7. Provision and licensing of audio (musical) content to providers of the distribution service to end users of content audio through internet platforms (OTT distribution of content) audio);

8. Provision and sale of time or space for commercial messages or advertising on channels for the STAR;

---

51 The Parties state that they cannot disaggregate the Information specifically for this service because it is provided in an aggregate manner for the provision and licensing of audiovisual content (programming channels, channel and program packages, including films and series) to STAR providers, and is therefore included in this service. 52 Ibid.

**ift**

INSHfUTO IIDf:Iÿ/\L IX
f[I.E(ÿOIVIIJNICA<;K>l\lI!S

9. Provision and sale of spaces for commercial messages or advertising by
Internet platforms dedicated to the provision of content
audiovisuals;

1 O. Provision and licensing of audio content for radio broadcasting stations;

11 , Licensing of intellectual property for broadcasting stations
sonora;

12. Provision of the OTT distribution service of audiovisual content, by
subscription, [53] and

13. Acquisition of rights for the transmission of sporting events in
Mexico.

**In other sectors** of the Mexican economy, Grupo TWDC is dedicated to:

• Licensing of feature films (movies) for exhibition in theaters
cinema and other exhibitions;

• Licensing for the distribution of audiovisual content for the
Home entertainment in physical and digital formats for purchase
and permanent download to physical storage devices (not
includes streaming distribution);\

• Licensing of audio content (recorded music) in physical formats
and digital for acquisition and permanent download on physical devices
storage (does not include streaming distribution);

-• Licensing of music in non-digital format, such as public performances (live entertainment,
including plays), and musical media;

• They license intellectual property rights for books and magazines in physical and digital
formats for their acquisition and distribution.                    permanent load
on physical storage devices; _ .,

• Licensing of intellectual property rights for the development of interactive media and
video games, and

• Licensing of intellectual property for consumer products;

---

[53] Potentially, this is a service in which both the TWDC Group and the 21 CF Group could overlap.
It states that it intends to offer this service through its own platform at the end of 2019, however, it has not yet defined a
specific date to do so.
Source: Press release published by TWDC, available at: https://www.thewaltdlsnevcompany.com/the-walt-
disney-company-slgns-amended-acquisitlon-agreement-to-acquire-twenty-first-centuN-fox-lnc-for-71-3-billlon-in-
cash-and-stock/.



## 5.3. Grupo 21CF's business in Mexico

**In Mexico,** Grupo 21 CF carries out economic activities through **D2C International: Estudios Teleméxlco, Fox International Channels México, Fox International Products México, 20CF Film, 20CF Home Entertainment, Twenty-First Century Fox México,** 20CF, **FNG, Sociedades Endemol, FIC** and **Star India.**

In the telecommunications and **broadcasting sectors ,** through its subsidiaries, Grupo 21 CF participates in the following activities: Provision and licensing of audiovisual

1. content (programming channels, channel and program packages, including films and series) to STAR suppliers;

2. Provision and licensing of audiovisual content (programs) to channel aggregators (programmers) for the STAR;

3. Provision and licensing of audiovisual content to providers of the STRD comercial;

4. Provision and licensing of audiovisual content (channels of programming, channel packages and programs, which includes movies and series) to **OTT** content distribution service providers audiovisuals;

5. Provision and licensing of audio (musical) content to providers of OTT distribution services for audio content;

6. Provision and sale of time or space for commercial messages or advertising on channels for the STAR;

7. Provision and sale of spaces for commercial messages or advertising by Internet platforms dedicated to 'the provision of content' audiovisuals;

8. Provision and licensing of audio content for radio stations sound broadcasting;

9. Provision of the OTT distribution service of audiovisual content, by suscnpc1on; r [54]

1 O. Production of audiovisual content (programs) for third-party providers of the commercial STRD, STAR, and the OTT audiovisual content distribution service; or for any other third parties and distributed on the STRD, STAR, and OTT platforms, and

---

[54] Group 21 CF states that    Currently, it provides OTT distribution services for audiovisual content; however, it is a service provided through third-party economic agents, MEDIAKEY, the latter being the one who offers the service to the end user.



Machine Translated by Google



11 , Acquisition of rights for the transmission of sporting events in Mexico.

**In other sectors** of the Mexican economy, Grupo 21 CF will be dedicated to:

˙\ Licensing of feature films (movies) for exhibition in movie theaters and other exhibitions:

• Licensing for the distribution of audiovisual content for the home entertainment in physical and digital formats 12_qra its acquisition and permanent download" on physical storage devices (not includes streaming distribution);

• Licensing of audio content (recorded music) in physical formats and digital for their acquisition and permanent download on physical devices storage (not including streaming distribution);

• Licensing of music in non-digital format, such as exhibitions\ public (live entertainment, including plays), and media physicists;

• Licensing of intellectual property rights for books and magazines In physical and digital formats for purchase and permanent download \ on physical storage devices;

• Licensing of intellectual property rights for the development of Interactive media and video games, and

• Licensing of intellectual property for consumer products.

**I. 5.4. Audiovisual Content**

TWDC Group and/or 21 CF Group are important suppliers of Contents. Audiovisuals.

In this regard, in previous decisions, the Institute has "determined1 that the Audiovisual Contents are:

*"(. . .). Las* associated audio and video works produced for transmission *by broadcast television stations, telecommunications networks and media in general.*

*Audiovisual Content may consist of news programs, sports, documentaries, cultural programs,*

*films, series, among others, and also in programming libraries of*

1 *access on demand or pay per view, Programming Channels, individual programmatic events or series of events",55*

*"(. . .) the term Audiovisual Content is used to make generic reference to the programs, programmed panels and packages of those channels whose use is subject to the granting of licenses or express authorization of the rights holder.* *"56*

*(.. )·*

Consistently, and for the purposes of analyzing the Operation, the following programs are considered to be **Audiovisual Content :** - programming channels and packages of these channels, the use of which is subject to the granting of licenses or express authorization of the rights holder. [57]

### 5.4.1. Use of audiovisual content transmission rights[58]

The economic agents holding the rights to Audiovisual Content determine how, when, where, and to whom they will allow their transmission or projection to maximize their profits; and they may choose to exploit such rights themselves or through third-party licensees or sublicensees.

In addition, the rights holders of the programs grant licenses to allow transmission or projection in different and subsequent media to the end user, which are called "windows". / The *VE:tntanas* constitute a temporary organization to exploit the rights of audiovisual content and form a system of general use in the value chain. In each *window,* the audiovisual content is formatted to suit the transmission or projection medium involved and *versions are created (versioning)* that allow marketing

the rights to the same content at different prices. In general, the
The sequence of the *windows* follows the order of the income that can be obtained.
Each version may or may not be provided exclusivity for one medium.

---

;::ÿÿÿ;ÿJÿl gÿÿ ÿÿÿ;ÿlÿÿÿtts ÿÿÿlÿ                    C Eÿÿ0ÿ:i1iÿEÿÿl ÿ:Gÿÿ+ÿÿgÿÿÿÿMÿgÿÿÿÿÿgÿ6EÿÿÿÿD :No
BROADCASTING SECTOR ", Available at: http://www.ift.org.mx/sites/defaultrfiles/anexo 1 medidas 2014-2017 aep radiodlfusion.pdf
56 "RESOLUTION BY WHICH THE PLENARY BOARD OF THE FEDERAL TELECOMMUNICATIONS INSTITUTE AUTHORIZES THE CONCENTRATION FILED UNDER CASE NO. UCE/CNC-004-2016, NOTIFIED BY AT&T INC., WEST MERGER SUB INC. AND TIME WARNER INC . , SUBJECT TO COMPLIANCE WITH CONDITIONS"
AT& T /TW version). Approved by the Plenary  (Resolution of August 15, 201 *i* by Agreement P /IFT /150817 /487.
Board of the Institute , publicly available at: http://apps.ift.org.mx/publicdata/VP P IFT 150817 487.pdf.
[57]  Thus, for example, this term of reference excludes audiovisual content shared on platforms like YouTube or similar , access to which is not subject to licensing conditions , and the platform also lacks editorial control over what those who create those audiovisual content present.
[58] European Commission, Directorate-General of Communlcations Networks, Content & Technology (2014) *"Analysis of the legal rules for exploitation windows and commercial practices in EU member states and of the importance practices",*
*of        exploitation        windows        for        new        business*                        avallable        at:
https://ec.europa.eu/futurium/en/system/filé's/ged/analysisofthelegalrulesforexploitationwindows.pdf

**48/305**

Machine Translated by Google



INSTITUTO I mrn/\L IX
11:UéCOMIJf\lIC/\CIC)I\JI.:S

transmission *p* pro)ection. Sequential window management allows
Maximize revenues derived from licensing rights for each
business model.

version. That is, in general, the rationality of mf
The number, type and order of windows for content distribution can be
change over time. The sequence in which rights are granted and their
\t'[gency is determined by the owner, considering several factors, which may include:

- The time in which the content can be requested--for example, the
  Sporting events have a more perishable value than movies or series;
- The income that the media and the economic agent can generate for the rights holder,
  compared to the alternatives;
- Technological developments - such as digital changes - that favor the
  open new windows and can change the relationships -of
  complementarity or substitution - with existing ones;59
- Impacts of one window on another window;
- By differentiating between versions, reduce substitution between them
  and allow several subsequent windows to have the ability to pay
  without the *demand* for the content dying out or being exhausted, and
-- • Changes in audience preferences.

In general terms, the means of projection to the end user (retail distribution) are the following:60
i) Movie theaters - for some

audiovisual content only,

ii) Pay-per-view ("PPV") services through the STAR platform,

iii) *Premium* Channels on STAR platforms,

\ iv) OTT distribution of audiovisual content, by subscription (SVOD),

v) Distribution in physical and digital formats,

vi) Exclusive STAR Channels - (Restricted Channels) basic/on platforms of the
STAR,

vii) Video on Demand (VOD) on STAR platforms, viii) VOD through

OTT distribution services, and

ix) Open channels of the commercial STRD.

---

59 Ver tdmblén European Audiovisu61 Observatory (2016), "Audiovisual sports rlghts - be1ween exclusivity and right
to Information", available at: https://rm.coe.int/l 680788a5d#page= l5&zoom= 100 0,
60 See also AT&T/TW Resolution.



)

In this way, Audiovisual Content reaches end users through retail distributors who participate in each *window* and acquire the rights for its transmission.

### 5.4.2. Transmission media involved in the Operation<

Thus, according to the information presented by the Parties, and taking into consideration previous decisions,61 the retail distributors that are identified in the activities involved in the Operation çan be classified into five groups:

A. STAR Suppliers. Includes suppliers that provide their services traditional cable, via satellite DTH (from the English "DIrect to Home") and IPIiV (from the English, "Internet Protocol Television").

B. OTT Audiovisual Content Distribution Service Providers. OTT distributors are relatively new to retail distribution.

of social content. They provide a wide variety of long-form video programming over the internet, which is received by users through various devices (computers

personal, laptops, televisions, cell phones, tablets, etc.) or download for for later viewing. Netflix, Blim and Clarovideo are examples of this category.62

C. Providers of commercial STRD or commercial broadcast television. Includes economic agents such as Televisa, Televisión Azteca and Imagen, who transmit programming channels to audiences without paying a fee. consideration, but who receive income from the transmission of advertising.

D. OTT audio content distribution service providers. Spotify, Apple Music, and Google Play Music are examples of this category.

E. Providers of commercial open sound broadcasting service (SRSAC) through radio broadcasting stations. Radio broadcasting stations Sonorq belonging to Grupo Acir and Grupo Fórmula are examples of this category.

According to the information submitted by the Parties, the economic activities with overlaps between Grupo TWDC and Grupo 21 CF, in Mexico, belong to the

---

61 AT&TffW Resolution,

62 Some STAR providers offer OTT distribution services for audiovisual content that is not require a STAR subscription. This is the case with the Dish OTT service delivered by Dish (the standalone HBO Go service).

Machine Translated by Google



INSTITUTE FIIXfML DI'
·1 HtCOIVIIJNICA< :101\lléS

value chain of Audiovisual Content that is distributed through: i) the STAR, ii) in the OTT mode, and iii) the commercial STRD.

### 5.4.3. Distribution of Audiovisual Content through the STAR

According to article 3, section LXIV, of the LFTR, the STAR is defined as the *"service telecommunications (...) of associated audio and video that is provided to subscribers, through public telecommunications networks3/ by means of a contract and the periodic payment of a pre-established amount."*

In previous decisions63 the Institute has defined that STAR signals are distributed by concession holders through their own networks of coaxial cable, copper twisted pair, optical fiber, or via satellite and, to a lesser extent, through the radioelectric spectrum64 • Services known as STAR by Cable, STAR via satellite DTH (Direct to Home), STAR IPN (Internet Protocol Television) and STAR MMDS (Microwave Multi-port Distribution Service) are delivered over these transmission media. These services are detailed below.65

### Value chain

The value chain associated with the delivery of Audiovisual Content through the STAR can be integrated by four major links:

- i) Production of Audiovisual Content (individual programs),
- ii) Aggregation of Audiovisual Content in programming channels (Aggregators or Programmers),
- iii) provision licensing of Audiovisual Content (channels of and programming, 7- annal packages and programs, which includes movies and series), and
- iv) Provision of the STAR to the end user.

**Production** ÿ /

According to the information provided by the Parties, the first link, in general, is in charge of producers who are in charge of pre-production (e.g. preparation of shots, casting and locations, etc.), production (e.g. photography, video production and filming) and post-production (e.g. editing, special effects and "\

sound;), for the creation of individual programs, \

---

63 Resolÿclón AT&Trrw.

64 Through microwaves with **Multichannel Multi-Pool** Distribution Service (MMDS) technology: which reports low levels of use in the national territory.

65 See as reference (OECD, 2013), *Competitions in Television and Broadcasting,* available at: http://www.oecd.org/daf/competitionnv-and-broadcasting2013.pdf, pages 14-15.



These contents are widely heterogeneous (differentiated) and include "'one-time events (e.g. football matches) to daily programs or Series, movies, game shows, news, *reality shows,* etc. Traditionally, this link involves independent producers or those integrated into distributors of these contents (e.g., STAR systems, broadcast television, OTT, or others). At this stage, the contents can be used in

different transmission media.

