**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FOX CORPORATION; FOX MEDIA LLC; FOX SPORTS EN ESPAÑOL LLC,<br>Plaintiffs,<br>v.<br>MEDIA DEPORTES MEXICO, S. de R.L. de C.V.,<br>Defendant. | Case No.: 1:25-cv-06703 |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF NON-PARTY MEXICO SPORTS DISTRIBUTION LLC'S MOTION PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2) and (5) TO SET ASIDE CONTEMPT ORDER**

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 5

II. FACTUAL BACKGROUND ..... 10

III. ARGUMENT ..... 20

A. MSD Lacks Minimum Contacts with New York. ..... 20

B. This Court Lacks General Personal Jurisdiction over MSD. ..... 21

C. This Court Lacks Specific Personal Jurisdiction over MSD. ..... 22

D. The Exercise of Personal Jurisdiction over MSD Would Be Unreasonable. ..... 26

IV. CONCLUSION ..... 28

# TABLE OF AUTHORITIES

**Cases**

*Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.*, 1 F.3d 848 (9th Cir. 1993)................................ 28

*AmTrust Fin. Services, Inc. v. Lacchini*, 260 F. Supp. 3d 316 (S.D.N.Y. 2017)......................... 26

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)............................................................. 22

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)................................. 21

*Gucci America, Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014) .............................. 20, 21, 22, 23

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211 (4th Cir. 2019) ................................... 23

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................................ 21

*Heyman v. Kline*, 444 F.2d 65 (2d Cir. 1971)............................................................................. 26

*In re Terrorist Attacks on September 11, 2001*, No. 03 MDL 1570 (GBD) (SN), 2023 WL 2430381 (S.D.N.Y. 2023)......................................................................................... 23

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)..................................................................... 20

*J. McIntyre Machinery, Ltd v. Nicastro*, 564 U.S. 873 (2011) .................................................... 21

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012)....................... 20

*Metro. Life Ins. Co. v. Robertson Ceco-Corp.*, 84 F.3d 560 (2d Cir. 1996)................................ 26

*Reebok Int'l Ltd, v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995) .................................................. 22

*Shaoxing Bon Textiles Co., Ltd. v. 4-U Performance Group LLC*, No. 16-cv-6805 (JSR), 2018 WL 11389637 (S.D.N.Y. Mar. 15,2018) ....................................................................... 22

*Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201 (1st Cir. 1994)............................................ 26

*Walden v. Fiore*, 571 U.S. 277 (2014)......................................................................................... 26

**Other Authorities**

Constitución Politica de los Estados Unidos Mexicanos, *Gobierno de México* .......................... 11

https://www.gob.mx/indesol/documentos/constitucion-politica-de-los-estados-unidos-mexicanos-97187 .......................... 11

*Restatement (Third) of the Foreign Relations Law of the United States* § 441(1)(a)(1 (Am. L. Inst. 1987) .......................... 22

**Rules**

Federal Rule of Civil Procedure 12(b)(2) .......................... 20

Non-party Mexico Sports Distribution LLC ("MSD") submits this Memorandum in support of its Motion under Rule 12(b)(2) and (5) of the Federal Rules of Civil Procedure to set aside the Court's Order Holding MSD in Contempt.

## I. INTRODUCTION

Fox Corporation ("Fox") presents this matter as an isolated dispute. It is not. This action is one front in a conflict spanning multiple litigations in Mexico and the United States. This case is a recent and tactical escalation, filed only after multiple related actions involving the same parties and subject matter were already underway in Mexico. To properly evaluate the motion before it, the Court requires context that Fox has omitted; context concerning the origin of this conflict.[1]

That origin is Fox's scheme to seize the assets of the Fox Sports Mexico business (the "Business")[2] without payment. Under the guise of a proposed acquisition, Fox used its leverage to strip the Business from the inside. Acting through a Fox executive who is simultaneously a director of MSD—Carlos Martínez—Fox instructed the Business's debtors to delay payments and then divert them directly to Fox. At the same time, Fox induced the Business to forgo all outside financing as a supposed condition of the deal, ensuring its target was financially weakened.

---

[1] The following allegations either have been or will be presented to Mexican courts by MSD and other interested parties.

[2] The Fox Sports Mexico Business refers to the group of entities that operate the Fox Sports channels in Mexico, including MSD.

As a direct result of being denied financing and stripped of its revenue, the Business was forced into late payments to its content providers. Having inflicted this harm, Fox abandoned the acquisition while keeping the assets and payments it had misappropriated.

Fox then escalated its attack by going after the "FOX" trademarks that a Mexican federal regulator had granted to the Fox Sports Mexico Business. Fox first unlawfully started using the "FOX" brand to broadcast sports content in Mexico—in defiance of the exclusive right that the Business holds under a governmental order—to compete with the very entity it had just debilitated. Fox then filed this lawsuit to sidestep the regulator.

This entire dispute is properly centered in Mexico—the forum Fox itself chose when it (through its wholly owned subsidiaries) first sought an injunction against the Business. The Business's rights that Fox has violated do not arise from a contract between private parties, but from a binding order issued by a Mexican antitrust regulator for the telecommunications and broadcast sectors. Accordingly, the Business filed its claims in Mexico, securing a narrow injunction to preserve its rights under Mexican law.

Fox's subsequent filing in New York is retaliatory and procedurally defective. The trademark rights at the heart of Fox's Complaint are governed by binding orders of a sovereign Mexican regulator—a necessary party to this action that is beyond this Court's jurisdiction. This lawsuit is a baseless procedural attack, designed to drain the resources of the Business and evade the authority of the proper Mexican courts and regulators.

