UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FOX CORPORATION; FOX MEDIA LLC; FOX SPORTS EN ESPAÑOL LLC
  Plaintiff,

v.

MEDIA DEPORTES MEXICO, S. DE R.L. DE C.V.,
  Defendants.

Case No. 1:25-cv-06703 (JSR)

## EXPERT OPINION OF MONY S DE SWAAN ADDATI
(Submitted Pursuant to Federal Rule of Evidence 702)

Yo, **Mony Sacha de Swaan Addati**, a solicitud de Mexico Sports Distribution LLC presento al Honorable Tribunal el presente dictamen en calidad de experto, en el marco del expediente **No. 1:25-cv-06703 (JSR)**, relativo a la controversia entre **Fox Corporation (Fox Corp), Fox Media LLC y Fox Sports en Español LLC, por un lado,** y **Media Deportes México (MDM), por el otro.**

### 1. Cartas Credenciales

Mi nombre es Mony Sacha de Swaan Addati, ciudadano mexicano con más de dos décadas de experiencia en la intersección de las telecomunicaciones, la radiodifusión, la política de competencia y la regulación económica.[1]

El 29 de junio de 2010, el Presidente de la República Mexicana, Felipe Calderón Hinojosa me nombró Comisionado de la Comisión Federal de Telecomunicaciones (COFETEL). Días después, los miembros de su Pleno me eligieron como su Presidente, cargo que desempeñé hasta el 10 de septiembre de 2013. En ese entonces, la Comisión era el órgano regulador, con autonomía técnica y de gestión, responsable de la administración del espectro radioeléctrico, la supervisión de la competencia en los sectores de telecomunicaciones y radiodifusión, la emisión de licencias y la regulación del mercado audiovisual. Como Presidente del organismo, tuve a mi cargo resoluciones de alta complejidad en materia de fusiones y concentraciones, licitaciones de espectro, medidas asimétricas y condiciones de acceso a contenidos audiovisuales. Asimismo, representé a México ante organismos multilaterales como la Organización para la Cooperación y el Desarrollo Económicos (OCDE) y la Unión Internacional de Telecomunicaciones (UIT), contribuyendo a la definición de mejores prácticas internacionales en regulación y competencia.

---

[1] https://es.wikipedia.org/wiki/Mony_de_Swaan_Addati

Hacia el final de dicho período, participé en el proceso político y encabecé el proceso técnico que condujo a la Reforma Constitucional en Materia de Telecomunicaciones de 2013, que transformó la arquitectura institucional del sector y dio origen al Instituto Federal de Telecomunicaciones (IFT) como órgano constitucional autónomo con facultades en materia de competencia y regulación.

Posteriormente, fundé y dirijo desde 2015 el Centro de Estudios e Investigación en Asuntos Públicos (CEIAP),[2] firma de consultoría especializada en infraestructura digital, telecomunicaciones y sectores regulados. Desde esta plataforma he contribuido al diseño de políticas digitales estatales y nacionales, diagnósticos regulatorios y estrategias de competencia, siempre bajo un enfoque de interés público y libre concurrencia.

Mi compromiso con la defensa de la competencia y los consumidores mexicanos se ha manifestado también a través de la presentación de denuncias contra prácticas monopólicas de corporaciones globales. Entre ellas destacan:

- La denuncia presentada en 2019 contra Amazon, por prácticas de posible abuso de poder de mercado en comercio electrónico.
- Las denuncias presentadas en 2022 contra Google y Apple, por presuntas ventas atadas y restricciones anticompetitivas en sus tiendas de aplicaciones, consideradas las primeras de este tipo en América Latina.[3]

Estos antecedentes confirman un compromiso personal y profesional con la defensa del consumidor y la promoción de mercados abiertos y competitivos. En síntesis, mi trayectoria combina la perspectiva de un exregulador federal, la práctica profesional como asesor en políticas públicas y competencia económica, y un compromiso activo en defensa del consumidor y la libre concurrencia. Ello me faculta para emitir una opinión técnica, independiente y fundada que sirva de apoyo a este Honorable Tribunal en la valoración de los hechos en disputa.