### Aggregation

According to decision-making precedents,66 in the second stage of the chain, the programmers intervene, who organize various programs, produced in-house or purchased from third parties, for their aggregation and presentation in a linear sequence (Linear Channels). In this activity, the Audiovisual Content is associated with the audiences that are intended to be attracted. Worldwide, there is generally a strong vertical integration between the creation of individual programs and their programming. _/ In this stage, the audiovisual content has already been formatted to adapt to the specificities of the specific transmission medium (e.g., identifying the spaces in the content to make advertising inserts, in the case of

STAR and Open IV).

### Provision and Licensing

For the third distribution link, STAR providers, to shape their offering, acquire licenses for audiovisual content—programming channels, channel packages, and/or programs, including films and series— from their rights holders. In this phase, the wholesale distribution of audiovisual content is generally carried out via satellite because it facilitates distribution to adapt to different geographic signal coverages, e.g., local, multi-location, national, or multinational. Occasionally, the audiovisual content licenses acquired by STAR providers also allow their subscribers to access the content of the licensed channels over the Internet through an authentication process, which requires subscribers to identify their STAR provider and provide a username and password assigned by the latter (e.g., HBO GO). This provides subscribers with ubiquitous access to the contracted audiovisual content.

### End-user services

In the fourth link, the provision and marketing of programming channel packages to end users is carried out through the different means of

---

66 AT&TffW Resolution,

Machine Translated by Google



INSfllIJTO rrnrn/\L     DE
·Ir:U"COIVIIJ\IC!',CIO\lléS

STAR transmission.--This transmission can be via coaxial cable, optical fiber and QIH. / STAR is marketed through offers of channel

packages in exchange for a periodic rent ( sometimes, it is composed of a fixed part (which is established in the contract,

and depends on the contracted signal package) and another variable part, for example, by contracting pay per view (PPV or *Pay per View* ).

The 9olncisdenclas of Grupo TWDC and Grupo 21 CF in the value chain of the delivery of audiovisual content through this medium are illustrated in Figure 6,



Figure 6. Audiovisual content delivered through the STAR

Notes:./
(l) Includes Disney Channel, Disney JR and Disney XD.
(2) Includes the A&E, Life History and H2 channels, distributed in Latin America by HBO LAG.
(3), Includes ESPN, ESPN 2, ESPN 3 and ESPN+ channels.
(4) Check out the National Geographic Klds and Baby N channels.
(5) Watch the National Geographic and Nat Geo Wild channels.
(6) Includes the Fox Sports, Fox Sports 2, i=ox Sports 3 channels, as well as a recently launched new channel by Grupo 21CF, called Fox Sports Premium.
(7) See the Fox Channel, FX and Fqx Litÿ, FXM, and Clnecanal channels
* Grupo 21CF states that it produces audiovisual content -programs- for itself and for third parties.
providers of the STRD, the STAR, and the OTT distribution service for audiovisual content. For its part, Grupo TWDC indicates that it produces audiovisual content (programs) solely for itself. Additionally,
Grupo 21CF offers News and Premium channels, where Grupo TWDC does not participate.
Source: Prepared by the authors with information provided by the Parties in the Notification Letter.

### Delivery of Audiovisual Content in the OTT Mode

In this Resolution, and taking into consideration the decision-making precedents of the Institute67, by OTT service we mean the one that allows the user to access audiovisual content through Internet platforms.68 The Content Audiovisual is generally composed of videos, films and, where applicable, television channels.

OTT services are provided through the Internet and are not considered a STAR, since the latter service, according to article 3, section LXIV, of the LFTR, consists of the *"telecommunications service of audio* or *associated audio and video **that is given to subscribers, through public telecommunications networks,** through a contract and the periodic payment of a pre-established amount.* " (Emphasis added)69

OTT distribution service providers for Audiovisual Content can offer this service in two different ways:

l) Services provided by online video distributors (" *on!ine video" distributors,* OVDs, and

2) OTT services called "multiscreen" or content access aucliovisuales por Internet (" *TV Everywhere"* o TVE).

/The characteristics of both categories are presented below.

### *Service* provided *by OVO*

Consistent with previous decision,7° for the purposes of this Resolution, an OVD is considered to be an economic agent that, when providing the service of distribution of audiovisual content, shows, among others, the following relevant characteristics:

---

6 7 Resólución AT&T/TW.

68 The term OTT, in principle, includes any implementation that uses the Internet to provide a service, for example, instant messaging. For the purposes of this document, OTT will be limited to any implementation for distributing Audiovisual Content over the Internet.

69 For further reference see: *"Agreement by which the plenary session of the Institute issues a response to the request for confirmation of criteria submitted by Alive Telecomunicaciones, S.Á. de* C.V. , *in the sense that the "restricted television service over the Internet is a public telecommunications service, in terms of article 28 of the Political Constitution of the United Mexican States and the Federal Telecommunications Law and consequently would be subject to the applicable provisions regarding retransmission, information obligations, registration of adhesion contracts and registration of public rates, among others";* available at: http://www.lft.org.mx/sites/default/files/ conocenos/pleno/sesiones/acuerdoliga/piftOl0715164.pdf; and

*"Agreement-by which the Institute's plenary issues a response to the request for confirmation of criteria    cÿ presented by Maxcom Telecomunicaciones, SAB de CV; and Maxcom TV, SA de CV";* available at: http://www.ift.org.mx/sites/ default/files/conocenos/pleno/sesiones/acuerdoliga/piftO 10715165. pdf 70 AT&T/TW Resolution.



INSTITUTO FI:lmML IX
If'l.f:COIVIIII\ICACIONI,S

a)    The distribution of audiovisual content to the users of your site is carried out through the Internet;71 not through a managed network,

b)    That service is not part of a subscription to a STAR or other video content distribution service, and

c)    The distribution is not exclusive to customers of a particular Internet access service provider that is owned or operated by the DVO or its affiliates.

The service provided by an OVD is offered primarily based on the following: business models:

- Subscription: End users of the service can access a wide range of services variety of programmatic content for the payment of an annual fee or monthly.72

- Electronic Selling (ESL): the OVD sells to the consumer a digital copy of specific content for a single payment, so that it can be downloaded and stored on a physical device or remote video, to be subsequently viewed by the consumer as many times as you wish.

- Rent: the OVD charges the user a fee so that he can access the content you choose for a limited period.7 3

- Supported by advertising: in this model the OVD do not charge directly to consumers, but they include advertising within the content offered (YouTube).

**The OTT audiovisual content distribution providers analyzed in this Resolution are those that offer their services on a subscription basis. These providers are referred to as OTT audiovisual content distribution service providers (SLPs) or OTT content distri audiovisuals.**

---

71 In article 3, section XXXII, of the LFTR, the Internet is defined as:
*"[The] decentralized set of telecommunications networks throughout the world, interconnected with each other,* that *provide a variety of communication services and that use internationally coordinated protocols and addressing for the routing and processing of data packets for each of the services. These protocols and addressing ensure that the physical networks* that *together comprise the Internet operate as a single logical network.*

7 2 Nettlix: A personalized **subscription** service that allows end users to access Netflix movies and shows streamed over the Internet to certain Netflix and other Internet-connected devices. Source: Public information available at httos://helo.nettlix.com/legal/termsofuse.

73    Clnépolis Klic: online **rental** service via access or streaming of an audiovisual work available in a compatible device, in exchange for payment of the corresponding price. This service allows the user to: the content, from the moment immediately after the payment of rent and up to 30 calendar days after, counted from the date and time of payment, but once playback has started, you will only have 48 hours afterward to view it as many times as you wish. Source: Public information available at httos://www.clnepollsklic.com/terminós-decuso

Internet service provider management and broadband service pricing may affect online video programming distributors. In particular, providers of the QTT audiovisual content distribution service could be competitively harmed if Internet service providers (ISPs) delay or affect the delivery of audiovisual content that transits through their networks.

through their networks.

Based on the information submitted by the Parties, Figure 7 illustrates the participation of TWDC Group and CF Group 21 in the delivery value chain.
\ of audiovisual content in OTT mode.

**Figure ?. Value chain of content delivered by OVD**



Notes:

(1) The IWDC Group states that it intends to provide this service through its platform by the end of the year 2019, however it has not yet defined a precise date to do so74 (2) Grupo 21 CF states that it currently provides the OTT distribution service of audiovisual content, without

However, it is a service provided through third-party economic agents, MEDIAKEY, the latter being the one who offers the service to the end user. / Source: Prepared by the authors with information provided by the Parties in the Notification Letter.

## LVE Services

The rights to provide LVEs services are acquired by STAR providers as a complement or feature of the licenses they obtain for the programming channels, channel packages and/or programs they offer to STAR end users.

---

74 See press release published by IWDC, available at: https://www.thewaltdisneycompany.com/the-walt-disney-com6any-signs-amended-acquisition-agreement-to-acqulre-twenty-first-century-fox-inc-for-71-3-billion-in-cash-and-stock/. 1



INSTITUTO FfDI'lU\L IJL'
'If:1.1:COIVIIJ\IIC/\CION\f,\ /

NE services are provided by STA providers who seek to expand the availability of some of their audiovisual content to their end users.

through the Internet, keeping similarities with OVD services.

A STAR provider that provides NE services to its subscribers allows them access to audiovisual content through the Internet through an authentication process, which requires subscribers to identify their

STAR provider and provide a user and last.75            6Password assigned by this

### Distribution of Audiovisual Content through the commercial STRD

In accordance with the previous definitions of the Institute,76 the STRD is defined as the *"(.,.) Public service of*

*general interest that is provided through the propagation of electromagnetic waves of digital audio and video signals associated, making use, exploitation and* use of Transmission Channels, with which the population can receive *the*

*transmitter's signals directly and* free of charge.

*the appropriate devices for this purpose." using*

In terms of loanterlor, the following characteristics are mainly identified in the provision of commercial STRD: • It consists of

associated audio and video signals;

• Signals are transmitted through Transmission Channels 9e spectrum radioelectric;

• \ End users receive the signals directly and free of charge, using the appropriate devices for this purpose, and

• Dealers obtain income from the provision and sale of time or spaces for commercial messages or advertising.

_____

75 izzi offers access to its platform "Izzl go" and "izzi klds", exclusive services for users subscribed to the video services called "Izzitv XP" "izzitv SP", "PackN 2.0", "PackN 3.0" or any other product with access to the izzi applications contracted by the subscriber, who are up to date with their payments and who authenticate themselves using a username and password, obtained after registering on the izzl website.
Source: Izzi Residential Legal Terms and Conditions. Available at: https://www.izzi.mx/legales/terminos-condiciones-Izzl

76 See resolution agreements corresponding to files UCE/OLC-002-2014 to UCE/OLC-009-2014.
Public versions available at: http://
apps.ift.org.mx/publicdata/P_IFT_EXT_131114_217_Version_Publica.pdf http://
apps.ift.org.mx/pubiicdata/P_IFT_EXT_131114_218_Verslon_Publlca.pdf http://
apps.ift.org.mx/publicdata/P_IFT_EXT_131114_219_Verslon_Publica.pdf http://
apps.lft.org.mx/publicdata/P_IFT_EXT_131114_220_Verslon_Publica.pdf http://
apps.ift.org.mx/publicdata/P_IFT_EXT_131114_221_Verslon_Publlca.pdf http://
apps.lft.org.mx/publlcdata/P_IFT_EXT_131114_222_Verslon_Publlca.pdf http://
apps.ift.org.rhx/publicdata/P_IFT_EXT_131114_223_Version-Publica.pdf http://
apps.ift.org.mx/publicdata/P_IFT_EXT_131114_224_Version_Publica.pdf

Machine Translated by Google

The commercial STRD is considered a two-sided market ,77 since two distinct groups of users are identified, television viewers and advertisers, who interact through a platform, the television signals. Through this platform, the value that the group of advertisers derives from one side of the platform increases with the number of television viewers on the other side of the platform (i.e., audience levels); with a greater number of television viewers, advertisers are able to transmit advertising information to a greater number of potential buyers. Likewise, television viewers who choose a television signal benefit from the programming designed and transmitted free of charge by the commercial STRD provider, which is financed by the provision and sale of time or spaces for commercial messages or advertising.

l0s advertisers.

Commercial RDTS providers comprise two groups of consumers: television viewers and advertisers. While commercial RDTS providers derive revenue only from the advertisers, the value of the time or space for commercial messages or advertising on their television signals depends on the number of viewers who receive such commercial messages or advertising and who constitute the advertisers' potential buyers.

In terms of the above, the provision of the commercial STRD aims to main objective is to generate audiences through the transmission of audiovisual content and market time or space for commercial messages or advertising /advertisers. In this way, the larger the audience, the more unclonte will be willing to pay more for the transmission of your commercial message or advertising, because this message could reach a greater number of potential consumers of your product or service.

Taking into consideration the decision-making precedents of the Institute,78 the chain of The value of the STRD provision is made up of the following activities:

**Production or acquisition of audiovisual content.** They are produced and/or acquired audiovisual content (i.e. programs); each content .audiovisual constitutes

---

77 A two-sided market is one in which the following characteristics are observed:
   a) pos distinct groups of consumers or users (who need each other) Interact through from a platform;
   b) The platform (Intermediates transactions between both types of users) provides goods or services to both groups;
   c) The decisions or actions of one group affect the results of the other group, usually through an externality (the value of the platform for a user on one side increases as the number of users on the other side increases), and
   / d) The price level and structure is the mechanism to induce both groups of consumers or users to join and adopt the platform (setting a higher price on one side of the market and reducing it on the other side can affect the volume of transactions).
Source: See resolution agreements corresponding to files UCE/OLC-002-2014 to UCE/OLC-009-2014.
7 8 See resolution agreements corresponding to files UCE/OLC-002-2014 to UCE/OLC-009-2014.

Machine Translated by Google



INSTITIHO [TDEIV\L IX
mEC( >MIJNICACIOI\11:!,

\ a set of moving images, with or without sound. Each audiovisual content, based on the information it

contains, 1 can be grouped into different television genres, including: soap operas, unitary dramas, game shows,

series, sports, pp. 1 1icles, comics, news and cartoons, among others.