As a direct consequence of Fox's sharp tactics, late last year, the Business was tardy on payments to certain content providers, causing widespread media attention. The news apparently attracted the attention of a Mexican regulatory agency, the Instituto Federal de Telecomunicaciones ("IFT"). The IFT is the Mexican federal agency appointed under the

Mexican Constitution to regulate the broadcast and telecommunications industries in Mexico. The IFT's constitutional mandate includes serving as an antitrust regulator for these industries by ensuring that they remain competitive and monopoly-free. Pursuant to this mandate, the IFT is empowered to impose conditions on transactions that have anticompetitive effects, and to order remedies when those conditions are not satisfied.

Consistent with its mandate, the IFT served information requests on the Fox Sports Mexico Business inquiring about the reported struggles. The IFT was investigating the viability of the Fox Sports Mexico Business.

The IFT's inquiry into the viability of the Business was directly related to its intervention into the formation of the present-day version of the Business. In fact, the IFT ordered the formation of today's version of the Business through its prior regulatory actions. In 2019, Plaintiffs' predecessor Twenty-First Century Fox ("21CF") and The Walt Disney Company ("Disney") agreed to a multibillion-dollar global transaction whereby 21CF merged with Disney (the "21CF Transaction").[3]

The IFT reviewed and ultimately approved the 21CF Transaction as it pertained to media assets in Mexico. But the IFT conditioned its approval on 21CF and Disney agreeing to spin off at least one of those assets: the Fox Sports Mexico Business.

The IFT also sought to ensure the viability of the Fox Sports Mexico Business so that it could become a competitor in the marketplace, thereby enforcing the public policy the IFT is mandated to pursue. Accordingly, the IFT set additional conditions for the spin off. For example,

---

[3] Prior to the merger, some of 21CF's assets were spun off into a newly formed entity known as Fox Corporation, which remained under the control of 21CF's previous shareholders. *See* Martinez Decl. ISO Mot. for TRO ¶ 3, ECF No. 11, Aug. 14, 2025.

the IFT ordered that the Fox Sports Mexico Business be sold to an approved third-party who could demonstrate the ability to keep the Business viable. And critically, the IFT also required Fox and Disney to grant the third-party purchaser the right to use the name "FOX" via a "free exclusive license for use for sports content." Declaration of Gabriel López Camacho, filed concurrently ("López Decl."), Ex. A2, § 8.4.12.4. The IFT imposed this condition so that neither Fox nor Disney could "affect the viability of the business after its Divestiture." *Id.*, Ex. A2, at 3. Thus, the IFT's condition granting the Fox Sports Mexico Business an exclusive license to the "FOX" name was not a gift. It was a measure taken by the IFT to protect the Mexican public by encouraging competition in the marketplace.

In November 2021, Grupo Lauman purchased the Fox Sports Mexico Business subject to the IFT's approval. Thus, Grupo Lauman availed itself of the regulatory power of the IFT. Indeed, the IFT expressly retained jurisdiction to investigate and adjudicate failures of all the parties to the spin off to comply with the IFT's conditions.

This explains why, in 2025, the IFT sent requests to the Fox Sports Mexico Business inquiring into its viability. The IFT issued these requests pursuant to its authority to ensure the ongoing viability of the Fox Sports Mexico Business.

The Fox Sports Mexico Business initially resisted the IFT's information requests. It argued that the IFT's conditions had been satisfied and that the IFT therefore no longer had authority to review the Business' viability. But the IFT expressly rejected this argument.

The IFT declared that the conditions for its approval of the 21CF Transaction remain in force. Thus, the IFT explained it continues to have the authority to investigate whether the conditions for the 21CF Transaction approval are being met. Additionally, the IFT expressly

noted that the condition of "sublicensing … the exclusive free use of the 'FOX' brand for sports content" is a condition that is "still in force." López Decl., Ex. B2, ¶ 5.

By filing this lawsuit and seeking sanctions against non-party MSD, Fox aims to sidestep the IFT and the Mexican process for adjudicating regulatory actions. Fox filed this complaint in the SDNY on a contract that does not govern the conduct at issue in Mexico and that is not the basis of relief sought by MSD or Media Deportes Mexico S. de R.L. de C.V. ("MDM") in Mexico. Fox's plain intention here is to financially cripple MSD before any of the issues in Mexico are resolved. As a result, this litigation is interfering with the IFT's constitutional mandate to protect the Mexican public.

The issues implicated by non-party MSD's foreign litigation–the viability of the Fox Sports Mexico Business and the use of the "FOX" name– are precisely the issues over which the IFT set conditions and retained jurisdiction to investigate and adjudicate. Fox's contracts do not override the IFT's authority. As a condition of its multi-billion-dollar sale to Disney, Fox is subject to the IFT's continuing jurisdiction to ensure the conditions the IFT set in 2019 continue to be met.

As the IFT explained in its 2019 Resolution approving the 21CF Transaction (López Decl., Ex. A, the "2019 Resolution" or "2019 IFT Resolution"), stripping the Fox Sports Mexico Business of the trademarks, or granting it only a non-exclusive license to use the "FOX' brand (as opposed to an exclusive license), would endanger the viability of the Fox Sports Mexico Business. López Decl., Ex. A2 at 3. This includes the viability of non-party MSD.This is precisely why the IFT deemed it necessary to make it a binding condition for the buyer of the Fox Sports Mexico Business to be granted an exclusive and royalty-free license to use the "FOX" name for sports broadcasts in Mexico.