## 2. Objeto de la Opinión

La opinión tiene por objeto compartir con el Honorable Tribunal que las decisiones regulatorias emitidas por el IFT en México —en el marco de concentraciones económicas con impacto en la competencia y en el acceso de los consumidores a contenidos audiovisuales— son **actos de orden público e interés general**, cuya revisión corresponde **exclusivamente** a tribunales mexicanos conforme al marco constitucional y legal aplicable.

---

[2] https://www.ceiap.mx
[3] https://www.reforma.com/denuncian-ante-ift-a-google-y-apple-por-monopolio/ar2467625

Esta opinión no aborda las pretensiones de las partes, sino que expone por qué, conforme al marco constitucional mexicano, la revisión de las decisiones del IFT corresponde exclusivamente a tribunales nacionales. Esta limitación no es un formalismo, sino la expresión de un diseño institucional deliberado que busca impedir que resoluciones regulatorias de orden público se vean desnaturalizadas en foros sin competencia técnica ni jurisdiccional.

### 2.1. Contexto de la creación del IFT

De 1960 a 2012, por distintos motivos que no son objeto de la presente opinión, los sectores de telecomunicaciones y radiodifusión en México fueron regulados con un marco normativo obsoleto e instituciones con facultades insuficientes, generalmente acotadas al poder político. Ello ocasionó un importante rezago tecnológico, una enorme concentración que afectaba la sana competencia y un consecuente costo para el bolsillo de consumidor mexicano.

En 2012 y en busca de una voz independiente con legitimidad suficiente para solventar debates internos, COFETEL a mi cargo contrató a la OCDE para realizar un estudio sobre ambos sectores. En un acotado resumen de un extenso reporte, después de abordar la debilidad del regulador, la obsolescencia del marco normativo y el abuso por parte de los regulados de estrategias litigiosas para bloquear las pocas facultades regulatorias en manos de los reguladores, la Organización concluyó que *"la pérdida de bienestar atribuida a la disfuncionalidad del sector mexicano de las telecomunicaciones se estima en 129,200 millones de dólares (2005-2009), es decir, 1.8% del PIB anual"*.[4]

La Reforma Constitucional en Materia de Telecomunicaciones de 2013 fue un intento por revertir esta situación e impedir que el consumidor mexicano siguiera pagando de su bolsillo la ineficiencia del marco normativo y las instituciones regulatorias siguiendo básicamente tres principios: a) otorgar autonomía constitucional al regulador, b) incrementar de manera sustantiva las facultades para regular eficazmente las telecomunicaciones y la radiodifusión, y c) impedir que sus resoluciones fueran suspendidas como estrategia para postergar remedios cuya finalidad fuera impulsar la sana competencia.

### 2.2. Resolución del IFT en la concentración Disney–Fox

En su resolución de fecha 11 de marzo de 2019, el Pleno del IFT autorizó la concentración entre The Walt Disney Company (Disney) y Twenty-First Century Fox Inc. (21CF) *"sujeta al cumplimiento de condiciones"*. Entre dichas condiciones se incluyó la desincorporación obligatoria de Fox Sports México como negocio independiente, así como la obligación, en

---

[4] OCDE (2012), *Estudio de la OCDE sobre políticas y regulación de telecomunicaciones en México*, OECD Publishing, p. 19-20. Disponible en: OECD iLibrary.

relación con el negocio de Fox Sports México, de *"conservar la viabilidad económica, valor comercial y competitividad equiparables con las prevalecientes antes de la Fecha de Cierre".*[5] Entre otras condiciones estructurales impuestas por el IFT para lograr lo anterior —condiciones a las que se encuentra sujeta la autorización de la concentración entre Disney y 21CF— destaca la que consiste en otorgar al comprador del negocio de Fox Sports México una licencia exclusiva para el uso del nombre "FOX" para la transmisión de contenido deportivo en México, por un período determinado.