Commercialization of time or space for commercial messages or advertising.

Television advertising consists of information or messages intended to promote goods or services to viewers.

Advertisers acquire the service of providing and selling time or space for commercial messages or advertising on television channels in exchange for payment.

The willingness to pay for a television advertisement depends on the impact that the television signal has on the group of viewers to whom each advertiser intends to expose their advertising information.

Aggregation (programming) of television signals. They integrate various contents.

audiovisuals (programs), together with the Jublicitary Insertions, which are ordered *to be* presented to the in time and the sequence in which the signal is transmitted is        audiences

defined during the period for each day of transmission.

Aggregation (programming) consists of associating audiovisual content with the intended audiences. These audiences, in turn, constitute the target group for advertisers, since the latter pay for advertising insertion to promote their products and services to these audiences. Thus, programming generates a correspondence between two groups of users.

television signals through the audiovisual content they present: audiences and advertisers.

Transmission of television signals. Once the contents have been integrated

audiovisual (programs), a transmission medium is required to broadcast them to end users (television viewers or audiences).

Commercial Open N signals use transmission media made up of licensed radio spectrum, infrastructure, platforms, networks and
others.

The transmission medium to provide the commercial STRD is the radio spectrum (Transmission Channels),

the channel allows that once the television signals are broadcast, the population can receive them and access their content directly and free of charge, using the appropriate devices for

it.        1

Machine Translated by Google

*Authorizations to provide the STRD*

In terms of the current legal framework, economic agents require express authorization from the Institute to provide the STRD. In this regard, the

Article 28, seventeenth paragraph of the CPEUM, establishes that the Institute is responsible for granting, revoking, as well as authorizing transfers or changes in share control, ownership or operation of companies related to concessions in the field of broadcasting and telecommunications.

Article 28, paragraph eighteen of the CPEUM, establishes that concessions for commercial use radio spectrum will be granted by tender.

public, in order to ensure maximum attendance, preventing concentration phenomena contrary to the public interest and ensuring the lowest price of services to the end user. In the case of

p onceÿons of public and social use, these They will be non-profit and will be awarded under the direct allocation mechanism.

Article 76 of the LFTR establishes, among others, the following: i) concessions for commercial use confer the right to provide broadcasting services for -

for profit; ii) with regard to concessions for public use, these may not be used to operate or provide broadcasting services for profit (aimed at, among others, States and higher education institutions of a public nature), and iii) concessions for social use grant the right to provide broadcasting services for cultural, scientific, educational or community purposes, without profit.

Thus, STRD providers in Mexico can be classified into two categories:

- Commercial STRD. They operate under concessions and are authorized to market advertising space; and

- STRD pública o social. Operan al amparo de concesio'ñes y no tienÿn fines for profit.

In this sense, the Public or Social STRD does not represent for users - television viewers and bnuAciantes - an alternative to those of the Commercial STRD. For the present analysis, It is considered that the Commercial STRD does not have as substitutes the Public or Social STRD (i.e. non-Commercial).



INSIITIHO rIDflU\I l)f:
less:l[COIVlÿlCACIOl\11:S

**Relationship with the STAR**

In Mexico, through *must-carry-must-offer* rules and contracts or agreements, various commercial and non-commercial STRD channels are retransmitted on STAR.

Commercial STRD Channels subject to the right to free access provided for in the *must carry-must offer* rules are retransmitted on the STAR free of charge and in full (i.e. including advertising content), such that the holders of their rights can assess the advertising insertions considering the audiences attributable to the *windows* corresponding to the STRD and the retransmission of those same channels or versions of those channels (e.g. Deferred or with changes in their programming) on the STAR.

**5.5. Economic coincidences of Grupo IWDC and Grupo 21 CF**

**5.5. I    Identification of economic activities**

In Mexico, Grupo TWDC and Grupo 21 CF participate directly and indirectly in the provision of the services indicated in Table 5.

**Table of Services provided by TWDC Group and Group 21 CF**

| Serv1c1os | Group IWDG | Group 21 CF |
|---|---|---|
| **Belonging to the telecommunications and broadcasting** sectors | | |
| I. Provision and licensing of audiovisual content (programming channels, channel packages and programs, including films and series) to STAR suppliers. Provision and licensing of audiovisual content (programs) to | Yeah | Yeah |
| 11. STAR channel broadcasters (promoters). | Yeah | Yeah |
| iii. Provision and licensing of audiovisual content to suppliers STRD comercial. | Yeah | Yeah |
| iv. Provision and licensing of audiovisual content (programming channels, channel and program packages, including films and series) to providers of OTT content distribution services audiovisuals. ᵇ | Yeah | Yeah |
| v. Provision and licensing of audio (musical) content to providers of OTT audio content distribution services. | Yeah | Yeah |
| vi. Provision and sale of time or space for commercial messages or / Yes advertising on channels for the STAR. | | Yeah |
| vile. Provision and sale of spaces for commercial messages or advertising; by Internet platforms dedicated to the provision of content audiovisuals. | Yeah | Yeah |
| viii. Provision and licensing of audio content for radio stations sound broadcasting. | Yeah | Yeah |
| Ix. Intellectual property rights for broadcasting stations sonora. | Yeah | No |

---

79 In accordance with the provisions of Article Eighth, Section 1, of the Constitutional Reform Decree, which corresponds to the provisions of Articles 164 to 169 of the Federal Telecommunications and Broadcasting Law (LFTR).



| Services | Group ÿ TWDG | Group 21GE |
|---|---|---|
| i<. Provision of the OTT distribution service for audiovisual content, by subscription (Group 21GF: *Fox Premium).C* Production of audiovisual content | Yeah | Yeah |
| xi. -programs- for third-party providers of the STRD, the STAR and the OTT distribution service of audiovisual content; or for any other third parties and that yes distributed on STRD, STAR and OTT platforms. | No | Yeah |
| xli. Acquisition of rights to broadcast sporting events in Mexico. | Yeah 'and | Yeah |
| Not belonging to the telecommunications and broadcasting sectors | | |
| xiii. Licensing of feature films (movies) for exhibition in theaters cinema and other exhibitions.; | sr | Yeah |
| 1 xlv. Licensing for the distribution of audiovisual content for example, home entertainment in physical and digital formats for acquisition and permanent download on physical storage devices (does not include distribution by streaming). | Yeah | Yeah |
| XV, Licensing of audio content (recorded music) in physical and digital formats for acquisition and permanent download on physical storage devices (does not include streaming distribution). | Yeah | Yeah |
| xvi. Licensing of music in **non-** digital format, such as exhibitions public (live entertainment, including plays), and physical media. ÿ | Yeah | Yeah |
| >Nil. Licensing of intellectual property rights for books and magazines in physical and digital formats for acquisition and permanent download to physical storage devices. | Yeah | Yeah |
| viii. Licensing of intellectual property rights for the development of interactive media and video games. | Yeah | Yeah |
| xlx. Licensing of intellectual property for consumer products. | Yeah | Yeah |

Notes:/

a. Includes the i) provision and licensing of restricted channels and restricted channel packages to STAR suppliers; ii) provision and licensing of audiovisual content (programs, including movies) to STAR suppliers, for the PPV service, and lil) provision and licensing of content audiovisuals (programs, including films) to STAR providers, for the VOD service. In this regard, The Parties state that they cannot disaggregate the information specifically for these services, since which are services provided in an aggregate manner. b. It is not identified that Grupo lWDC or Grupo 21 CF provide programming channels and/or packages to third parties providers of the OTT distribution service of audiovisual content. However, Grupo 21 CF, through third parties, offers on its Fox Premium platform (commercially offered as "FOX+"), in addition to movies and series, 18 (eighteen) programming channels, all of which are its property, among which are Fox Sports, Fox Sports 2 and Fox Sports 3. These programming channels are broadcast simultaneously by the STAR providers and providers of the OTT distribution service for audiovisual content.00 c. This is potentially a service in which both the lWDC Group and the 21CF Group could overlap. 21CF Group states that it currently provides the OTT distribution service of audiovisual content, however, it is a service provided through a third party (MEDIAKEY) that offers it to the end user. For its part, the lWDC Group

_____

00 Source: httos://foxmas.foxolay.com/? ga=2.23705788.783658666. l 543938 l 22-2092638288. l 536 l 01671.
Likewise, Time Warner, through its "HBO GO" platform, offers programming channels, all of which are its own, in addition to movies and series. These programming channels are broadcast simultaneously by STAR providers and OTT audiovisual content distribution service providers.
/ Public information available at: https://www.hbogo.com.br/home.



INSTITIJTO H])UV\L D[: /
it;Ll:COIVIUI\IIC/\('.l0Nf')3

| Servicios | Grupo TWDC | Grupo 21CF |
|---|---|---|
| It states that it intends to provide this service through its own platform at the end of 2019, however it has not yet defined a precise date to do so.81 Source: Prepared by the Commission with information from the Parties.  p  p | p | |

The markets identified in numerals (xiii) to (xix) of Table 5 belong to the area of competence of COFECE, so the Institute does not pronounce itself regarding the possible effects derived from the 'Operation. --

### 5.5.2. Coincidences in the telecommunications and radiology sectors

In terms of articles 28, paragraph sixteen, and 5 of the LFCE, the Institute is the authority in matters of economic competition in the broadcasting and telecommunications sectors.

### Economic Activities

Based on the information in the File, it is identified that, within the telecommunications and broadcasting sectors, Grupo,,TWDC and GrupQ 21 CF are current or potential competitors in the following activities 1 (Activities and List, respectively):

I. Provision and licensing of audiqvisL,Jales content (channels of programming, channel packages and programs, including movies and series) to STAR providers;

2. Provision and licensing of audiovisual content (programs) to aggregators-(programmers) of channels for the STAR;

3. Provision and licensing of audiovisual content to commercial STRD providers;

ÿ \

4. Provision and licensing of audiovisual content (channels) programming, channel packages and progamai, which includes movies and (be them)　OTT content distribution service providers to audiovisuals;

5. Provision and licensing of audio (musical) content to OTJ audio content distribution service providers;

6. Provision and sale of time or space for advertising on　　　menÿajes c6merciales o channels for the STAR;

---

81 See press release published by the IWDC, available at: https://www.thewaltdisneycompany.com/the-walt-disney-company-signs-amended-acauisition-agreement-to-acguire-twenty-flrst-century-fox-inc-for-71-3-billion-in-cash-and-stock/.

7. Provision and sale of spaces for commercial messages or advertising by Internet platforms dedicated to the provision of content audiovisuals;

8. Provision and licensing of audio content for radio stations sound broadcasting;

9. Provision of the OTT distribution service of audiovisual content, by subscription, and

1 O. Acquisition of rights for the transmission of sporting events in Mexico.

In these activities, the Operation would imply the disappearance of one competitor and an increase in the share of another. In the others listed in Table 5, belonging to the telecommunications and broadcasting sectors, the Operation would be the substitution of one economic agent for another.

The analysis of the risks involved in carrying out the Operation is carried out in accordance with the provisions of articles 58, 59, 63 and 6A of the LFCE. This analysis requires identifying the effects that directly derive from the Operation in the relevant and/or related markets, with respect to the resulting economic agent and related parties.

f / **Economic Activities where Low Participation is Identified**

In Activities 2, 3 and 4 of the List it is identified that the IWDC Group and Group 21 CF have low levels of participation, estimated with the information provided by the Parties, which is presented in Table 6. According to the analysis of the Operation carried out by this Institute, in these markets it is not considered necessary to carry out an exhaustive analysis for horizontal effects.

\ **Table 6. Markets with low participation of Grupo IWDC and Grupo 21 CF significant, 2015-2017**

| Market analyzed | Variable - | RartIclpaciones @) Grupo [WID@ - ÿr9po 21 GR 2015' 2016-;2011, 2015' 2016 -2011 | | |
|---|---|---|---|---|
| 2. Provision and licensing of content audiovisuals (programs) to aggregators (p Channel ramifiers for the STAR p | Ingresos82 | (in) | | |

---

[82] Shares of TWDC Group and 21CF Group revenues in terms of branch revenues economic activities related to the production of television programs in Mexico.
Source: Information provided by the Parties in Annex 1 of the Second Scope to the Additional Information Release Document.



If\J'.iTIIUIO HD[IV\L Die
TtlJ:C()MUI\11< :/\CIOI\11,S

| Market analyzed | Variable | Shares (%) | | | | | |
|---|---|---|---|---|---|---|---|
| | | GrupoIWDC | | | Grupo2ICF | | |
| | | 2015 | 2016 | 2017 | 2015 | 2016 | 2017 |
| 3. Provision and licensing of corit_?nldos audiovisuals to suppliers of the commercial STRD 4. | Ingresos83 | (in) | | | | | |
| Provision and licensing of content audiovisual programming channels, packages of channels and programs, which includes movies and series) to providers of the audiovisual content distribution service. 5. Vision and licensing of | Ingresos84 | | | | | | |
| content from audio (musical) to suppliers of the OTT content distribution service audio | --- Ingresos85 | | | | | | |
| 6. Provision and sale of time or space for commercial messages or advertising on channels stopped-the STAR | Ingresos86 | | | | | | |
| 7. Provision and sale of spaces for commercial messages or advertising through Internet platforms dedicated to the provision of audiovisual content. | / Ingreÿosÿ | | | | | | |
| 8. Provision and licensing of audio content for broadcasting stations sonora | ESPN Mexico receives income from the provision and sale of time or space for commercial messages or advertising dollars ▮ ▮ during that 2017) | | | | | | |
| 9. Provision of OTT distribution service for audiovisual content by subscription | Subscribers88 | (in) | | | | | |
| _IQ. Acquisition of rights for the broadcast of sporting events in Mexico | Number of contracts signed/ with teams -from Liga MX-- (24 contracts | | | | | | |

---

[83] Shares of GrupoTWDC and Grupo 21CF revenues in consumption costs of products and materials from STRD suppliers in Mexico. \ \ Source: Information provided by the Parties in Annex 28 of the Additional Information Release Document.