Fox seeks to use this venue to sidestep the IFT's regulatory authority for its own commercial gain. In doing so, Fox necessarily aims to undermine the IFT's efforts, on behalf of the Mexican people, to promote competition in the sports media marketplace. The Court should not allow this.

Fortunately, the due process clause of the Fourteenth Amendment constrains Fox's overreach. U.S. CONST. amend. XIV. Fox has not shown that MSD is subject to personal jurisdiction in this forum. MSD does not carry out business in this forum. López Decl. ¶ 5. Nor has MSD engaged in conduct designed to have a purpose and effect in the forum. MSD's alleged conduct relating to the use of the Fox trademarks and the Mexico Injunction, all occurring in Mexico, is designed to comply with the IFT's authority, conditions, and policies. Due process does not permit exerting specific jurisdiction over non-party MSD for its efforts in Mexico to comply with Mexican law.

For these reasons, and explained further below, MSD respectfully requests the Court set aside the Contempt Order for lack of personal jurisdiction.

## II. FACTUAL BACKGROUND

MSD is a Delaware company with an office in Florida. *Id*., ¶ 4. MSD does not conduct business in New York. *Id*. at ¶ 5. The conduct at issue relates to the use of trademarks in Mexico by defendant MDM, and legal proceedings in that country. *See generally,* Plaintiffs' Emergency Mot. For Contempt Against Nonparties, Aug. 29, 2025, ECF No. 42.

As Fox admits, the gravamen of those foreign legal proceedings is about a Mexican regulatory agency's promotion and preservation of a competitive marketplace in Mexico for sports media. *See* Complaint, ¶ 47, Aug 14, 2025, ECF No. 1 ("Compl."). ("The allegation at the heart of MDM's injunction request was that MDM had an exclusive license to use the Fox Sports

Trademarks. MDM claimed that Mexico's telecommunications regulator, the Instituto Federal de Telecomunicaciones . . . had issued a resolution in 2019 . . . requiring that MDM's license to use the Fox Sports Trademarks be exclusive in nature.")

The IFT is a Mexican government agency appointed by the Mexican Constitution with the *exclusive* power to regulate competition in Mexico's broadcast and telecommunications industries. *See* Constitución Politica de los Estados Unidos Mexicanos, *Gobierno de México*, (Mex.) art. 28, *available in Spanish at* HYPERLINK https://www.gob.mx/indesol/documentos/constitucion-politica-de-los-estados-unidos-mexicanos-97187.[4] (Last visited Sept. 12, 2025); s*ee also* Declaration of Jaime Dorenbaum ISO Supplemental Memorandum, Exhibit 1 ("de Swaan Decl."), filed concurrently, § 2 ("The opinion aims to share with the Honorable Court that the regulatory decisions issued by the IFT in Mexico – in the context of economic concentrations that impact competition and consumer access to audiovisual content – are acts of public order and general interest, the review of which corresponds exclusively to Mexican courts in accordance with the applicable constitutional and legal framework.").

---

[4] "The Federal Telecommunications Institute shall also be the authority in matters of economic competition in the broadcasting and telecommunications sectors, and therefore shall exclusively exercise in these sectors the powers established by this article and the laws for the Federal Economic Competition Commission and shall asymmetrically regulate participants in these markets with the objective of effectively eliminating barriers to competition and free competition; it shall impose limits on the national and regional concentration of frequencies, on the licensing and cross-ownership that controls several media outlets that are broadcasting and telecommunications concessionaires that serve the same market or geographic coverage area, and shall order the divestiture of assets, rights or parts necessary to ensure compliance with these limits, guaranteeing the provisions of articles 6 and 7 of this Constitution." (machine translation using Google Translate).

Specifically, the IFT oversaw and ultimately approved the 21CF Transaction. On March 11, 2019, a Plenary Session of the IFT authorized merger of 21CF into Disney. *See* López Decl., Ex. A.

The IFT's approval was subject to several conditions. *See id.*, Ex. A, §§ 8.3-8.6.4 (part 4). The IFT's approval and conditions are set forth in Agreement P/IFT/110319/122. *Id*.

One of those conditions was that 21CF and Disney agreed to spin off 21CF's sports media assets in Mexico to an independent third-party (the "Fox Sports Mexico Business"). *See* López Decl., Ex. A, § 8.4(a) (part 4). The Fox Sports Mexico Business included Defendant MDM, and non-party MSD.

By imposing this condition, the IFT sought to promote competition in the market for sports media in Mexico. *See* López Decl, Ex. A2, § 8.4.1, titled "Purpose." ("Structural Conditions are imposed for the purpose of correcting the effects of the Transaction that would generate risks of diminishing, harming or impeding competition.")

Importantly, the IFT's Resolution went further than merely ordering a spinoff. "[T]he purpose of the sale of the FSM [Fox Sports Mexico] Business was, among other things 'to preserve the number and size of participants existing before the closing of the Transaction', *as well as 'to preserve [the existence of the FSM Business] as a viable competitor'*…" López Decl., Ex. B at 1, quoting Ex. A, 2019 IFT Resolution at §§ 8.2.2.6, 8.4.1, pages 228/305 and 257/305, respectively (emphasis added).