Estas condiciones no derivaron de la voluntad de las partes, sino de un mandato regulatorio de orden público para evitar riesgos a la competencia en el mercado audiovisual deportivo en México. Estas condiciones fueron aceptadas expresamente por las partes.

### 2.3. Supervisión y cumplimiento posterior

En su resolución del año 2019, el IFT ha dejado claro que, una vez concretada la venta, las partes debían *"asegurar la viabilidad del Negocio a Desincorporar (Fox Sports México)"* y otorgar una licencia gratuita y exclusiva al comprador de Fox Sports México para usar el nombre "Fox" para la transmisión de contenido deportivo en territorio nacional.[6]

La utilización exclusiva de la marca y los contratos derivados responden a una obligación regulatoria destinada a preservar la viabilidad del negocio desincorporado y la competencia en beneficio del consumidor. Permitir que un tribunal extranjero reinterprete estas condiciones equivaldría a sustituir al propio regulador en la definición de qué constituye una unidad económica viable, desnaturalizando un mandato constitucional diseñado para preservar la competencia en México.

De lo anterior se desprenden tres consideraciones centrales que, posteriormente, desarrollaré con mayor extensión:

1. **Naturaleza imperativa:** las condiciones del IFT no son cláusulas contractuales, sino medidas regulatorias vinculantes, dictadas en defensa de la competencia y del consumidor.
2. **Competencia exclusiva:** conforme al artículo 28 constitucional, su revisión corresponde únicamente a tribunales mexicanos mediante juicio de amparo, sin posibilidad de suspensión.
3. **Orden público internacional:** cualquier sentencia extranjera que contradiga o intente modificar estas determinaciones sería de imposible ejecución en México, no

---

[5] Instituto Federal de Telecomunicaciones, *Resolución P/IFT/110319/122 relativa a la concentración entre The Walt Disney Company y Twenty-First Century Fox, Inc.*, 11 de marzo de 2019. Versión pública disponible en: IFT.
[6] Instituto        Federal        de        Telecomunicaciones, https://www.ift.org.mx/sites/default/files/conocenos/pleno/sesiones/acuerdoliga/verpubpift110319122canxuce.pdf .

solo por disposición constitucional, sino porque no atendería las preocupaciones de interés general que justificaron la actuación del IFT.

### 3. Marco institucional y normativo mexicano

La regulación de las telecomunicaciones y la radiodifusión en México descansa en un marco jurídico rediseñado a partir de la Reforma Constitucional de 2013, cuyo objetivo fue corregir fallas estructurales del mercado y dotar al Estado de un órgano autónomo con facultades plenas en materia de competencia y regulación económica.

En este rediseño institucional, el Constituyente Permanente reformó el artículo 28 de la Constitución, para crear al IFT como órgano constitucional autónomo, con atribuciones exclusivas para regular y supervisar el sector, así como asegurar que el impacto de sus resoluciones llegaran alos mercados y a los consumidores sin dilaciones innecesarias. El texto constitucional es claro al señalar:

> *Las normas generales, actos u omisiones del Instituto Federal de Telecomunicaciones podrán ser impugnados únicamente mediante el juicio de amparo indirecto y no serán objeto de suspensión.*[7]

Este principio de no suspensión tiene como finalidad garantizar la eficacia de las medidas regulatorias, evitando que recursos judiciales dilaten su cumplimiento o trasladen los litigios a foros dispersos geográficamente, en detrimento del consumidor y de la competencia. La prohibición de suspensión en el juicio de amparo respondió precisamente a la experiencia histórica de que agentes dominantes utilizaban litigios estratégicos para dilatar o neutralizar medidas regulatorias, con altos costos para el consumidor.