84 Participation of the Revenues of TWDC Group and 21 CF Group in the expenses incurred by Netflix for the acquisition of audiovisual content.

Source: Information provided by the Parties in Annex 28 of the Additional Information Release.

;¡;,Shares of TWDC Group and CF Group 21 Revenues in the Parties' total revenues for the year 2017 in the Income obtained from the economic activity "Music Publishers".
Source: Information provided by the Parties in the Notification Letter and Annex 4 of the First Scope to the Additional Information Release Letter.
[86] Shares of Grupo TWDC and Grupo 21 CF revenues in total television advertising revenues.
Source: Information provided by the Parties in the Notification Letter.
[87] Shares of TWDC Group and 21 CF Group revenues in total revenues in this market.
Source: Information provided by the Parties in the Third Scope of the Additional Information Release. 88

Participation in terms of subscribers. The Parties only present information for 2016.
Source: Information provided by the Parties in the Notification Letter.



| Market analyzed | Variable | Shares (%) | | | | |
|---|---|---|---|---|---|---|
| | | TWDG Group | | | Group 21GE | |
| | | 2015 | 2016 | 2017 | 2015 | 2016, 2017 |
| | in total that They involve sporting events with different audience participations ) | | | | | |

Source: Prepared by the authors with information provided by the Parties.

In these Activities the Operation would not result in a significant level or increase in the shares that the acquiring economic agent would obtain, nor does it significantly modify resulting. The above, because 1<:lpart its position when acquiring the assets subject to the Operation.

In terms of the above, in economic activities 2, 3 and 5 to 9 of Table 6, it is not expected that the Operation will have as its object or effect generating effects contrary to the process of competition and concurrence.

- This, in accordance with the provisions of articles 61 or 64 of the LFCE, the following They establish the mandate to prevent and eliminate harm that may result as a result consequence of a concentration. In such a way that this legal instrument does not has the scope to influence or 'reverse the position that an economic agent has obtained based on their merits -which do not result from the concentration being analyzed . .- the above, in accordance with international practice.89 With respect to

Activities 4 and 10, a significant relationship with Activity 1 is identified, so that, although they would report low levels of accumulation, they will be analyzed in greater detail. In this sense, Activity 4 is analyzed, as the provision and licensing of audiovisual content (programming channels, channel *and* program packages) in the Sports category to providers of the OTT distribution service for audiovisual content.

---

89 For example, it is consistent with the provisions of Article 101 of the Treaty on the Functioning of the European Union. European Union (formerly Article 81 of the Treaty on European Community). In particular, the Guidelines on the assessment of horizontal concentrations under the Council Regulation on the control of concentrations between undertakings, in paragraph 19, outline the technical standards for identifying when horizontal competition concerns are unlikely to be identified. This is also stated in the Guidelines for the
Merger Legislation. Available at: https://eur-lex.europa.eu/legal-content/ES/TXT/PDF/?uri-CELEX:52004XC0205(02)&from-EN and
http://ec.europa.eu/competition/mergers/legislation/Merger2015.pdf, respectively.
In the US, the Horizontal Merger Guidelines (201 O) published by the Department of Justice-
, the Antitrust Division notes, on pages 18 and 19, that "Mergers involving an HHI increase of less than 00 points have a low likelihood of generating anticompetitive effects and generally do not require further analysis." Available at: https://www.ftc.gov/sites/default/files/attachments/merger-review/l008l9hmg.pdf



IMSTITUTO FI:DI:RAL DE
I[IJ:C()IVIIJNICATIONI:S

### 5.6. Activities with high participation - Susceptible to competitive risks -

In accordance with decision-making precedents and international practice,9° if a transaction reports high levels of concentration after its execution, then a detailed analysis of its effects must be carried out, both in the markets relevant as in the related ones.

Henceforth, the exhaustive analysis carried out in this Resolution focuses on those markets for which the existence of risks generated by the Operation has not been ruled out and which are within the jurisdiction of this Institute. In accordance with the provisions of section 5.5 of this Resolution, the following markets will be analyzed: a) The relevant markets for the provision and

   licensing of content
      audiovisuals (programming channels and channel packages) to
      STAR suppliers at the national level, divided according to their different
      programmatic categories (in particular, in the phadic and
      sports);

b) The relevant market for the provision and licensing of content
   audiovisuals (programming channels, channel packages and
   programs) from the Sports category to service providers
   OTT distribution of audiovisual content;

c) The related market for the acquisition of rights for the transmission of
   sporting events in Mexico

Below is an analysis of each of the elements provided for in articles 58, 59, 63 and 64 of the LFCE and their correlates 5 to 8 of the Regulatory Provisions. First, the relevant and related markets are defined. Then, an analysis of the effects of the Operation on those markets is presented.

### SIXTH. RELEVANT AND RELATED MARKETS

**Legal framework applicable for analysis**

   *"**Article 63.** To determine whether the concentration should not be authorized* or *should*
   *be sanctioned under the terms of this Law, the following shall be considered:*
   *following elements: 1*

-----------"'

90 See as a reference the AGREEMENT by which the Plenary Session of the Federal Telecommunications Institute issues the technical criteria for the calculation and application of a quantitative index in order to determine the degree of concentration in the markets and services corresponding to the telecommunications and broadcasting sectors. Available at: http://www.élof.gob.mx/nota detalle,php?codigo=5432595&fecha= 11/04/2016.

Machine Translated by Google

*The relevant market, in the terms prescribed in this Law;*

*(. . .).*

In correlation with article 63 section 1 of the LFCE, article 58 of the LFCE establishes the criteria that must be considered for the determination of the relevant market(s):

*"**Article 58.** For the determination of the relevant market, the following criteria must be considered: The possibilities of substituting*

*the good or service in question for others, both of national and foreign origin, considering the technological possibilities, to what extent consumers have substitutes and the time required for substitution; The distribution costs of the good itself, - of its relevant inputs, - of its complements and substitutes from other regions and from abroad,*

*taking into account freight, insurance, tariffs and non-tariff restrictions, the restrictions imposed by economic agents or by their associations and the time required to supply the market from those regions;*

*The costs and probabilities that users or consumers have to go to other markets:-*

*Federal, local , or international regulatory restrictions that limit users ' or consumers' access to alternative supply sources, or suppliers' access to alternative customers.*

*The others established in the Regulatory Provisions, as well as the technical criteria that the Commission issues for this purpose."*

In turn, articles 5 and 6 of the Regulatory Provisions establish:

*"**Article 5.** To determine the relevant market, the particular circumstances of each case must be analyzed, identifying the goods or services produced, distributed, acquired, marketed*

*or offered and those that replace them or may replace them in a timely manner. Likewise, the geographical area in which said goods or services are offered or demanded , and if there is the option of going indiscriminately to suppliers or customers without incurring at significant costs.*

***Article 6.** Related markets are those that involve goods, services or geographical areas other than those that are part of the relevant market, but that affect or are influenced by the conditions of competition and free competition prevailing in it. /\ To determine the related markets, the goods or services that are inputs in the production, distribution or marketing chain may be considered; those that are complementary goods or services and, in general, those economic activities that .*



Machine Translated by Google



FWF:I<AL INSTITUTE OF
ECONOMIC COMMUNICATIONS

> *impact* or *influence the conditions of competition and free concurrence dJI mercap(]Levant,* or *vice versa."*

## Economic Activities Analyzed

### 6.1 . Provision and licensing (Offering of audiovisual content to suppliers of the STAR

The provision and licensing of Audiovisual Content to STAR providers refers to the provision of channels or signals programmed and formatted to be transmitted by authorized concessionaires to provide the STAR to end users. In this way, the Audiovisual Content constitutes inputs so that the authorized concessionaires (STAR providers, as well as the QH distribution service of audiovisual content) can provide services to end users.91

In this market, the following interact: i) the copyright holders of audiovisual content, the latter being available on programmed channels, with ii) the economic agents interested in its subsequent retail distribution (STAR providers and OTT distributors of audiovisual content). In this way, subject to a set of provisions negotiated between the parties, licensing contracts are established through which the former assign to the latter the right to specific audiovisual content to intermediaries or users.
distribute these final contents.

### Offer

The agents who      Providers and licensers (also identified as wholesale distributors) of Restricted Channels have two options for integrating programming into those channels:

a) Programming produced within the same GIE (own programming),92 and

b) Programming acquired from third parties (content creators), from the cudies
They also acquire licenses for these contents.

---

91 See as precedent AT&T/TW Resolution 92 In this regard,
according to the Information submitted by the Parties, in the production of audiovisual content -programs- for third party providers of the commercial STRD, the STAR and/or the OTT distribution service of audiovisual content, the rights obtained for said production, among others, could fall on the

following:
1) Work for hire: the producer does not obtain rights over the content produced and only obtains Revenue from production services; 11) 50-50
ownership rights: the producer retains 50% of the rights to the content produced;
Lii) Co-production: the producer retains the percentage of rights agreed for each content; or
lv) Licensed content: the producer owns the content and licenses it to the agent who requested it.
production.
Source: Information provided by the Parties in the First Scope of the Additional Information Release Document submitted to the Institute's Official Records Office on October 18, 2018.

 /J **69/305**

Machine Translated by Google

I.

The programming they have is arranged in programming channels or television channel packages that are subsequently licensed to retail distributors.

Generally, audiovisual content for the STAR (as well as for the OTT distribution service of audiovisual content) is sold wholesale, by package of channels or by programming channel, with a price per subscriber per month. The price per subscriber paid by a STAR provider allows the latter to transmit the signals or signal package to the end users of said service within a defined time horizon.

**Deman will**

STAR providers market packages consisting of programming channels to end users in exchange for a monthly access fee.

These packages are put together by STAR providers to provide a variety of content that is attractive to end users.

Audiovisual content represents the basis for successful performance by economic agents competing in STAR markets.

The business model based on subscription payments implies that

Companies, to attract greater demand for their service, must have a broad set of content.

Television channels are differentiated goods, as each channel contains a specific set of content (programs), with a particular distribution over time. The programming profile of each licensee is determined by the audiovisual content of the channels it broadcasts. Thus, programming is designed to appeal to the preferences of subscribers or consumers. From this perspective, the demand for content, and therefore for channels, is related to subscriber demand.

Since end-user preferences are heterogeneous, STAR providers must have access to channels with content on diverse topics and specific schedules to meet the diverse preferences of end-users.

These preferences can vary over time for a given user, which is why there is a diverse range of preferences for the universe of end users. **6.1. Product Dimension**

**Substitution analysis**

It is carried out with respect to the provision and licensing of audiovisual content, STAR suppliers, in accordance with the provisions of Section I of Article 58 of the LFCE: \

Machine Translated by Google



FEDERAL INSTITUTE OF
COMMUNICATION (

### Basic Channels

Taking into consideration the Institute's previous decision-making processes, the following elements characterize the Basic Channels:

i) They make up the basic offer of a particular STAR provider
(available to all subscribers), and

ii) The main sources of income for the providers of these channels are:
licensing them for inclusion in the STAR, *Vio* by the
marketing of advertising space.

Thus, for STAR providers, who require audiovisual content licenses to incorporate Basic Channels into their offerings, it is important that the service they offer their end users includes a variety of attractive content. These preferences can vary over time for the same user, which is why there is a diverse range of preferences for the universe of end users. These characteristics of end users must be considered by STAR providers, which is why the latter require having different and complementary audiovisual content for the consumer over time, such that they can choose (for example, choose to watch a movie or sports at a certain time, or have alternatives at various times while the device is in use).

In this regard, the importance of programming diversity for STAR end users is made clear in the                                        data generated by the Survey National Survey of Audiovisual Content Consumption 2016 (ENCCA 2016)93 which indicates that for 47% (forty-seven percent) of respondents,1 "having more content and channel options" is the main reason for contracting the STAR.
On the contrary, for 6% (six percent) of those surveyed, the main reason for not subscribing to EISTAR is because *"the open TV channels are sufficient",*
While for 64% (sixty-four percent) it is *"because of the price."*

### Income reported by the Parties

In this regard, according to the information provided by the Parties, for the year two thousand seventeen, the income of Grupo IWDC and, Grupo 21 CF in Mexico for the provision and sale of time or space for commercial messages or advertising

in the channels that offer the STAR Pf oveeÿores, represented the                         (in)

---

93 This survey, designed and developed by the Institute, was carried out from October 14 to November 24, 2016, with the general objective of knowing the audiovisual content consumption habits of radio and television audiences, as well as the demand for such content on the Internet.

Information available at: http://www.lft.org.mx/comunlcaclon-y-medios/estudios-y-reportes-de-anallsis-de-media and audiovisual content

71/305

**(in)**                                                   and the     **(in)**

and from the income obtained by these same agents for the provision and licensing
of these channels to the STAR providers respectively.9

4 No data is available for other participants on this platform, or for other platforms. 1 ;

Table z presents the percentage represented by the income from the provision and
Licensing of the sports content channels of Grupo 21 CF and Grupo TWDC of the total income
they obtain from the provision and licensing of audiovisual content (programming channels,
channel packages and programs, including movies and series) to STAR providers in Mexico.

**Table 7. Percentage of income from licensing of channels in the Sports programmatic category to STAR95 providers**

| | Canales | 2015 | 2016 | 2017 | |
|---|---|---|---|---|---|
| Group 21CF | Deportivos Otros | (in) | | | |
| | Total | 100.00% | 100.00% | 100.00% | |
| **GrupoIWDC** | Sports Others | (in) | | | |
| | Total | 100.00% | 100.00% | 100.00% | |

Source: Prepared by the authors with information provided by the Parties.

## Programmatic Categories (CP)

Considering the decision-making precedents of the Institute,96 according to the diversification of
content, STAR providers, in order to be viable competitors, need to offer Basic Channels in 8
(some) CP of different signals (Entertainment, Sports, Children's, Cultural, Movies, Music, News
and Open N). These categories are complementary -and therefore are related- to each other.

Yes, all of these are required for STAR providers to be able to form
attractive packages to attract and retain end users - subscribers.