Thus, the IFT imposed further conditions to ensure the viability of the Fox Sports Mexico Business. *See, e.g.*, López Decl., Ex. A2, § 8.4 ("In the present case … this authority establishes the following conditions…in order to prevent the concentration from diminishing, harming, or

impeding competition or free market access in the relevant market for the provision and licensing of audiovisual content to STAR providers in the Sports PC (Structural Conditions)"); s*ee also id*. at 3 ("In this regard, in a manner consistent with the Purpose of these conditions, it is considered necessary to adopt measures so that the Parties cannot affect the viability of the business after its Divestiture. Therefore, it is determined that the license of use for sports content to be free and exclusive, as long as it is used in accordance with its current use by the Business to be Divested.").

To this end, the IFT required that the purchaser of the Fox Sports Mexico Business be granted a sublicense with the exclusive rights to use the "FOX" name for sports broadcasts in Mexico for a period of years:

> Once the sale of the Business to be Divested is completed, the name "Fox" will be offered to the Buyer under a free exclusive license for use for sports content, to be used in accordance with its current use by the Business to be Divested, for a period of at least three (3) years.

López Decl., Ex. A2, § 8.4.12.4.

This condition aimed to promote the viability of the Fox Sports Mexico Business in the hands of a third-party purchaser. *See id*., Ex. A2 at 3 ("In this regard, in a manner consistent with the Purpose of these conditions, it is considered necessary to adopt measures so that the Parties cannot affect the viability of the business after its Divestiture. Therefore, it is determined that the license of use for sports content to be free and exclusive, as long as it is used in accordance with its current use by the Business to be Divested."); *see also id.*, Ex. B2 at 1. ("[T]he the ultimate purpose of the divestiture conditions is 'to preserve [the existence of the FSM Business] as a viable competitor.' Likewise, in accordance with these decisions issued by the IFT, the following

conditions are still in force: … ii) the sublicensing of the exclusive free use of the 'FOX' brand for sports content…")

Fox's Complaint alleges that the sublicense ultimately granted to the Fox Sports Mexico Business was expressly non-exclusive. *See* Compl., ¶¶ 47-50. The Complaint relies on the language of the License Agreements. *See id*. at ¶ 50. But, by conditioning its approval of the 21CF Transaction on the granting of an exclusive license, the IFT imposed a non-contractual obligation via its 2019 Resolution that the buyer of the Fox Sports Mexico Business gets an exclusive license. *See* López Decl., Ex. A2, § 8.4.12.4. 21CF consented to the IFT's conditions in 2019 and represented that the IFT's conditions "have already been deemed fulfilled." *See id.*, Ex. B2 at 1, quoting 2019 IFT Resolution. And Mexican courts have the exclusive jurisdiction to enjoin anyone violating the IFT's condition that the Business' license is exclusive. *See* de Swaan Decl., § 2.3(2) ("Pursuant to Article 28 of the Constitution, its review is solely the responsibility of the Mexican courts through amparo proceedings, with no possibility of suspension.") Therefore, so long as Fox seeks to violate the IFT condition, Fox is subject to jurisdiction in Mexico. *See also* López Decl., Ex. A2, § 8.6.1-2.

The IFT's Resolution explains why the IFT required the grant of an exclusive license as a condition for its approval of the 21CF Transaction. The Resolution observes that Fox and Disney initially proposed that the Fox trademark be granted to a third-party "under a non-exclusive, free license to use such trademark…" *See* López Decl., Ex. A2 at 2; *see also id.* ("Upon completion of the sale of the Divesting Business, the name 'Fox' will be offered to Buyer under a non-exclusive, complimentary license to use such a mark…"). But the IFT rejected this proposal. It responded:

> Likewise, together, numerals 4 of section A, and 3 of Appendix A.1 of the Proposal for Structural Conditions establish that the Business to be Divested does not include the rights to trademarks and trade names that contain the name 'Fox". However, once the sale of the Business to be Divested is finalized, it proposes granting the Buyer(s) a free exclusive license to use sports content to be used for a period of at least three (3) years, in accordance with its current use by the Business to be Divested, which is considered adequate and proportional to preserve the viability of the Business to be Divested. In this regard, in a manner consistent with the Purpose of these conditions, it is considered necessary to adopt measures so that the Parties cannot affect the viability of the business after its Divestiture. Therefore, it is determined that the license of use for sports content to be free and exclusive, as long as it is used in accordance with its current use by the Business to be Divested.

*Id.*, Ex. A2 at 3. Thus, by requiring the sublicense for the "FOX" name to be exclusive, the IFT ensured that 21CF and Disney could not undercut the viability of the Fox Sports Mexico Business by using the same trademarks. In turn, this requirement ensured that the IFT's efforts to promote competition would be realized. *See* López Decl., Ex. A2, § 8.4.1 ("Purpose") ("Structural Conditions are imposed for the purpose of correcting the effects of the Transaction that would generate risks of diminishing, harming or impeding competition.").

On March 15, 2019, 21CF and Disney formally accepted the IFT's conditions. *See* López Decl., Ex. B at 1. In doing so, 21CF and Disney also accepted the IFT's jurisdiction to ensure that the conditions are being met. *Id.,* Ex. A2, § 8.6.1-2.

The 21CF Transaction closed on March 20, 2019. *See* López Decl., Ex. B, p. 1. After the close of the Transaction, an IFT appointed administrator continued to operate the Fox Sports Mexico Business until it was sold to a third-party purchaser approved by the IFT. *See id*., Ex. A, (attachment 4 of 4, 271/305), §§ 8.4.6.1-2.

On May 14, 2021, the IFT determined that Grupo Lauman met the criteria in Section 8.4.7.1 of the 2019 Resolution and was eligible to purchase the Fox Sports Mexico Business. *Id.*, Ex. B at 3.