En su artículo 312, la Ley Federal de Telecomunicaciones y Radiodifusión (LFTR) refuerza este mandato

> *Las normas generales, actos u omisiones del Instituto podrán ser impugnados únicamente mediante el juicio de amparo indirecto y no serán objeto de suspensión.*[8]

Asimismo, la Reforma de 2013 ordenó la creación de tribunales especializados en competencia económica, telecomunicaciones y radiodifusión, con el objetivo de que los litigios en estas materias fueran resueltos por jueces con conocimiento técnico, evitando la dispersión de juicios en distintas instancias jurisdiccionales y asegurando una tutela judicial eficaz.

---

[7] Constitución Política de los Estados Unidos Mexicanos, artículo 28, fracción VII. Texto vigente disponible en: Suprema Corte de Justicia de la Nación.
[8] Ley Federal de Telecomunicaciones y Radiodifusión, artículo 312. Texto vigente disponible en: Cámara de Diputados.

En conjunto, estas disposiciones confirman que las resoluciones del IFT no son meros actos administrativos ordinarios, sino actos de orden público e interés general, dictados en defensa de la competencia y del consumidor mexicano.

La evidencia muestra que el nuevo marco constitucional trajo beneficios tangibles para los consumidores mexicanos. A diferencia de lo descrito en 2012, en 2017 la OCDE documentó que entre 2013 y 2016 los precios de banda ancha móvil disminuyeron 65% en la canasta de bajo uso, 61% en la de uso medio y más de 75% en la de alto uso, además de un crecimiento de casi 50 millones de suscripciones de banda ancha móvil.[9] En el mismo sentido, en 2024, el IFT señaló:

> Por la labor regulatoria del IFT las personas usuarias de servicios de telecomunicaciones en México se ahorraron 805 mil millones de pesos, en su conjunto en un periodo de 10 años, cantidad que dejaron de pagar debido a la reducción de los precios de la telefonía e internet.[10]

En suma, las resoluciones del IFT, al buscar proteger la competencia y generar beneficios tangibles a los consumidores, son actos de orden público e interés social. Permitir que estas decisiones se vean afectadas o diluidas por estrategias litigiosas en foros ajenos al diseño institucional mexicano no solo contravendría la Constitución, sino que también pondría en riesgo los avances logrados en precios, acceso y calidad de los servicios de telecomunicaciones en perjuicio directo de los usuarios.

## 4. Antecedentes relevantes del caso Disney–Fox en México

El Instituto, en su carácter de autoridad autónoma y exclusiva en materia de competencia económica en los sectores de telecomunicaciones y radiodifusión, evaluó en 2019 la concentración internacional entre Disney y 21CF. En particular, el IFT analizó los posibles efectos que dicha concentración podría tener en ciertos mercados relevantes en México. En su resolución, el IFT identificó coincidencias relevantes en el mercado de provisión y licenciamiento de contenidos audiovisuales deportivos en México, pues la operación implicaba integrar en un mismo agente económico a ESPN —propiedad de Disney con anterioridad a la concentración— y Fox Sports México —que se integraría a Disney como consecuencia de la concentración—, los dos principales programadores de canales deportivos en televisión de paga.

El Pleno del Instituto consideró que la operación, de llevarse a cabo sin condiciones, eliminaría la competencia directa entre Fox Sports México y ESPN, reduciendo significativamente las alternativas de programación deportiva para distribuidores y

---

[9] OECD (2017), *OECD Telecommunication and Broadcasting Review of Mexico 2017*, OCDE Publishing. Disponible en: OECD iLibrary.
[10] IFT (2024), Comunicado de prensa, *El IFT genera ahorros a las personas usuarias de servicios de telecomunicaciones por 805 mil millones de pesos en un periodo de 10 años*, 29 de agosto de 2024. Disponible en: IFT.

consumidores, y generando riesgos sustanciales de aumento de precios, disminución en la calidad de contenidos y menor innovación.[11] En palabras de la resolución, la concentración

> *[...] hubiera colocado a un solo agente económico con la capacidad e incentivos de imponer condiciones contractuales en perjuicio de los concesionarios y usuarios finales[12]*

Para mitigar estos riesgos, el IFT impuso condiciones estructurales de desincorporación, consistentes en la obligación de vender en su totalidad el negocio de Fox Sports México a un tercero independiente y previamente aprobado por el regulador. Estas condiciones incluyeron la obligación de mantener el negocio como una unidad económica viable, con salvaguardas para asegurar la conservación de su valor comercial y competitividad hasta la transferencia definitiva.