94 According to the information provided by the Parties, Grupo TWDC and Grupo 21 CF for the year 2017 obtained income from the provision and licensing of channels to STAR suppliers in Mexico of **(v)** million pesos, respectively. Grupo TWDC reported its revenue in Mexican pesos, while Grupo 21 CF presented it in dollars, as well as the corresponding exchange rate for converting it to pesos.

For the provision and sale of time or space for commercial messages or advertising on the channels they offer  to STAR providers, Grupo TWDC and Grupo 21 CF obtained income of  **(in)**  millions of pesos.

Source: Annexes 18 and 20 of the Notification Document and Annexes 26.a and 26.b of the Document of Relief of the Request for Additional Information.

95 Source: Annexes 14.a and 14.b of the Notification Letter.

96 For further reference see Resolution AT&TffW and the resolutions of files E-IFT/UC/DGIPM/PMR/0001/2013 UCE/AVC-002-2014, public and http://apps.ift.org.mx/publicdata/Verslon Publica P IFT EXT 150814 195.pdf http://apps.ift.org.mx/publicdata/          available    in: Version Publica P IFT EXT 110215 48.pdf



INSITfUfO n,Df'IV\L IJ[:
II'tl'.COIVIUNIC/\Cl<)NÿS

Taking into account the analysis of audiovisual content to which it adds its programming offering, the classification used for the analysis carried out in this Resolution is as follows.

1. (E)=Entertainment,

2. (!)=Children's,

3. (P)=Films and series,

4. (F)=Factual (Cultural, documentary and *reality),*

5. (M)=Music,

6. (N)=News,

-1. (D),,,Sports, and

8. (A)= Open, which includes simultaneous and delayed broadcasts.

Table 8 illustrates the composition of Basic Channel packages offered by STAR providers to end users and shows a certain regularity in the CPs present in the STAR channel offering, as well as the way in which they are composed.

### e:::::: Table 8. Composition of some basic packages offered by STAR providers

| Category | SkyMéxico (J! eN, $209) | Dish (Basic, $206.00) | Megocable (Conecto Digital, $229.00) | IZZI (PockTV, $220.00) | Coblecom (Mini Basic, $210.00) |
|---|---|---|---|---|---|
| Factual (Cultural, Documentary, Reality) | -A&E, -Canal Judicial, -Discovery Channel, -Link, --The Entertainment -History, -H&H-DIscovery Home & Health, -Mariavision, -Natlonal Geographic. | -Animal Planet, -A&E, -DIscovery Chaonel, -The Entertainment, -History, -HolaTV, -H&H-Discovery Home & Health, -ID Investigation DIscovery, -Lifetime, -**MIV,** -National Geographlc, -Natlonal Geographlc Wild, -TLC-Trovel & Living Channel. | -Discover,and Channéí, -El Entertalnment -Hlstory, -H&H-Discovery Home & Health. -Mariavision, -National Geographic, -MIV, | -DIscovery Channel, -Discover Channel, -Link, -The Entertainment, -Hlstory, -National Geographlc. | -A&E, -Link, -The Entertainment -Mariavision, -**MIV,** -National Geographic. |
| Sports | -**ESP**ÿ2, -Fox Sports,ÿ -Fox Sports 2, -NFL Network, -UTDN. | -ESPN, -ESPN 2, -ESPN 3, -Fox Sports, -Fox Sports 2, -Fox Sports 3. | -ESPN, -ESPN 2, -Fox Sports, -Fox Sports 2, -Fox Sports 3, -NFL Network, -IVC Deportes, -IVC Deportes 2. | -ESPN, -ESPN 2, -Fox Sports, -Fox Sports 2, -UTDN, -TON. | -ESPN 2, -Fox Sports, -UTDN. |
| Entertainment | -Comedy District, -Telemundo, -Tlnovelas, -Unicable. | -Comedy Central. | -Comedy Central, -The Gourmet, -Telemundo. | -Comedla District, -Telemundo, -Tlnovelas, -Unicable. | 0Comedy District, -Telemundo, -Tlnovelas, -Unlcable, |

| Category | Sky Mexico (OjeN $209) | Dl sh (Basic $206.00) | Megacabfe (Conecta Digital, $229.00) | IZZI (Pacl< N, $220.00) | Cablecom (Mini Basic, $210.00) |
|---|---|---|---|---|---|
| Children's / | -Discovery Kids, -Disney Channel, -DisneyXD, -Nickelodeon, -Tiin. | -Cartoon Network, -Dlscovery Klds, -Disney Channel, -Disnéy JLǃnior, -DisneyXD, -Nlckelodeon. | -Cartoon Network, -Dlscovery Kids, -Disney Junior, -DisneyXD, -Nickelodeon, -Nat Geo Kids. | -Cartoon Network. -Discovery Kids, -Dlsney Channel, -Dlsney Junlqr, -DlsneyXD, -Nickelodeon, -Tiin. | -Cartoon Network, -Discovery Kid, -Disney Channel, -DisneyXD, -Tiin, -Nlckelodeon. |
| Movies and Series | -AMC, -Cinemax, -De Película, -Edge, -Film Zone, -Fox Channel, -Fox Lite, -Fx, -Golden, -Sony, -Space, -Warner. | -AXN, -Cine Latino, -Ginecanal, -Cinemax, -Fox Channel, -Fox Lifÿ, -Fx, -FXM, -Paramount Channel -Sony, -Space, -Studio Universal, -TBS Veryfunny, -TNT, -TNT Series, -Universal, -Warner. | -AMC, -AXN, -Who is Latin? -Cinemexlcano, -Fox Channel, -Fox Lite, -Fx, -Póǀico -Universe Studio( -Sony, -Space, -TBS Veryfunny, -TNT, -TNT Series, -Universal, -Warner. | -AMC, -Cinemax, -From a Movie, -Edge, -Fox Channel, -Fox Lite, -Fx, -Golden, -Lifetime, -Sony, -Space -Studlo Universal, -TNT Series. -Warrer. | -Cinecanal -From a Movie, -Edge, -Fox Channel, -Fox Lite, -Fx, -Golden, -Space, -Studio Universal, -TNT. |
| Musicals | -Banda Max, -Rltmoson, -Stingray Julcebox, -Telehit. | -Exa TV, -Nu Muslc, ___ -Teleritmo, -Videorola. | -Beat box, -MTV Hits, -No Music, -About the video. | -Max Band, -Ritmoson, -Telÿhit. | -Max Band, -Ritmoson, -Telehlt. |
| News | | -CNN in Spanish, -Milenio Television. | -CNN in Spanish. | -Excelsior TV, -Teleformula, -Milenio Tv. | |
| Open TV / | -DNA 40, -a+, -Azteca I, -Azteca 7, -Channel 5, -Channel Nine, -Channel Once, ( 1 -Eleven Children, -Channel 14, -Channel 22, -Channel 22.2, -Foro TV, -Imagen Television, -Ingenio TV, -Las Estrellas, -TV Mexiquens&,-- i-:-:---,------ÿ | -Azteca 1 1, -Azteca 7, -Canal 5, -Canal Once, -Eleven Children, -Channel 22, -Image11 Television, -The Stars, -UNAM TV, | -DNA 40, -Aztec l, -Azteca 7, -Canal 5, -Canal 5, -Azteca l, -Channel Nine, -Azteca 7, -Channel Eleven, -Eleven Children, -Eleven Children, -Cgnal Nine, -Canal 22, -Canal Once, -Canal 22.2, -Channel 22.2, -Eleven Children, -Channel of -Channel 22.2, ___--- Congress, -Foro TV, -TV Forum, -TV Forum, -Image Television, -Ingenio TV, -The Stars, -Ingenio TV, -The Stars, -TV Mexiquense, -The Stars, -TV UNAM, -TV UNAM, -TV UNAM, -Multimedia Plus. -A Voice With | -DNA 40; -a+, -Canal 5, -Cgnal Nine, -Canal 22.2, Congress, | -Aztec l, -Azteca 7, -Channel Nine, -Canal Once, -Canal 22, -Channel of the -Cbnal 22, |

TV_U_N_A_M. _----ÿ------ÿ-TV_M-,-exl_ÿq,ue_n_se_. _-ÿ------ÿTo_do__s_. ____ ---;

Notes: -

    The trade names of the STAR suppliers are used .

    - Includes those channels included in two or more of the selected packages/providers.

    The data for the Cablecom "Mini Basic" package corresponds to the town of Apizaco, Tlaxcala.

Source: Prepared with public information, retrieved on October 11, 2018 from the websites of the concessionaires with the aforementioned trade names: https://vetv.com.mx/paquetes, https://www.megacable.corn.mx/listar-canales-comqleta, https://ÿ. lzzl.mx/pGcktv, htto: / / www.cablecom.com.mx/GuiaCanales.html?oaauete=miniBasico.

Machine Translated by Google



INSTITUTE OF
'If:I.ECOMUI'JICAt:101\JI:S

According to the Institute's previous decisions, the following elements are identified:97

- To offer a competitive service, STAR providers need transmit in their programming packages different C\:P of signals for attract a greater number of customers.

- Each CP's unp of signals seeks to attract a certain type of viewers, and according to this selects the contents that make up the channel packages that it offers to its subscribers.

- For STAR providers to attract various types of customers, they must offer several CP signals. In the provision of STAR to end users, the different CP signals are complementary to each other

- There is no substitution between CP, for a moment and        a certain taste, a viewer will not stop watching a program to watch another one in a different way category (it is not possible for a user who wants to observe a content musical replace it with children's content).

- Each CP constitutes an independent relevant market.

Considering the above, and in accordance with precedents decision-makers of the Institute,98 it is considered that i) the different CP of programming channels offered in the STAR are not substitutes but complementary - and therefore related to each other, and ii) the provision and licensing of audiovisual content (programming channels, television packages and programs, which includes films and series) to STAR suppliers in each CP constitutes an independent relevant market.

### (Premium Channels

Premium Channels have the following characteristics:99 i) they include high-value programming for audiences; ii) they do not include advertising within their channels; and iii) their content is uncensored. Given these elements, Premium Channels have pricing and cost structures that differ from Basic Channels.

STAR providers need Premium Channels to configure packages aimed at the population that is willing to pay an additional amount to access exclusive or recently released content, in this sense, the

---

9 7 See Resolution by which the Plenary Session of the Federal Telecommunications Institute resolves the file E-IFT /UC/DGIPM/PMR/ 0001 /2013, public version available at: http://apps.lft.org.mx/publlcdata/ Verslon Publica P IFT EXT 150814 195.pdf.

9 8 See resolutions of the AT&TffW cases and/or the E-IFT/UC/DGIPM/PMR/0001/2013 file, public version available at: http://apps.ift.org,mx/publlcdata/Version Publica P IFT EXT 150814 195.pdf.

99 See as precedent AT&T{fW Resolution.





The availability of Premium Channels in the STAR suppliers' offering may be taken, from the point of view of end users, as an indicator of the quality of their service.

For smaller STAR providers, another element of differentiation between Basic and Premium Channels is the need to have coding systems to ensure that not all of their users receive those signals.

From the point of view of the aggregators (programmers), Premium Channels represent higher costs, compared to those incurred in the case of Basic Channels, due to the nature of the programmatic content that must be acquired.

It is identified that in Mexico the offer of Premium Channels by STAR providers may be movies that are broadcast for the first time through STAR and recently released series (eg Canales BO and Fox Premium), specialized sports channels (eg UFC Network) and Adult Channels (eg

Playboy TV and Venus).

Considering the above, it is concluded that Premium Channels can form part of a separate market from that of Basic Channels.

However, the Institute does not currently consider a classification between Basic Channels and Premium Channels. It is noted that this approach does not alter the conclusions of this analysis, among other reasons because the Parties do not agree on the provision of these channels.

However, since the purpose of this analysis is to identify the effects directly derived from the Transaction in the relevant markets, with respect to the resulting economic agent, it is estimated that, if risks are identified at the level of relevant services, that is, at the aggregate level and without determining whether the Basic Channels and the Premium Channels belong to different relevant markets, a more disaggregated analysis would not change the conclusions and, if so, would show that the risks associated with the Transaction would be even greater in them. This is so because the economic agents involved participate in both the Basic Channels and Premium Channels segments, and the nature of the antitrust concerns in these segments is the same, as will be detailed later.

The above is consistent, a *contrario sensu,* 700with the following criterion adopted by the Institute: *Yes, under the analysis of the narrowest markets,*

---

100 The application of this criterion is supported by the following thesis: DISTRICT JUDGE. MAY INVOKE LEGAL PRECEPTS A CONTRARIO SENSU, TO SUPPORT HIS/HER DECISIONS. Location: (TA); 9th. Era; TCC; SJF and its Gazette; Volume XXIII, February 2006; Page 1827.111 .20.C.18 K. Registry No. 1 175910.

Machine Translated by Google



INSTITUTE OF
TELECOMMUNICATIONS

*If any impact on competition and free competition is ruled out, it is possible to conclude that the Transaction will not entail impacts on competition and free competition in markets with broader definitions. This is because, when considering broader definitions of the product dimension of the markets analyzed, the Parties' market shares will be lower than the shares they achieve when considering narrower definitions.* "101

It should be noted that in the ex ante analysis of concentrations, the Institute enjoys full powers to decide technical issues, and therefore has a reasonable margin of appreciation, which must be exercised in a reasoned manner.102

### STRD Channels or Open IV Channels

It is observed that the channels belonging to the programmatic category IV Open IV Open or STR Channels 1::3) present characteristics or attributes (Channels of specific programmatic channels, specific to lg; Restricted Channels in the STAR that are identified in section 5.4 of this resolution.