On November 10, 2021, Grupo Lauman closed the transaction to purchase the Fox Sports Mexico Business. *See* López Decl., Ex. B, p. 4.

In the month before Grupo Lauman closed the transaction, Disney corresponded with cable operators who were carrying the Fox Sports Mexico Business' channels on their platforms. Cable operators pay fees to broadcast the Fox Sports Mexico Business' channels on their platforms. *See* Martinez Decl., ECF No. 11, ¶ 3. Various cable operators reached out to Disney with questions about the impending transition of the Fox Sports Mexico Business to Grupo Lauman. *See* López Decl., Ex. C2. In response to those questions, Disney affirmed that Grupo Lauman "will have an exclusive license in Mexico for sports content under the name "Fox," with a license term that covers at least the term of the Agreements." *See id.*, Ex. C2, § 11.

Ultimately, the terms of the Fox Sports Mexico Business spin off were governed by the IFT's conditions:

> The divestiture of the FSM Business from 21CF and TWDC businesses, its sale as a viable, competitive and ongoing business, the assessment of potential buyers, the approval of Grupo Lauman as a possible buyer and the subsequent sale of the FSM Business in favor of Grupo Lauman, were all legal acts ordered and supervised by this IFT. That is, Grupo Lauman acquired the FSM Business through the order of divestiture, surveillance, monitoring, and sale authorized by the IFT.

López Decl., Ex. B2 at 1.

Since the spin off, the IFT has continued to oversee the Fox Sports Mexico Business. This is consistent with 2019 Resolution, in which the IFT expressly retained jurisdiction, including over Fox, to oversee whether its conditions continue to be met. *See* López Decl., Ex.

A2, § 8.6.1 ("In the event that the Institute has any indications or an objective cause of a possible non-compliance by the Parties with any of the conditions and/or obligations to which the authorization of the Notified Transaction is subject, it shall initiate an incidental procedure related to compliance with the conditions, in the terms provided for in articles 132 and 133 of the Law…").

In February 2025, around the time that news arose about MSD's financial difficulties, the IFT exerted its investigative power to issue information requests to the Fox Sports Mexico Business. The IFT inquired about the Business' alleged issues with paying licensing fees to certain sports rights holders. *See* López Decl., Ex. B, pp. 14-16. In correspondence to the Fox Sports Mexico Business, the IFT remarked that its conditions had not yet been fulfilled: "In its Letter of Refusal to Respond, Grupo Lauman states that the conditions or obligations for divestiture ordered by the IFT in Resolution P/IFT/110319/122 'have already been deemed fulfilled,' as it recognized in its Agreement P/IFT/120122/7 dated January 12, 2022. However, this is incorrect, since, as noted, the ultimate purpose of the divestiture conditions is 'to preserve [the existence of the FSM Business] as a viable competitor.'" López Decl., Ex. B2 at 1. Thus, the IFT made clear that pursuant to its 2019 Resolution, the Fox Sports Mexico Business must continue to pursue viability.

To this end, the IFT's 2025 correspondence expressly declared that the exclusive trademark sublicensing condition is a continuing obligation under the 2019 Resolution:

> [T]he the ultimate purpose of the divestiture conditions is "to preserve [the existence of the FSM Business] as a viable competitor." Likewise, in accordance with these decisions issued by the IFT, the following conditions are still in force: … ii) the sublicensing of the exclusive free use of the "FOX" brand for sports content agreed between TWDC and 21CF, so that the buyer of the divested business (in this case, Grupo Lauman) could use said brand for a minimum period, which, derived

> from the negotiations between TWDC/21CF and Grupo Lauman and in accordance with the License Assignment Agreement submitted to the IFT on March 16, 2022, turned out to be five (5) years, which would conclude on November 10, 2026. – condition 8.4.12.4.-

López Decl., Ex. B2 at 1-2.

MSD's pursuit of the Mexico Injunction seeks to comply with the IFT's requirements. The Mexico Injunction aims to preserve the viability of the Fox Sports Mexico Business. *See* López Decl., Ex. E at 4 ("The petitioners state that exclusivity in the use of the Fox Sports Trademarks in Mexico was an essential requirement for the regulator to authorize the sale of the Fox Sports Mexico business…"). Indeed, the IFT declared that the exclusive use of the "FOX" name is necessary for the viability of the Business. *See* López Decl., Ex. A2 at 3 ("[I]t is considered necessary to adopt measures so that the Parties cannot affect the viability of the business after its Divestiture. Therefore, it is determined that the license of use for sports content be free and exclusive, as long as it is used in accordance with its current use by the Business to be Divested."). *See also* López Decl., Ex. B2 at 1 ("[T]he the ultimate purpose of the divestiture conditions is 'to preserve [the existence of the FSM Business] as a viable competitor.' Likewise, in accordance with these decisions issued by the IFT, the following conditions are still in force: … ii) the sublicensing of the exclusive free use of the "FOX" brand for sports content…").

Having obtained the Mexico Injunction, Grupo Lauman filed a complaint before the IFT notifying the agency that Fox *and Disney* have failed to comply with the conditions of the 21CF Transaction. *See* López Decl., Ex. F at 6-7. The complaint states,

> "Particularly seriously, Fox Corp. has stated publicly, as well as in various legal proceedings, that Grupo Lauman and/or its subsidiaries **do not have** the right to the exclusive use of the name 'FOX' for the broadcasting of sporting events in Mexico, but only a **non-exclusive** license to use said name."