En este contexto, resulta relevante señalar que son las partes de una concentración las que, en un primer momento, pueden proponer al IFT ciertas condiciones estructurales a las cuales sujetar la autorización de la concentración con la finalidad de mitigar los riesgos a la competencia en los mercados relevantes. El IFT puede aceptar, modificar, o rechazar las condiciones propuestas por las partes. En ese sentido, debe destacarse que en el caso de la concentración entre Disney y 21CF, las Partes originalmente propusieron al IFT imponer una condición consistente en otorgar al eventual comprador del negocio de Fox Sports México una licencia no exclusiva para el uso del nombre "Fox" para la transmisión de contenido deportivo en México. Sin embargo, como está expresamente señalado en la resolución del IFT del año 2019, el Instituto rechazó la propuesta de las partes, pues consideró que el hecho de que la licencia fuera "no exclusiva", permitiría a las partes *"afectar la viabilidad del negocio, tras su Desincorporación"*. Por lo tanto, impuso la condición de que la licencia para el uso del nombre "Fox" otorgado al comprador del negocio de Fox Sports México fuera *"gratuita y exclusiva"*.

En este momento, vale la pena hacer un paréntesis pues no es un tema menor el hecho de que sea ante la autoridad regulatoria mexicana ante quien , en primera instancia, Disney y 21CF acudieron a aceptar las condiciones de desincorporación establecidas en la resolución que approbaba la resolución de concentración ni —como veremos a continuación—, en segunda instancia, 21CF y Lauman acudieron a solicitar la autorización de la concentración del caso que nos ocupa con base en esas mismas condiciones de compra-venta.

Asi, en 2021 y tras un procedimiento exhaustivo, el IFT aprobó a Lauman como comprador elegible del negocio Fox Sports en México, considerando que cumplía con los criterios de independencia, capacidad financiera y técnica necesarios para garantizar la continuidad y competitividad de los canales deportivos. La autoridad reiteró que el objetivo primordial de

---

[11] IFT, Resolución P/IFT/110319/122, sobre la concentración entre The Walt Disney Company y Twenty-First Century Fox, 11 de marzo de 2019. Disponible en versión pública en: IFT Resolución Disney–Fox 2018.
[12] Idem.

esta condición era preservar la competencia en la provisión de contenidos deportivos televisivos y proteger el interés de los consumidores mexicanos.[13] Para lograr ese objetivo, según lo manifestado por el propio IFT, sería necesario que Grupo Lauman contara con una licencia gratuita y exclusiva para el uso del nombre "Fox" para la transmisión de contenido deportivo en México, por lo que el Instituto condicionó su autorización de la concentración a que la licencia fuera otorgada en esos términos (gratuita y exclusiva).

Estas decisiones dieron certeza jurídica a una transacción que implicó compromisos financieros y contractuales de gran magnitud. Reabrir su análisis no sólo desconocería la actuación soberana del IFT, sino que introduciría un nivel de incertidumbre incompatible con la seguridad que requieren inversiones de esta escala.

Como he dicho, la desincorporación de Fox Sports México y el otorgamiento al comprador de dicho negocio de una licencia exclusiva y gratuita para el uso del nombre "Fox" para la transmisión de contenido deportivo en México, no fue resultado de la mera voluntad de las partes privadas, sino de una decisión regulatoria de carácter vinculante, sustentada en principios de orden público e interés general, precisamente para evitar una concentración anticompetitiva entre ESPN y Fox Sports que habría tenido efectos nocivos en el mercado mexicano.