### *Advertising revenues*

The sale of advertising by Grupo Televisa, SAB (GIETV) represents for the year two thousand seventeen, 60.94% (sixty point ninety-four percent) of the income obtained in the business segment defined as *"Contents",*
which covers the *"channel sales"* and *"program and license sales" businesses.* The latter represent 11.94% (eleven point ninety-four percent) and 27.12% (twenty-seven point twelve percent) of the income obtained in that segment.103

---

101 See Resolutions issued through Plenary agreements P/IFT/201015/152 (available at: http://apps.ift.org.mx/publicdata/ Version Publica UCE P IFT EXT 201015 152.pdf. Page 26) and P/IFT/030914/268
(disponible en: http://apps.lft.org.mxlpublicdata/P IFT 030914 268 Version Publica UCE.pdf Página 8).
102 The following rubl'O theses are applicable to the case: JUDICIAL CONTROL OF ACTS OF HIGH TECHNICAL COMPLEXITY ISSUED BY THE FEDERAL TELECOMMUNICATIONS INSTITUTE. ITS LIMITS AND CHARACTERISTICS. Location: (TA); J Oa, Era; TCC; Gaceta S,JF,; Book 40, March 2017; Volume IV; Page 2638. l.lo.AE206 A (lOa.), Registry No. 2013920. and ECONOMIC COMPETITION. IN TERMS OF FEDERAL LAW
RELATIVE REPEALED, CONCENTRATIONS REQUIRE AN EX ANTE ANALYSIS FOR THEIR AUTHORIZATION, Location: (TA); law. Epocan.cc; SJF Gazette; Book 40, March 2017; Volume IV; Pg. 2638. l.lo.AE206A .(10a.). Registration No. 2013920,
103 GIEN segments its business into Content, Sky, Cable, and Other Businesses. In the Content segment, it generates revenue from:
a) "Advertising sales are derived primarily from the sale of advertising time on television networks.
open television, which include the production of programming and the transmission of channels 2, 4, 5 and 9; as well as the sale of advertising time in programs provided to pay television companies in Mexico and on the Company's Internet portal and the production of programming and transmission on local stations in Mexico and the United States. The transmission of channels is carried out through repeater stations in Mexico, which are owned by the Company, majority or minority owned by the Company or, failing that, affiliated companies." b) "Revenues from Channel Sales are derived from national and international
programming services
provided to both independent cable television systems in Mexico and to the Company's businesses

As referred to in section 5.4 of this resolution, the economic agents that program the Commercial SRD Channels have the capacity to -

Market advertising spaces considering the audience levels they can capture on the Open N platform, but also in the STAR for the same Channels or versions of those Channels.

For their part, agents that provide Restricted Channels obtain their income mainly from the licensing of those channels to STAR providers and, to a lesser extent, from the

advertising they incorporate (as referred to in the Basic Channels section of section 6.1.1 of this Resolution); these channels are only available to STAR users upon payment of fees.104 In this regard, in previous decisions, taking into

consideration the applicable regulations, the Institute has identified that:[105]

> *"(. . .) it is concluded that there are differences of a legal, financial and technical nature between the Open TV and Restricted TV signals, (. . .), since it is proven that both types of signals are different* or *distinguishable from each other(. .. )."*

Below are other elements that support this conclusion.

### *Audience of Open TV Channels*

Graph 1 shows the audience of the 50 (fifty) main channels distributed in the STAR during the years two thousand fifteen to two thousand seventeen.

- The N Abie}ta Channels currently referred to as Las Estrellas, Azteca Uno, Channel 5 and Azteca 7, accumulated the ▮(we)▮ ▮(we)▮ of the audience share of 106 channels in the STAR in the country.
- The shelf is atomized among the other channels transmitted via the STAR, and none of them reaching more than ▮(we)▮ ▮(we)▮ of the share of au9cience individually, for period. Of the CP Sports channels involved in the transaction,

---

Direct-to-home satellite and cable television services. These programming services for cable television companies and pay-per-view are provided in Mexico, other Latin American countries, the United States and Europe, and include both company-produced and non-company-produced programming. third parties."

c) "Income from the Sale of Programs and Licenses is derived from the Company's programming sales to clients abroad, including Unlvislón."

Source: Public information from the GI annual report for 2017, available at: _. http://www.televisair.com/ ~ /media/Files/T /Tele visa-IR/ documents/ annual/2017/Reoorte%20Anual%202017. pdf.

104 In this regard, there is agreement with the Institute's previous decisions: See Resolution AT&TffW and the Resolution by which the Plenary Session of the Federal Telecommunications Institute resolves the file E-IFT/UC/DGIPM/ PMR/0001 /2013, htto:// version public! available in: apps:itt.org.mx/publicdata/Version Publica P IFT EXT 150814 195.pdf.

105 See AT&T{fW Resolution.

106 See for example http://"t{Y"W.kantaribooemedia.com.ar/ibope/wp/glossary

Machine Translated by Google



INSTITUTE OF UNIFORMITY AND
COMMUNICATION

Only three - Fox Sports, ESPN 2 and ESPN - report shares of ▮▮▮▮▮ (we)

(we) ▮▮▮▮▮ cqm? maximums in this period. Of the CP Factual channels, only two - National Geographic and History - both reporting shares as maximums in ▮▮▮▮▮

(we) ▮▮▮▮▮

this is the period

In this way, there are indications that for STAR audiences, Open TV Channels constitute a fundamental part of the content offer of STAB providers. For its part, the fact that subscribers of a STAR, despite making 1

relatively little use of exclusive pay TV channels are willing to pay for

r such services, is an indication that these are products distinct.

Machine Translated by Google

**Chart 1. Audience of the qanales distributed in the STAR, 2015-2017.**



Source: Prepared by the authors with information provided by the Parties in Annex 2.b of the Second Scope of the Additional Information Release. ÿParticipation with respect to audience share by channel during the years 2015 to 2017 (Households with N pay), without considering the share of Others (unidentified channels, as well as other devices).

Machine Translated by Google



H'DI:RAI.. INSTITUTE OF
H:1 í:COMMUNICATIONS

### Must Offer and Must Carry Obligations

*Must Offer* is the obligation of broadcast television licensees to make their signals available to STAR provider licensees for broadcast; *Must Carry* is the obligation of STAR provider licensees to retransmit broadcast television signals on their systems.

The objectives pursued through the *Must Carry* and *Must Offer* obligations are summarized in the following points:

- ·Promote competition in the provision of the STAR, reflecting the latter 'in user fees.

- Benefit end users by ensuring free access to the contents of the public broadcasting service.

- That the contents of federal public institutions can reach all STAR users in the country.

The *Must Carry* and *Must Offer* obligations are provided for in Section I of the Eighth Transitory Article of the Constitutional Reform Decree1º7 , whose legal reflection is found in articles 164 and 165 of the LFTR. For quick reference, they are transcribed last coughs.

> **"Article 164.** *Concessionaires who provide television services broadcasting are obliged to allow restricted television concessionaires to retransmit their signal, free of charge and in a non-discriminatory manner, within the same geographic coverage area, in full, simultaneously and without modifications, including advertising and with the same quality as the signal that is broadcast.*
>
> *Concessionaires that provide restricted television services are required to retransmit the broadcast television signal, free of charge and in a non-discriminatory manner, within the same geographic coverage area, in full, simultaneously and without modifications, including advertising and with the same quality of the signal that is broadcast, and to include it without additional cost in the services contracted by subscribers and users.*
>
> **"Article 165.** *The concessionaires of restricted satellite television must only retransmit the signals broadcast with Coverage of fifty percent or more of the national territory. All restricted television concessionaires must retransmit the signals broadcast by federal public institutions.*

---

107 Decree by which various provisions of articles 60, 70, 27, 28, 73, 78, 94, and Article 5 of the Political Constitution of the United Mexican States, regarding telecommunications.

Likewise, on February 27, 2014, the following were published in the Diario

Official of the Federation (DOF) the "General guidelines in relation to the provisions of section I of the eighth transitory article of the decree by which various provisions of articles 6 and 7 are amended and added

, 27, 28, 73, 94 yl 05 7º

of the CPEUM, in matters of telecommunications"108, and its modifications published on December 21, 2016 in the DOF109, which establish in their articles 4, 6 and 11 the following:

*"Article 4.- The obligation on the part of the Broadcast Television Concessionaires to allow the retransmission of Broadcast Signals, entails the obligation of the Restricted Television Concessionaires to carry out said retransmission in the Same Geographic Coverage Zone without the need for any expression of will on the part of the Broadcast Television Concessionaire."*

*"Article 6.- Satellite Restricted Television Concessionaires are required to obligatorily transmit Broadcast Signals with 50% or more Coverage of the National Territory only within the Same Geographic Coverage Zone in which said signals are broadcast, Free of Charge and Non-Discriminatory, in Full and Without Modifications, Simultaneously, including advertising and with the Same Quality of the signal that is broadcast.*

*In order for the Satellite Restricted Television Concessionaires to be able to retransmit the Broadcast Signals of 50% or more Coverage of the National Territory within the Same Geographic Coverage Zone, the Institute will publish and maintain-*
*updated on its website (www.ift.org.mx) the list of locations in the country where these signals are broadcast."*

*"Article 11: Restricted Television Concessionaires must take the Broadcast Signals with the highest definition of image and sound available and retransmit them with the highest definition of image and sound that their networks are capable of transmitting, and in accordance with the different characteristics of the user terminal equipment that their subscribers and users have.*

*Likewise, the Broadcast Signals that are retransmitted by Restricted Television Concessionaires must be included in all their packages, in accordance with the terms of the previous paragraph.*

*Restricted Television Concessionaires shall not place the Broadcast signals retransmitted in such a way as to generate an artificial competitive advantage for one or more signals, and for\*

---

108 Source: DOF, http://www.dof.gob.mx/nota detalle.php?codlgo=5334 I 0ó&fecha=27 /02/2014,
109 Source: DOF, available at http://www.dof.gob.mx/nota detalle.php?codigo-5466366&fecha-21/12/2016.

 



FEDERAL INSTITUTE OF
TELECOMUNICACIO\I'S

> They should group the non-multiprogrammed broadcast signals and
> the audience multiprogrammed that have more
>
> regardless of the secondary number they have, which
> jointly and consecutively in the first block of programming channels in their high definition
> and/ or standard definition packages,
>
> respect the primary numbers of the virtual channels assigned by the
> Institute in terms of the General Guidelines for the Assignment of Virtual Broadcast Television
> Channels.
>
> Restricted Television Concessionaires operating with analog technology must group non-
> multiprogrammed Broadcast Signals and multiprogrammed ones with the highest audience,
>
> regardless of the secondary number they have; in the order of the virtual channels designated
> by the Institute in terms of the General Guidelines for the Assignment of Virtual Channels of
> Broadcast Television, jointly and consecutively in the first block of programming annals.
>
> In this case, all Restricted Television Concessionaires must place the multi-programmed
> Broadcast Signals, which do not have the largest audience, together with the programming
> channels that have the same or similar program genre.
>
> Restricted Television Concessionaires operating with digital technology must reflect all of
> the above in their Electronic Programming Guide.

Consequently, in terms of the constitutional and legal provisions that establish the rules of *Must Carry* and *Must Offer,* the providers of access STAR have to Open N Channels in the geographic areas in which they are broadcast, which includes the most demanded signals, produced in the country, while the providers of STAR via satellite are only obliged with the signals called "Las Estrellas", "Azteca 7", "Aztecal 3", "Canal1

5", "adn40" and "a+"11o as determined by the Institute.

The fact described in the preceding paragraphs is acknowledged by the Parties in the Notification Letter, where they state the following:

> "By a large margin, the most popular channels are the TV channels
> Open that are distributed free of charge by "must carry" obligations, according to which
> broadcasters are required to supply these

---

110 See "Agreement by which the Plenary Session of the Federal Telecommunications Institute updates the broadcast signals with coverage of 50% or more of the national territory in terms of the General Guidelines in relation to the provisions of Section I of the Eighth Transitory Article of the Decree by which various provisions of Articles 60, 7, 27, 28, 73, 78, 94 and 105 of the Political Constitution of the United Mexican States are amended and added, in matters of telecommunications." Published in DOF on December 20, 2017.

Source: http://dof.gob.mx/nota_detalle.php?codigo=5508430&fecha=20/12/2017





> *channels free of charge to TVR providers, who in turn must broadcast them free of charge.*
>
> *"(. . .) Under these obligations, Open TV channels must be retransmitted free of charge by TVR providers within the corresponding geographic coverage or nationally in the case of satellite providers for open TV channels, which cover at least 50 percent of the national territory. Articles 164 and 165 of the Federal Telecommunications and Broadcasting Law and articles 4 and 11 of the IFT Guidelines on must carry-must offer."*

It is also identified that the rights holders of Open N Channels *"more "popular"* can also offer versions for both the STRD and STAR platforms (e.g. delayed transmission Candles of one or more hours or Channels with partial modifications of program content), reporting levels of audience.

### Acquisition of Restricted Channels

For its part, in accordance with the previous decisions of the Institute111              he Licensing of Restricted Channels is subject to negotiations between the providers of such Audiovisual Content (who provide the license -

Licensors-) and the STAR providers (who obtain the license for the retransmission of said contents -Licensees-), among others, include the following:

,a) Period of validity: On average, it is between one and three years, and can be renewed by signing a simplified form.

b) Channel packaging: Channels are provided in packages, although there are cases in which it is carried out individually.112 c) Channel

prices: They are mostly set in US dollars, and
These can be a fixed amount per channel or depend on the number of subscribers that the STAR provider has. It is common for the licensors establish a minimum number of subscribers secured and They can also establish discounts for increases in the number of subscribers.

d) Licensor's right to conduct audits: Audits may be conducted in order to verify that payments have been made in accordance with the

---

111 See Resolution AT&Trrw(
112 Cases have been identified in which the packages offered include Open N channels, however, the rationale for the existence of commercial contracts for the licensing of channels lies in the rights that must be obtained for the distribution of Restricted Channels, since open television is *access the relevant signals of* assured thanks to the *Must Carry* and *Must Offer obligations.*

Machine Translated by Google



FF:DE'RAL INSTITUTE OF
TEII,COMIJI\IICACiQNI,S

agreed (when the channel price is set based on the number of subscribers).

e) Advertising conditions: The licensor generally has control and
power over the advertising that may be included in the channels. However,
Sometimes it is established that the concessionaire that provides the STAR may
have a time of publicity.

## Regulatory provisions_

The LFTR imposes restrictions on the characteristics of channels and content.
audio0isyales that are transmitted through the STRD, other than those that are 0sta751ecen/
for those that are exclusive to the STAR.