> "This has jeopardized the viability of FSM and, more importantly, could constitute a very serious non-compliance with the conditions established by the IFT in the 2019 IFT Resolution, including the Fox Exclusive Use Condition." López Decl., Ex. F at 3-4.

Grupo Lauman's position is clear: whether the Fox Sports Mexico Business has an exclusive right to use the "FOX" name for sports broadcasts is exclusively an IFT issue.

Meanwhile, Fox too has pursued legal avenues in Mexico through its subsidiaries. In fact, Fox moved *first* in Mexico. On February 6, 2025, Fox initiated an action for injunctive relief related to the trademarks at issue in the Superior Court of Justice in Mexico City against the Fox Sports Mexico Business entities. *See* Lopez Decl., Ex. I at 1. By seeking relief in Mexico, Fox submitted to the Mexican courts' jurisdiction.

MSD filed its request for and was awarded an injunction on March 26, 2025 to preserve the IFT's regulations granting the Fox Sports Mexico Business exclusive licenses. Fox promptly appealed the injunction on April 23, 2025, and that appeal has since been rejected. *See* López Decl., Ex. H at 21-22.[5]

On April 28, 2025 Fox sought a declaration from the IFT that the trademarks were subject to non-exclusive licenses. Martinez Decl., ECF No. 11, ¶ 15. Apparently, unsatisfied with the IFT's response, Fox has since returned to the IFT for further action. *See* Lopez Decl., Ex. J. Thus, by seeking relief in Mexico, Fox has assented to Mexican jurisdiction.

---

[5] "The order dated March 26, 2025, issued by the Forty-Second Civil Court of Written Procedure of Mexico City, in the proceedings of the Preliminary Measures, promoted by Media Deportes México, S. de R.L. de C.V. and Mexico Sports Distribution LLC against Fox Corporation; Fox Media LLC; Fox Cable Network Services LLC; and Carlos Enrique Martínez Sánchez, processed before the Forty-Second Civil Court of Written Procedure of Mexico City under file number 180/2025, is hereby confirmed." (translated by google machine translation).

## III. ARGUMENT

"[A] district court can enforce an injunction against a nonparty … only if it has personal jurisdiction over that nonparty." *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014). The Contempt Order against non-party MSD should be set aside for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

"The lawful exercise of personal jurisdiction by a federal court requires satisfaction of three primary requirements." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). First, the plaintiff must properly deliver service of process upon the defendant. *See id*. Second, the plaintiff must have a "statutory basis for personal jurisdiction that renders such service of process effective." *Id*. Third, the exercise of personal jurisdiction must comport with due process. *See id*. at 60.

The Second Circuit applies a two-step test to determine whether the exercise of personal jurisdiction over a non-party is consistent with due process. First, courts determine whether the non-party has sufficient minimum contacts with the forum. *Gucci*, 768 F.3d at 136. Second, courts determine whether asserting specific personal jurisdiction is reasonable under the circumstances of the particular case. *Id*. at 136-137.

Because the exercise of personal jurisdiction against non-party MSD does not comport with due process, the Contempt Order should be set aside.

### A. MSD Lacks Minimum Contacts with New York.

MSD must have "minimum contacts" with this forum such that it is fair to force it to defend a claim here. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). These basic due process principles are reflected in two types of personal jurisdiction: (1) general jurisdiction; and (2) specific jurisdiction. *See Gucci*, 768 F.3d at 134. "General, all-purpose jurisdiction permits a

court to hear 'any and all claims' against an entity." *Id*. (citations omitted). "Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that arise out off or relate to the entity's contacts with the forum." *Id*. (citations omitted (cleaned up). Fox cannot establish either general or specific jurisdiction over non-party MSD.

**B. This Court Lacks General Personal Jurisdiction over MSD.**

To establish general jurisdiction, the party asserting jurisdiction must show that the responding entity possesses "continuous and systematic general business contacts" with the forum. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 929 (2011) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). The United States Supreme Court held that general jurisdiction exists only when a responding entity is "at home" in the forum state. *Goodyear*, 564 U.S. at 923-24; *see also id.* at 919 (general jurisdiction applies only when the responding entity's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State"). In general, a corporation's "home" refers to its "domicile, place of incorporation, and principal place of business." *Id*. at 924. Simply put, "those who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter." *J. McIntyre Machinery, Ltd v. Nicastro*, 564 U.S. 873, 881 (2011).

Fox's Motion does not state, refer to, or otherwise indicate that MSD has any "affiliation" with the forum, much less any affiliations that are "continuous and systematic" as to essentially render MSD "at home" in this forum. *Goodyear*, 564 U.S. at 924. Also, MSD did not enter into the alleged agreements with Fox. Thus, Fox cannot show MSD is subject to general jurisdiction.

### C. This Court Lacks Specific Personal Jurisdiction over MSD.

Specific jurisdiction exists only where the defendant purposefully directs its activities at the forum and the litigation arises out of or relates to those activities. *See Gucci*, 768 F.3d at 136 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).). The same reasoning applies to foreign non-parties who violate a court order. *Gucci*, 768 F.3d 122 at 137-138 (noting that the "the exercise of personal jurisdiction" over foreign non-parties depends in part "on the nature of the foreign non-party's contacts with the forum."). *See also, Shaoxing Bon Textiles Co., Ltd. v. 4-U Performance Group LLC*, No. 16-cv-6805 (JSR), 2018 WL 11389637, at *3 (S.D.N.Y. Mar. 15,2018) (finding that the non-party aiders and abettors "purposefully directed their conduct toward this forum, establishing the required minimum contacts.") In fact, the Second Circuit has emphasized that, in determining specific jurisdiction over foreign non-parties, district courts should focus "on the connection between the nonparty's contacts with the forum … and the order at issue." *See id*. (quoting *Gucci*, 768 F.3d at 141).