El IFT impuso remedios estructurales de carácter obligatorio para evitar la concentración de ESPN y Fox Sports, proteger la competencia y asegurar a los consumidores mexicanos condiciones justas de acceso a contenidos deportivos

Estas medidas, como se explicó en el apartado 3, derivan de un marco constitucional y legal que otorga a las resoluciones del IFT el carácter de actos de orden público e interés general, insusceptibles de suspensión y cuya impugnación únicamente puede ser conocida tribunales mexicanos.

En este sentido, cualquier controversia que surja en torno a las condiciones impuestas por el IFT en la concentración Disney–Fox —incluidas las relativas a la desincorporación del negocio Fox Sports México y a la utilización del nombre "Fox" para la transmisión de contenido deportivo en México— no puede ser entendida como un simple conflicto contractual, sino como parte de un mandato regulatorio soberano del Estado mexicano. Por lo tanto, sólo las instituciones jurisdiccionales nacionales están facultadas para revisar, confirmar o modificar dichas determinaciones.

De este modo, los antecedentes del caso Disney–Fox ilustran con claridad que la materia objeto de discusión en este litigio trasciende la esfera privada de las partes y se ubica en el ámbito de la competencia económica y la protección del consumidor en México, reforzando

---

[13] IFT, **Acuerdo P/IFT/EXT/140521/9**, por el que se aprueba a Grupo Lauman como comprador del negocio Fox Sports México, 14 de mayo de 2021. Disponible en: IFT Aprobación Lauman 2021.

la conclusión de que corresponde exclusivamente al orden jurídico mexicano conocer y resolver cualquier disputa vinculada.

Quizá también ello ayuda a entender por qué Fox Corp —en este caso a través de sus subsidiarias Fox Cable Network Services LLC y Tubi Inc.— decidió acudir en primera instancia ante un tribunal nacional (el Juzgado 35 de lo Civil, en febrero de 2025) para solicitar medidas cautelares. Asimismo, así puede entenderse el hecho de que cuando otro Juzgado (el 42 de lo Civil, en marzo de 2025) otorgó medidas cautelares en favor de Grupo Lauman, Mexico Sports Distribution LLC y Media Deportes México, S.A. de C.V., Fox Corporation, a través de su subsidiaria Fox Cable Network Services, decidió apelar el otorgamiento de dichas medidas ante un tribunal mexicano. No fue sino hasta después de haber acudido en esas dos instancias ante los tribunales mexicanos que Fox Corp decidió llevar el caso más allá de la terriotrialidad donde ellos mismos habían aceptado las condiciones impuestas por la autoridad regulatoria local en 2019.

## 5. Consideraciones jurídicas internacionales

Hemos manifestado que las resoluciones del IFT en materia de concentraciones no son actos privados, sino decisiones regulatorias de orden público, dictadas en ejercicio de atribuciones constitucionales y en defensa del interés general. Desde la perspectiva del derecho internacional privado y de la cooperación judicial, este carácter tiene consecuencias jurídicas relevantes.

En primer lugar, conforme a principios generalmente aceptados en materia de orden público internacional, ningún tribunal extranjero puede modificar ni sustituir las decisiones soberanas de un Estado que tutelan intereses colectivos esenciales, tales como la competencia económica y la protección del consumidor. En la práctica, aun si una sentencia extranjera pretendiera reconocer o ejecutar efectos distintos, dicha resolución sería jurídicamente inejecutable en México, en virtud de que contravendría directamente normas constitucionales de orden público.

En segundo lugar, como hemos reiterado, el marco constitucional mexicano establece que las resoluciones del IFT podrán ser impugnadas únicamente mediante el juicio de amparo indirecto y no serán objeto de suspensión. Esto significa que México ha diseñado un esquema jurisdiccional cerrado y exclusivo para este tipo de decisiones, precisamente para evitar dilaciones, dispersiones geográficas o litigios paralelos en foros ajenos a la competencia nacional.