For example, in the case of the STRD, the LFTR states that: •

The content must be transmitted in national languages or subtitled, and only in
In exceptional cases it may be         authorize *the* use of foreign languages

article:{23O);

• For commercial STRD providers, the time allocated to advertising
commercial should not exceed eighteen percent of the total time
transmission                                                    [113]
per programming channel (article 23! section I); • Daily
programming that uses personal performance must include a
longer time covered by Mexicans (article 249);

*1.* Free daily broadcasts must be made on each station.                              and
for each programming channel, with a duration of up to thirty continuous or discontinuous minutes,
dedicated to broadcasting educational, cultural and social interest topics (articles 251 and 252);

• The National Anthem must be broadcast at six twenty-four hours, and
in addition, simultaneously the image of the national flag (article 253); • The television
stations and television channels must be linked in the
country when it comes to transmitting information of importance to the
Nation, in the opinion of the Ministry of the Interior (articles 254 and 255), and • The
service must comply with the rights of the audiences (article 256).

As can be seen, among other elements, based on what is established in the LFTR, there are
differences in the amount of advertising that can be included in each
·type of c9mal, sien,?⁰ the latter mÿy9J in the case of Open N Channels,

---

113 The duration of commercial advertising does not include station promos or broadcasts to the

times of the State or the Executive Branch, nor programs offering products or services.

"eighteen percent of the total broadcast time per programming channel / (approximately ten point eight minutes for each hour of broadcast114), which is exclusive to STAR (six minutes in each hour of broadcast).1 [15]

Thus, it is identified that the provisions established in the regulatory framework are one more element that prevents both types of channels, Restricted Channels and Open TV Channels, from being perceived as substitutes, both from the point of view of licensors and licensees.

### *Type of content*

The programming of Open TV Channels is mainly composed of national or local content of various genres, while a large part of the content that makes up the Restricted Channels is produced outside of Mexico or is about events broadcast exclusively on said signals, *such as*

It happens with certain sporting or entertainment events.

Certain content, *such as* films and series, broadcast on Restricted Channels are differentiated from that broadcast on Open TV Channels by a prior exploitation window. That is, the broadcasts are differentiated in time, since the

broadcast on restricted television occurs first and, later, months or years later, broadcast on open television takes place.

Regarding the transmission of sports audiovisual content, this difference in the

distribution windows between Open TV Channels and Restricted Channels is not identified. Mainly the Open TV channels

They broadcast sporting events in simultaneous transmission to the event itself,

which can represent high levels of ring, [116] as described in section 6.4.2 of this Resolution.

It is important to emphasize that Open Channels generally have a fixed programming schedule throughout the day and week, while the Channels Restricted (especially thematic channels) have a scheme that allows

---

11 4 In accordance with Article 47 of the LF-TR, the percentage of advertising time may be increased by up to two percentage points when at least twenty percent of its programming is covered by **national production .** This incentive applies in direct proportion to the national production potential with which the above is met, and therefore the advertising percentage could be increased to twenty-eight percent (sixteen point eight minutes for each hour of transmission) when all of its programming is covered by national production.

In the event that at least twenty percent of its production is covered by independent national production programming, may increase the percentage of advertising time by up to five percentage points. This Incentive also applies in a manner directly proportional to the percentage of national production with which the above is met (Article 248 of the LFTR).

115 STAR provider concessionaires may broadcast, daily and per channel, up to six minutes of advertising in each hour of transmission. For the corresponding calculation, advertising contained in retransmitted broadcast signals or the programming channels' own promotional material will not be considered, and channels dedicated exclusively to product offering programming will be exempt from the limit indicated in the previous Section (Art 237, Section II of the LFTR).

11 6 See for example http://www.kantaribopemedia.com.or/ibope/wp/glosario



FEDERML INSTITUTE OF
H:I[COMUI\ICACIONF:S

Several repetitions of the same content/program at various times during the same day or the same week.

Consequently, viewers have the possibility of watching the program of their choice within a Restricted Channel on multiple occasions during the same day or even during the same week. Additionally, some Restricted

Channel providers allow STAR providers to offer TVE service bundles in their packages,

allowing consumers to enjoy the content of the respective channels in video-on-demand mode and to access them, inside and outside their homes, through various internet-enabled devices such as smartphones, tablets, smart TVs.

and computers and elements (e.g. a password) that identify them as authorized subscribers.

Another difference lies in the advertising that can be found on both types of channels, a product of the different business models of the programmers.

Open TV Channels will dedicate as much of their air time as possible to these purposes, with advertising aimed at the general public, for their part, in

Restricted Channels are privileged - subscriber retention is attempted to offer less advertising pressure and with ads included based on the type and nature of each channel .

*in*

Considering 19 presented so far, for the purposes of this analysis it is considered that the provision and licensing of Restricted Channels corresponds to a market that is distinct and distinguishable from that of Open TV Channels of the commercial STRD117 • **-Hereinafter the analysis focuses on Restricted Channels, since the**

**audiovisual content (programming channels, 'channel and' packages programs, including films and series) that are provided and licensed by Grupo lWDC and Grupo 21 CF are located within this type.**

### 6.1.2. Geographic dimension

Pursuant to article 58, sections 11 to V, of the LFCE, the following considerations apply.

contracts between suppliers and Restricted Channels with STAR suppliers are subject to the coverage of the latter.    On the demand side,

---

117 Similar conclusions have been reached by other antitrust authorities. See, for example, the Vlacom/Channel 5 Broadcasting merger, Case No. COMP/M.7288, available at: http://ec.europa.eu/competition/mergers/cases/declsiéíns/m7288 20140909 20310 3881848 EN.pdf.

On the one hand, the coverage area of a STAR provider is defined primarily by its concession title, the technological platform (satellite or fixed), and the infrastructure installed by each of the operators.

Concessions for the provision of STAR in the satellite segment allow their holders to provide this service with national coverage; while concessions in the fixed or wired segmentQ establish local geographic coverage that
They may comprise one or more municipalities or localities.

The current legal framework, i.e., the LFTR, provides in Article 7, Section 111, the sole concession to provide all types of telecommunications and broadcasting services that are technically possible. Likewise, the "General Guidelines for the Granting of Concessions Referring to in Title Four of the Federal Telecommunications and Broadcasting Law," published in the Official Gazette of the Federation on July 24 , 2015, state: i. in Article 25 that "the Sole Concession for Commercial Use shall be granted to provide, in a convergent manner, all

type of public telecommunications or broadcasting services and with national coverage ( .. ,)", Thus, the coverage of STAR providers can
be at most national.

Based on the above, for the purposes of this Resolution, in terms of the evaluation of the economic competition of the Operation, the service consisting of the provision and licensing of audiovisual content (programming channels, channel and program packages, including films and series) to STAR providers in each of the different CPs is considered, with a national geographic dimension.

This definition is consistent with the actions of other authorities.

9 Competition.118

**6.2. Provision and licensing of sports audiovisual content to OTT distributors**

This market is analyzed as a market in which the parties could potentially enter, due to the high participation observed in the market for the provision and licensing of audiovisual content from CP Deportes to STAR providers, this in the event that this high participation could be transferred to this market.

The following elements are identified in the provision of this service:

----------"

118 See for example the concentration SOGECABLE / CANALSATELITE DIGITAL/ VIA DIGITAL analysed by the Commission of the European Communities,
available at: http://ec.europa.eu/compet1tlon/mergers/cases/declsions/m2845 20020814 330 es.pdf.

Machine Translated by Google

**ift**

INSTITLHO r+DI.:I<AL DF.
TI:IJCOMMUNICATIONS (

a) Refers to the provision of ?anals or signals scheduled to be transmitted by providers of the OTT distribution service of audiovisual content.

b) These sports audiovisual contents constitute inputs for the OTT distributors can provide their services to end users.

The following interact: i) copyright holders; ii) OTT distributors of audiovisual content, which establish licensing agreements through which the former grant the latter the right to distribute this specific audiovisual content to end users.

### Offer

Agents who provide and license sports audiovisual content require rights to broadcast sporting events to integrate them into their offering.

In this case, it is identified that the offer could be programming channels (such as those offered on STAR-Fox Sports, ESPN1 TON, etc.) or particular sporting events (Mexican National Soccer Team vs. United States National Soccer Team match), which are subsequently made available to end users through the OTT technological platform of audiovisual content distributors.

These sports audiovisual contents, as is done for the STAR, could marketed wholesale, by channel package, by programming channel or by sports sales package.

### Demand

As can be seen in this market today, OTT distributors of audiovisual content sell packages made up of programs (series and films) to end users in exchange for a monthly access fee.

In some cases, such as G{upó 21 CF (through third parties) and Time Warner[119] through their Fox Premium and HBO GO platforms respectively, they offer, in addition to programs, programming channels that are broadcast simultaneously by STAR providers.

Fox Premium, in addition to movies and series, offers 18 (eighteen) programming channels, all of its own, among which are ntran 3 (three) of the programming category Sports, Fox Sports, Fox Sports 2 and Fox Sports 3 (these are

---

119 Entreotros, through MEDIAKEY, who provides the access service to Grupo Fox Premium platform 21CF. Source: https://foxmas.foxplay.com/.

broadcast simultaneously by STAR and OTT audiovisual content distribution service providers).

Time Warner, through its "HBO GO" platform, in addition to movies and series, also offers programming channels, all of its own.120 Although, it is not

identified that the main OTT distributors of audiovisual content in Mexico such as Netflix, Claro Video and Blim acquire content
sports audiovisuals for transmission on their respective platforms, given the number of transmission rights for sporting events held by Grupo TWDC and Grupo 21 CF, is considered a potential market.

### 6.2. I Product Dimensions

In the case of audiovisual sports content, it is not considered that, if offered, there are substitutes for it, given its attribute of not being replicable.

### 6.2.2. Geographic dimension

Considering the current characteristics of audiovisual content

sports offered on the programming channels owned by the Parties, which include national and international sporting events, commentaries and/or narrations of sporting events broadcast in Spanish, for the purposes of this Resolution, in terms of the evaluation of the economic competition of the Operation, the service consisting of the provision and licensing of audiovisual content (programming channels, channel and program packages) sports to providers of the OTT distribution service of audiovisual content, with a geographic dimension of at least Latin America, is considered.

### 1 6.3. Acquisition of 1 'rights for the transmission of sporting events in Mexico - Reldclonado Market

Sports audiovisual content (CAD) is generated from events that
They      as an attribute of not being replicable, so they are products
are differentiated.121 This attribute is replicated throughout the value chain.

Economic agents compete to obtain the rights to sporting events - national and international - from which they can produce CAD and related programs that can generate greater income in the provision and licensing of STAR providers.

---

120 Public information available at: htt s: www.hbo o.com.br home.a
121 See, for example, the criteria for the analysis of Relevant Audiovisual Content adopted by the Institute.
Available at:
http://www.ift.org.mx/sites/default/files/conocenos/pleno/seslones/acuerdoliga/pift I 41118706. pdf.

Machine Translated by Google



INSTITUTE 1'1:DUU\L DE
\ TEU:COMMUNICATIONS

1In this way, providers of channels with sports content can use these licenses and thus offer STAR providers channels with sports content for inclusion in the channel packages they offer to end users.

### Offer

Ownership of sporting event rights is assigned in accordance with the laws of the applicable jurisdiction. In practice, it is generally assigned to the parties with individual and collective rights in respect of the event. National and international federations typically have contractual frameworks, practices, and business models that $_9$ child clarify responsibilities depending on the type of event considered (e.g., series or sporting event organized under the auspices of a federation). For series of regular sporting events in the that involve members of a federation or league (for example, a professional football league), the team is generally considered to be the title holder. of the rights because he carried the organizational and financial responsibility, ParClÿ_ Regular national or international individual events - organised under the auspices of a federation - the clubs or associations whose teams participate in the event are sometimes considered co-organisers and therefore co-owners of the treatment rights, due to the economic investments they have made in *upstream* activities (e.g. recruitment and preparation of athletes, Facilities and others). The same situation may apply to a national association with respect to individual matches that are part of an international competition.

122                                          ÿ

These rights holders, in turn, may grant rights to produce a CAD \ from specific events. The production of these CADs constitutes a work in itself recognized as a work protected by copyright, and those who choose can decide how to transmit them to audiences through the various media or platforms available.

In this regard, according to the information provided by the Parties, the rights for the broadcasting of sporting events are made available to third parties or can be acquired from broadcasting rights holders, which may be:

(i) Directly the sports teams,
(ii) Sports federations, or
(iii) Less frequently, third party Intermediaries,

In turn, the holders of these rights grant transmission licenses that:



122I see for example European Audlovisuÿl Observatory (2016), pages 12 to 24.

a) They may or may not be exclusive to one or more platforms or media transition,

b) Over a period of time,

c) Territory,

d) Number of events, e) [123] and

La plataforma de distribución.

These elements are determined in the contract between the rights holder and the agents who integrate sports content into their programming channels.

The usual business model for éAD broadcast rights is one in the I that the holder negotiates with a the audiovisual service providers in each platform or for several platforms, such that the granting of exclusive contracts for one platform does not necessarily inhibit competition between platforms for the acquisition of those rights. If several operators are interested in obtaining those exclusive rights, they can be assigned through auctions or tenders, in which competition for the contract increases prices.124 The rights over the CAD can be distributed as follows:

• "Live broadcasts: the most important and valuable and the most expensive acquisitions because they attract the largest audience the event can capture - interest is significantly reduced once the event concludes;

• Internet Transmission (WebcastIng): In recent years the number of webcasts has increased number of events that are broadcast on this medium (in high definition);

• Delayed transmissions: they still have value (and report audiences) but in lesser extent; and

• Highlights Pack: commonly used for purposes news on broadcast media, including digital media where they can be offered on demand.

The programming available to them is arranged in programming channels or channel packages for television that are subsequently licensed to retail distributors.

---

123 In some cases, the rights to broadcast all matches corresponding to a league may be granted.
124 See for example, European Audiovisual ObseNatory (2016) pp. 20-25 ; y Hoehn, T., and Kastrinaki, Z., "Broadcasting and sport: value drivers of TV rIghts deals in European football", available at: http://www.city.ac.uk/ data/assets/pdf file/0007 /120130/Hoehn Kastrinaki Sports Rights Feb 2012. Pdf.