The Second Circuit's approach to foreign non-parties applies equally to domestic non-parties acting abroad. In those instances, as with foreign non-parties, the domestic non-party may not be directing its conduct to the forum but rather may be trying to comply with the laws of the foreign jurisdiction. *See Reebok Int'l Ltd, v. McLaughlin*, 49 F.3d 1387, 1392 (9th Cir. 1995) ("It is a general principle that one state cannot require a person 'to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national,' nor can the person be required to refrain from an act that is required.") (citing *Restatement (Third) of the Foreign Relations Law of the United States* § 441(1)(a)(1 (Am. L. Inst. 1987).).

Indeed, in no circumstance is there a blanket rule that aiding and abetting any violation of a court order is sufficient to establish "minimum contacts." *See e.g., In re Terrorist Attacks on*

*September 11, 2001*, No. 03 MDL 1570 (GBD) (SN), 2023 WL 2430381, at *15 (S.D.N.Y. 2023) ("None has suggested that aiding and abetting *any* unlawful act will meet the effects test.") (emphasis in original); *see eg., Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 230 (4th Cir. 2019) (rejecting the argument that the mere act of aiding and abetting a violation of an injunction under Rule 65(d)(2) is necessarily sufficient contact to support jurisdiction because "this theory … sweeps too broadly...").

Thus, in each case involving foreign conduct, a district court should look to the nature of the non-party's conduct to determine whether the non-party's activities were designed to be directed to the forum. *See Gucci*, 768 F.3d at 136-7 (discussing specific jurisdiction to enforce injunctions against non-parties).

MSD – a domestic non-party – has engaged in foreign conduct that is not directed to this forum. MSD's conduct in Mexico seeks to comply with the IFT's constitutionally authorized orders, which MSD is required to do as part of the Fox Sports Mexico Business. *See* Lopez Decl., Ex. B at 14 ("Therefore, Grupo Lauman is obligated to respond to the information requests issued by this IFT *to verify compliance with the objective of the conditions imposed in Resolution P/IFT/110319/122, which is to 'preserve [the existence of the FSM Business] as a viable competitor*.'") (emphasis added). *See also* de Swann Decl., § 2.3 ("IFT conditions are not contractual clauses, but rather binding regulatory measures, issued in defense of competition and the consumer.").

Further, MSD's only legal recourse is through the Mexican legal system. *See* Declaration of Mony Sacha de Swaan Addati ("de Swann Decl."), § 2.3 ("Pursuant to Article 28 of the Constitution, its review is solely the responsibility Mexican courts through amparo proceedings, with no possibility of suspension.").

Compliance with the IFT's conditions requires that the Fox Sports Mexico Business have the use of the exclusive license of the "FOX" name for sports broadcasts in Mexico to ensure the Business' viability. *See* Lopez Decl. Ex. A at 3 ("In this regard, in a manner consistent with the Purpose of these conditions, it is considered necessary to adopt measures so that the Parties cannot affect the viability of the business after its Divestiture. Therefore, it is determined that the license of use for sports content to be free and exclusive, as long as it is used in accordance with its current use by the Business to be Divested."). *See also id*., Ex. B2 at 1-2 ("Likewise, in accordance with these decisions issued by the IFT, the following conditions are still in force: i) TWDC's obligation not to repurchase the FSM Business, which will remain in force until November 10, 2031 - condition 8.4.8.2 - and ii) the sublicensing of exclusive free use of the "FOX" brand for sports content agreed between TWDC and 21CF, so that the buyer of the divested business (in this case, Grupo Lauman) could use said brand for a minimum period, …"). Again, the IFT imposed this condition, not as a gift to the Fox Sports Mexico Business, but as a matter of public policy to protect the Mexican public from monopolistic power. *See* de Swann Decl., § 2.2 ("These conditions did not arise from the parties' will, but rather from a public order regulatory mandate to avoid risks to competition in the Mexican sports audiovisual market.") Thus, MSD's conduct is designed to comply with the IFT's constitutional authority and its resulting policies.

Similarly, MSD's pursuit of the Mexico Injunction seeks to comply with and preserve the IFT's constitutional mandate, which aims to ensure the viability of the Fox Sports Mexico Business. *See* Lopez Decl. Ex. E at 8 ("Consequently, and in order to preserve the substance of the trial that is filed, *as well as that during the duration of said trial no serious damage is caused to the plaintiff due to the unlwful conduct described*, the undersigned decides to grant a

I**<u>NJUNCTIVE RELIEF</u>**…") (italics emphasis added). To be sure, MSD has private interests in the Mexico Injunction (survival) that align with the IFT's objectives (the protection of the Mexican public through the promotion and preservation of competition). Nevertheless, the IFT has the constitutional mandate to promote and preserve MSD's survival, which the IFT undertook in the 2019 Resolution.

Thus, MSD's conduct in Mexico is designed to respect the IFT's constitutional authority and its resulting policies. Its failure to do so would undercut the IFT's constitutionally authorized efforts to protect the Mexican public by promoting and preserving competition. *See* de Swann Decl., § 2.3 ("The exclusive use of the trademark and the resulting contracts respond to a regulatory obligation intended to preserve the viability of the divested businesss and competition for the benefit of consumers. Allowing a foreign court to reinterpret these conditions would be equivalent to replacing the regulator itself in defining what constitutes a viable economic unit, distorting a constitutional mandate designed to preserve competition in Mexico."). Because MSD is not purposefully directing conduct to this forum, it is not subject to specific jurisdiction.