Cualquier pronunciamiento que altere las resoluciones del IFT sería incompatible con la Constitución mexicana y carecería de efectos ejecutables en México. El principio de orden público internacional protege también la expectativa legítima de los inversionistas de que las reglas dictadas por la autoridad mexicana serán estables y ejecutables en México, sin riesgo de ser alteradas por tribunales sin jurisdicción ni competencia técnica. Cualquier

sentencia de este tribunal que pretenda alterar las resoluciones del IFT sería inejecutable en México, lo cual priva de objeto práctico al presente litigio.

### 5.1. Experiencia internacional en materia de remedios estructurales

La doctrina comparada confirma que los remedios estructurales en materia de competencia son de observancia obligatoria, trascienden la esfera contractual y constituyen actos regulatorios de interés público:

- **Estados Unidos – Department of Justice (DOJ) y Federal Trade Commission (FTC):** en operaciones de concentración que generan preocupaciones de competencia, estas agencias imponen remedios estructurales como la desinversión de líneas de negocio completas, bajo supervisión de un fideicomisario independiente designado por la autoridad. Ejemplos incluyen *United States v. Comcast/NBCU* (2011)[14], donde se condicionó la integración vertical a compromisos obligatorios de acceso y supervisión continua, y *United States v. Aetna/Humana* (2017)[15], donde se ordenó la desinversión de activos de seguros de salud para preservar la competencia regional. Debe destacarse que la imposición de remedios estructurales, en estos casos, se hace a través de una orden judicial, que, por tratarse de un acto relevante en materia de competencia económica, indica de manera expresa que se trata de una resolución "de interés público" (*"Entry of this Final Judgement is in the public interest"*).
- **Unión Europea – Comisión Europea (DG COMP):** el Reglamento de Concentraciones de la UE prevé explícitamente la imposición de compromisos estructurales como condición para autorizar fusiones (art. 6 y 8 del Reglamento CE 139/2004). Casos paradigmáticos como *Dow/DuPont* (2017)[16] y *Bayer/Monsanto* (2018)[17] exigieron la desinversión de unidades de negocio enteras para evitar posiciones dominantes en mercados de agroquímicos y semillas. La Comisión ha señalado de forma reiterada que los remedios estructurales "deben restablecer de forma duradera las condiciones de competencia".
- **Brasil – Conselho Administrativo de Defesa Econômica (CADE):** en casos recientes, CADE ha impuesto remedios estructurales obligatorios como condición para aprobar fusiones. En la operación *AT&T/Time Warner* (2017)[18], CADE aprobó la concentración bajo condiciones que incluyeron la desinversión de activos de programación y compromisos de no discriminación supervisados por un "trustee"

---

[14] DOJ/FTC, *Comcast/NBCU Consent Decree* (2011). Disponible en: U.S. Department of Justice.

[15] DOJ, *United States v. Aetna Inc. and Humana Inc.*, Civil Action No. 1:16-cv-1494 (2017). Disponible en: U.S. District Court for D.C..

[16] Comisión Europea, *Dow/DuPont merger – Case M.7932* (2017). Disponible en: European Commission.

[17] Comisión Europea, *Bayer/Monsanto merger – Case M.8084* (2018). Disponible en: European Commission.

[18] CADE, *AT&T/Time Warner merger – Merger Control Ruling* (2017). Disponible en: CADE.



independiente, a fin de preservar la competencia en TV de paga y contenidos audiovisuales.

## 5.2. Soberanía regulatoria y orden público económico

Estos ejemplos muestran que los remedios estructurales son una práctica consolidada en la regulación internacional de concentraciones, diseñados para proteger la competencia en beneficio del consumidor. En todos los casos, se trata de actos públicos, impuestos por las autoridades de competencia y supervisados mediante mecanismos obligatorios, no de simples cláusulas contractuales voluntarias.