**92/305**



INSTITUTO FEfXlÿAL m:
( TF.Ù,COMIJNICACIONI"S

The CADs offered in Mexico for STAR may be part of: (i) STAR-exclusive channels; (ii) open television channels rebroadcast on STAR; and (iii) PPV.

ADCs, unlike other audiovisual content, are non-replicable and have maximum value when they are transmissions lose [125] transmitted simultaneously with the event from which they are created. Delayed significant value.

Rights holders generally optimize their revenues by managing simultaneous or near-simultaneous versions for different windows or streaming media. Thus, depending on their business model, they can grant retransmission licenses for STRD, STAR, and/or digital media within the same territory. Not all CADs have the same value. It is a well-known fact for this Institute that there are CADs that have a high value for streaming media, based on their potential to attract high levels of audience; and because their non-replicability makes them scarce (i.e., commonly identified as Premium CADs). These contents can generate high advertising revenues for the media that transmits them because they are consumed in real time and—unlike other recorded audiovisual content such as movies—audiences increase their exposure time to the entire broadcast, including advertising inserts.126

Due to the demand for Premium CAD and its stable volume, streaming rights have increased significantly broadcasters. at the international level. The acquisition of rights represents a high cost for Premium CADs *are* defined in terms of audiences and can vary between jurisdictions.

---

".

125 See "AGREEMENT BY WHICH THE PLENARY OF THE FEDERAL TELECOMMUNICATIONS INSTITUTE IDENTIFIES THE RELEVANT AUDIOVISUAL CONTENT IN TERMS AND FOR THE PURPOSES OF THE FOURTH MEASURE AND THE SECOND TRANSITIONAL ARTICLE OF ANNEX 4 OF RESOLUTION NUMBER P/IFT/EXT,060314/76 WHICH DETERMINED THE PREPONDERANT ECONOMIC AGENT IN THE TELECOMMUNICATIONS SECTOR AND THE EIGHTEENTH MEASURE AND THE THIRD TRANSITIONAL ARTICLE OF ANNEX 1 OF RESOLUTION NUMBER P/IFT/EXT/060314/77 WHICH DETERMINED THE PREPONDERANT ECONOMIC AGENT IN THE TELECOMMUNICATIONS SECTOR BROADCASTING"

Public information available at: http://apps.ift.org.mx/publicdata/P IFT EXT 290514 105.pdf. This document states: *"Non-replicated audiovisual content is that which presents events that do not have close*

*substitutes, due to their particular characteristics.*

*For example, the final of a professional football league, which is strongly anchored in national tastes and culture. The opposite is the case with content such as soap operas, series and so-called talk shows, among others, which are, by their very nature, reproducible, since they generally operate from pre-established formats, from which it is possible to reproduce a wide variety of content with common characteristics and which are offered simultaneously with the intention of competing for the same audience."* 1 6 European Audiovisual Observatory (2016), pages 18-20. r



Machine Translated by Google

For non-Premium CADs, multiple events may be available on the same date and time, so CP Sports Channel programmers must choose *in advance* which events to broadcast in order to secure the rights from their rights holders.

### Demand

It is a well-known fact for this authority127 that"--- the economic agents                that provide channels for STAR offer a portfolio that includes various CPs. This business model allows them to develop negotiation capacity with STAR operators who choose the channels to integrate into their packages.

In Mexico, it is identified that dSTAR operators include eleven channels in their basic packages in the Sports CP, of which only nine report audience levels, the other two channels do not report audience levels since they are not monitored. Other CPs (e.g. Open N, Movies and Series and Facts) include more channels, which is identified related to their

capacity to attract higher levels of audiences (see Table 8).

In this regard, it is identified that the main economic agents that provide STAR channels do not necessarily compete by participating in the same CPs, but \through specific CPs.

Programming channel providers generally integrate a variety of CAD of national and international character, which is why they require acquire rights to broadcast these events on their channels.

The programming profile of a programming channel is determined by the audiovisual content it transmits. Thus, integrating channels with content Sports are designed to appeal to the preferences of subscribers or consumers with specific tastes in sports content.

The value of a channel in CP Sports is derived in turn from:

i. Include high-value éADs, although due to their limited number they are not sufficient. to fill its entire programmatic bar and, due to the costs of acquisition of rights, production costs increase, affecting the business model; Include a diversity of CAD that -although

ii. not Premium- allows Attract positive audience levels that allow filling the Canaleÿ programming bar and Have the rights and resources to

iii. produce other content based on the above (e.g. News programs, magazine programs or others specialized in sports).

---

127 See resolutions of the ATT/TW concentration and file DC-01-2014.

Machine Translated by Google



INSTITUTE IF:Df'.IML DL
I[étÿC<iMUNICATIONS

The economic agents to which the Parties belong do participate in the 9-p *d1e*
Sports. As referred to in section 6.1.1 of this resolution, CP Sports includes broadcasts of soccer

and basketball games, and related programs (reports, summary programs, etc.). To integrate
these Channels, their programmers must acquire rights for the broadcast. 6.3 . **Analysis of your**

**title**

The following is a substitution analysis regarding the acquisition of rights to broadcast sporting
events in Mexico.

**National CADs**

In Mexico, the most watched CADs are soccer, and to a lesser extent, baseball. In this regard, the
following sporting events are identified as being broadcast on STAR's exclusive channels

(Restricted Channels) and the open TV channels broadcast on STAR:

(1) Liga BBV A Bancomer or Liga M¡,
(ii) Ascenso BBV A Bancomer o/Ascenso MX,

(iii) Copd MX,',

(iv) League MX Fehlef il,
(v) Matches of the Mexican National Soccer Team (within the different tournaments)
    in which he participates),

(vi) Mexican Baseball League, and

(vii)Box,

**CAD International**

In Mexico, the main international CADs that are broadcast on the exclusive channels of STAR and
the Open TV channels that are broadcast on STAR, among others, are the following: (i) NFL
(National Football League),

(ii) MLB (Major League Baseball),

(iii) NBA (National Basketball Association),

(iv) Ligb Europf a de la UEFA (dÿJnglés UEFA Europa League),
(v) Bundesliga,

(vi) UEFA Champions League, (vii) Serie A

(Italian League),

(viii) Portuguese League,

(ix) MLS,

(x) CONCACAF Champions League,

(xi) Copa Libertadores, (xii)

Copa Sudamericana,

(xiii) US Open,





95/305

Machine Translated by Google

(xiv) Athletics,
(xv) Formula I, and
(xvi) Spanish League.

### CAD naclonales e Internaclonales

STAR users' preferences are varied, as a result, there is a tendency for providers of

channels with sports content to include both national and international CADs. In this sense,
the CADs / National and International are complementary from the "perspective of the

economic agents that program sports content channels (Sports Channels) for STAR.

The programming of each Sports Channel for STAR depends largely on its programmers' ability to secure broadcast rights. The incentives to include CADs that increase the likelihood of attracting audiences are, therefore, those with a higher acquisition cost. Thus, the business model requires incorporating a diversity of CADs and programs within the broadcast space, considering cost and value issues for subscribers and/or advertisers.

Thus, for providers of channels with sports content, the acquisition of rights to broadcast

national sporting events cannot be considered a substitute for an international sporting event.

For the purposes of this analysis, the acquisition of broadcast rights for national sporting events is considered to be a distinct and distinguishable market from the acquisition of international sports content. Each of these markets exhibits distinct structures, participants, and stakes, which are analyzed in the following sections.

Based on the information presented above, the following was determined: •

The analysis of risks generated by the Operation is [carried out in:
   a) The relevant markets for the provision and licensing of content
        audiovisuals (programming channels and channel packages) to
        STAR suppliers, in the different CP of Basic Channels, in particular
        in the CP Sports and in the CP Factual; [128]

/ . b)

As a potential, the relevant market for the provision and licensing of
        audiovisual content, (programming channels, cable packages)

---

[128] The provision and licensing of audiovisual content (programs, including films) to STAR providers for PPV or VOD services is not analyzed. This is because the Sports and Facts CPs do not show that the parties provide this type of content to STAR providers for PPV and VOD services.



INSTITUTO i=mrni\L DE
íHECOMUNICACIOI\Jr,s

and,,,,sports programs to providers of the OTT distribution service of audiovisual content by subscription, and

c) The related market for the acquisition of rights for the transmission of sporting events in Mexico.

,,,--- • It was identified that the programming channels that are licensed to STAR providers can be subdivided into various programming categories: Entertainment, Children's, Movies and Series, Factual, Music, News, Sports and Open TV.

• The market for the provision and licensing of audiovisual content STAR suppliers will be analyzed with a national geographic scope.

• The provision and (licensing of audiovisual content (channels d1:;¡ programming, channel packages and programs, including movies and series) to STAR suppliers in each CP constitutes a relevant market independent.

• Given the high participation observed by Grupo 21 CF and Grupo TWDe in the provision of channels in the Sports programmatic category to STAR suppliers, this situation is evaluated in the provision and licensing of sports audiovisual content to service providers OTT distribution of audiovisual content, in case that high participation can also be transferred to this last service.129

### 6.4. Competitors, market power and concentration in relevant markets and related

This section analyzes the relevant and related markets, in which it was identified that the concentration generates risks to economic competition and free competition, in terms of what is established in section II of article 63 of the LFCE.

> **"Article 63.** To determine whether the concentration should not be authorized - or *should be sanctioned in the terms of this Law, the following elements will be considered:*
>
> *(. . .)*
>
> *11. The identification of the main economic agents that supply the market in question, the analysis of their power in the*

---

129 TWDC Group offers NE's service, "ESPN Play", as an additional service to that of STAR providers.
This service offers exclusively sports content, including ESPN, ESPN2, and ESPN3 programming channels, as well as several exclusive sports content. )\ Source: https://support.espn.com/hc/es/categorles/115000435812-ESPN-Play.




> relevant market, in accordance with this Law, the degree of concentration in said market;
>
> (... )"

In accordance with section 11 of article 63, article 59 of the LFCE establishes the criteria transcribed below.

> **"Article 59.** To determine whether one or more Economic Agents have substantial power in the relevant market, or to decide on conditions of competition, effective competition, existence of substantial power in the relevant market or other issues related to the process of competition or
>
> free competition referred to in this or other laws, regulations or administrative provisions, the following elements must be considered:
>
> I.    Their market share and whether they can set prices or restrict supply in the relevant market themselves, without competitors being able, currently or potentially, to counteract such power. To determine market share, the Commission may take into account sales indicators, number of customers, production capacity, as well as any other factor it deems relevant;
>
> II.    The existence of barriers to entry and the elements that
>
> can foreseeably alter both these barriers and the supply from other competitors;
>
> III.    The existence and power of its competitors 1
>
> IV.    The possibilities of access of the Economic Agent( s ) and their competitors to sources of inputs;
>
> V.    The recent behavior of the Economic Agent( s ) that participate in said market, and
>
> WE.    The others established in the Regulatory Provisions, as well as well as the technical criteria issued by the Commission for this purpose."

The following section analyzes the elements established by the aforementioned article.

## Article 59, section 1, of the LFCE

> "( .. .)                                                                 ÿ )
>
> I. Their participation in said market and whether they should set prices or restrict the supply in the relevant market by themselves, without the agents competitors may, currently or potentially, counteract such power. In order to determine market share, the Commission may



Machine Translated by Google



Ff:DEI<AL INSTITUTE OF.
n:LECOMUNICACIO\lI::S

*take into account sales indicators, number of customers, production capacity, as well as any other factors that are considered relevant;*

(.J·

### 6.4. Provision and licensing of audiovisual content to STAR providers

#### a) Aggregate Level - All CPs

*On the supply side* - e/1 At a first *audience terms* level of aggregation in Table 9, in accordance with the information provided by the Parties, the shares are presented, calculated based on the audience *share* during the months of January to December in the period from two thousand thirteen to two thousand seventeen, of Grupo TWDC, Grupo21CF and the other participants in the provision and licensing of audiovisual content to STAR providers in Mexico.

This activity includes programming channels, channel packages and programs (ie audiovisual content)!

As identified in section 5.1.2 of this Resolution, TWDC Group has the ability to exercise joint control over the entities that ultimately distribute the A&E Channels licensed by HBO LAG in Mexico. For this reason, TWDC Group is attributed ownership of the A&E Channels.

**Table 9. Audience-based participation in the provision and licensing of audiovisual content by STAR providers, considering all CPs, 2013-2017**

| Proveedor y licenciante | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Time Warner Channels (without considering i Channels A&E) J | (we) | | | | |
| Time Warner Channels distributed by• TumeryHBO'TEAM: | | | | | |
| Third Party Channels distributed by• HBO LAG (not considering Channels): A&E)• NBC• Sony1 | | | | | |
| GIETV | | | | | |
| STAR Exclusive Channels | | | | | |
| Broadcast Open TV Channels • GrupoTWDC | | | | | |
| | | | | | |
| Distributed by TWDC Group | | | | | |
| A&F channels distributed by HBO LAG | | | | | |

Machine Translated by Google

/ ".

| Supplier and Licensor | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Group 21CF | | | | | |
| DIscovery | (we) | | | | |
| Vlacom | | | | | |
| MVS | | | | | |
| Megacable/PCJY | | | | | |
| AMC Networks | | | | | |
| Multimedlos | | | | | |
| Formula | | | | | |
| Antenna | | | | | |
| Others from 1V Open | | | | | |
| Other specific$ of STAR | | | | | |

Source: Prepared by the authors based on information provided by the Parties and public information from the suppliers' websites.

Data obtained from January 1 to December 31, 2017. The query variable is Share in the 28 cities/ for Hooares with 1V of Paoa from Monday to Sunday/ 24:00 hours a day.

Main participants before the Operation

As of December 2017, on the supply side, FOUR economic agents with shares greater than 5% (five percent) of the
audience *share :*

1. Time Warner-  (we)

/ 2. *GONE* -  (we)

\ 3" TWDC Group -  (we)

4. Group 21 CF -  (we)

During the period 2013 to 2017, GIEN was the economic agent that held the largest share at this level of aggregation, followed by Time Warner, as illustrated in Chart 2.

100/305