In addition, MSD is not alleged to have manipulated MDM or take any action in New York.[6] It acted in Mexico and only in Mexico. This places MSD outside this Court's jurisdictional reach.[7]

**D. The Exercise of Personal Jurisdiction over MSD Would Be Unreasonable.**

As explained above, Fox did not and could not allege MSD had continuous and systematic contacts with New York. But even if it could, the "exercise of personal jurisdiction would [still] be decidedly unreasonable." *Metro. Life Ins. Co. v. Robertson Ceco-Corp.*, 84 F.3d 560, 575 (2d Cir. 1996). The five factors for determining "reasonableness" under *Metropolitan Life*— burden, interest of the forum state, interest of the plaintiff, interest of the judicial system, and public policy— weigh in favor of dismissal. *See also Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994) ("The weaker the plaintiffs showing [on minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction")

[6] Jurisdiction also cannot be based on the harm MSD's actions in Mexico allegedly caused to Fox simply because Fox is a New York resident. The Supreme Court has unequivocally rejected this theory. In *Walden v. Fiore*, 571 U.S. 277, 290 (2014), the Court held that "mere injury to a forum resident is not a sufficient connection to the forum." Courts in this District have adhered to this rule, finding for example that conduct "quintessentially directed at events in Italy" did not create jurisdiction in New York, even when it harmed a New York company. *AmTrust Fin. Services, Inc. v. Lacchini*, 260 F. Supp. 3d 316, 333 (S.D.N.Y. 2017). MSD's conduct was quintessentially directed at Mexico, and it cannot be haled into court in New York on that basis.

[7] Furthermore, there is no evidence that MSD was "aiding and abetting" MDM. There's no basis to construe MSD's participation as substantial assistance when MDM was fully capable of suing alone in Mexico. To the contrary, MSD, a separate corporate entity, acted to vindicate its own independent rights in the Mexican litigation. Its decision to join a lawsuit in Mexico to protect those independent interests does not transform MSD into MDM's agent for jurisdictional purposes. A non-party that "asserts an independent interest... and is not merely acting on behalf of the defendant" is not subject to jurisdiction under an aiding and abetting theory. *Heyman v. Kline*, 444 F.2d 65, 65-6 (2d Cir. 1971). MSD, as a separate corporate entity, has its own interests.

First, the burden on MSD to litigate in New York is great because it has no presence in the forum.

Second, New York has a minimal comparative interest in the gravamen of the dispute, a Mexican regulatory agency's promotion of a competitive marketplace in Mexico for sports media. *See* Compl., ECF No. 1, ¶ 47 ("The allegation at the heart of MDM's injunction request was that MDM had an exclusive license to use the Fox Sports Trademarks. MDM claimed that Mexico's telecommunications regulator, the Instituto Federal de Telecomunicaciones ("IFT"), had issued a resolution in 2019 (the "2019 IFT Resolution") requiring that MDM's license to use the Fox Sports Trademarks be exclusive in nature."). Fox's requests for injunctive relief, appeal in the Mexican court, and its petition to the IFT demonstrate that it recognizes Mexico's overriding interest in this dispute.

Third, Fox's main interest in obtaining relief in this forum is to sidestep ongoing litigation in Mexico, where Fox must contend with the IFT, and likely Disney.[8] Fox admits that it prefers not litigate anything in Mexico, where it believes it's not getting a "fair shake." Hr'g Tr. at 5 (Aug. 29, 2025).; *See also* Dkt. No. 66 at 5 (referencing "Defendant's campaign to weaponize the Mexican government to shut down the production facilities of Fox and its business partners in Mexico."). Thus, Fox seeks to enforce a crippling injunction before it has to exhaust necessary efforts in Mexico to obtain the relief it wants.

Fourth, because the contempt motion concerns acts that have taken place in Mexico—and none in the United States—the judicial system's interest in efficiency weighs in favor of

---

[8] MSD's petition to the IFT requests that the agency demand Disney to comply with the conditions of the IFT's 2019 Resolution.

dismissal. *See e.g., Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.*, 1 F.3d 848, 852 (9th Cir. 1993) ("The site where the injury occurred and where the evidence is located usually will be the most efficient forum.") (citation and quotations omitted). Again, Fox's multiple proceedings initiated in Mexico implicitly recognize that it's a more efficient forum to resolve this dispute.

Finally, because this dispute implicates Mexico's public policy in the area of regulation of media competition, this factor weighs in favor of dismissal. Thus, the exercise of personal jurisdiction over MSD on this record would be unreasonable.

## IV. CONCLUSION

For all the foregoing reasons, MSD respectfully requests the Court grant its motion under Rules 12(b)(2) and (5) and set aside its contempt order against MSD.

Respectfully submitted,

Dated: September 12, 2025

Kassra P. Nassiri
Jaime Dorenbaum
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, California 94111
(415) 762-3100
kass@njfirm.com
jaime@njfirm.com
*Attorneys for Mexico Sports Distribution LLC*

**CERTIFICATION PURSUANT TO S.D.N.Y. LOCAL CIVIL RULE 7.1(c)**

I, Kassra Nassiri, an attorney duly admitted to practice law in the State of California, hereby certify that this memorandum complies with the word count limit set forth in Local Civil Rule 7.1 and contains 7,872 words, excluding the parts exempted by the Rule.

Dated: September 12, 2025

Kassra Nassiri