En consecuencia, las medidas adoptadas por el IFT para desincorporar el negocio de Fox Sports México y preservar la viabilidad de un competidor independiente —incluyendo la obligación de otorgar al comprador del negocio de Fox Sports México una licencia exclusiva y gratuita para el uso del nombre "Fox" para la transmisión de contenido deportivo en México— se insertan en una práctica regulatoria estándar y reconocida a nivel internacional. Cualquier intento de un tribunal extranjero de revisar o alterar dichas condiciones no solo contradiría la Constitución mexicana, sino que desentonaría con la forma en que la comunidad internacional entiende y aplica los remedios estructurales en materia de competencia.

## 6. Consideraciones finales

**Primero.** El Instituto Federal de Telecomunicaciones es un órgano constitucional autónomo con atribuciones exclusivas y excluyentes en materia de competencia y regulación en telecomunicaciones y radiodifusión, de conformidad con el artículo 28 de la Constitución Política de los Estados Unidos Mexicanos. Por ello, sus resoluciones no pueden ser sustituidas ni revisadas en el fondo por ninguna otra autoridad administrativa o judicial.

**Segundo.** Las resoluciones del Instituto en materia de concentraciones tienen carácter de orden público y persiguen la protección del interés social, al salvaguardar la competencia efectiva y el bienestar del consumidor. Permitir que se reabran mediante litigios estratégicos significaría vulnerar directamente dichos bienes jurídicos.

**Tercero.** En el caso que nos ocupa, el Instituto ya resolvió de manera definitiva la operación Disney/Fox/Lauman, autorizó a Lauman como comprador y mantiene sus facultades para supervisar el cumplimiento de aquellas condiciones impuestas que deben seguirse cumpliendo incluso después del cierre de la operación —incluida la consistente en otorgar al comprador del negocio de Fox Sports México una licencia gratuita y exclusiva para el uso del nombre "Fox" para la transmisión de contenido deportivo en México—. Dichas facultades incluyen las consistentes en imponer sanciones económicas en caso de incumplimiento, ordenar la desconcentración, y/u ordenar el cumplimiento de las condiciones. Pretender revisar dicho cumplimiento en otra jurisdicción sería tanto como



negar la arquitectura regulatoria diseñada en 2013 para evitar precisamente esta clase de dilaciones.

**Quinto.** La OCDE ha advertido que la impugnación sistemática de decisiones regulatorias en telecomunicaciones ha dañado el interés público en México. Repetir este patrón en el presente caso equivaldría a contradecir las mejores prácticas internacionales y a profundizar una distorsión que el Constituyente buscó corregir con la autonomía del Instituto.

**Sexto.** La incertidumbre generada por litigios dilatorios impacta de manera inmediata a millones de suscriptores de televisión de paga que dependen de los contenidos de Fox Sports México. Dejar en suspenso resoluciones firmes del regulador no protege derechos fundamentales, sino que traslada costos al consumidor final.

En mi opinión técnica e independiente, el presente litigio trasciende un conflicto comercial entre partes privadas, pues involucra condiciones regulatorias de orden público. La controversia está directamente vinculada a condiciones regulatorias de orden público impuestas por una autoridad constitucional mexicana, cuya revisión corresponde exclusivamente a las instituciones administrativas y jurisdiccionales nacionales.

Por lo tanto, cualquier resolución emitida por un tribunal extranjero carecería de efectos jurídicos en México y no atendería las preocupaciones de competencia e interés general que motivaron la actuación del IFT. Además, cualquier sentencia de este tribunal que pretenda alterar las resoluciones del IFT sería inexecutable en México, lo cual priva de objeto práctico al presente litigio.

**Declaro, bajo protesta de decir verdad y en virtud de las leyes de los Estados Unidos de América, que lo anterior es verdadero y correcto.**

**Firmado el 12 de septiembre de 2025 en la Ciudad de México**