**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

FOX CORPORATION; FOX MEDIA LLC; and FOX SPORTS EN ESPAÑOL LLC,

Plaintiffs,

v.

MEDIA DEPORTES MEXICO, S. de R.L. de C.V.,

Defendant.

Case No.: 1:25-cv-06703-JSR

**SUPPLEMENTAL BRIEF IN RESPONSE TO SEPTEMBER 26, 2025 HEARING ON NON-PARTY MEXICO SPORTS DISTRIBUTION LLC'S CONTEMPT**

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 4

A. The IFT's Rejection of Grupo Lauman's Complaint Further Confirms There Was No "Fair Ground For Doubt" About This Court's Jurisdiction ..... 4

B. The Opinions of MSD's Expert Are Irrelevant, Without Foundation, and an Improper Invitation to this Court to Violate the Act of State Doctrine ..... 7

1. Gómez's Opinion Is Irrelevant ..... 7

a. Neither the Injunction nor the Contempt Proceedings Rely on Interpretation of Conditions Imposed by the 2019 IFT Resolution ..... 7

b. The Opinions of MSD's Expert Are Irrelevant as MSD's Purported "Fair Ground of Doubt" Is Mere Pretext ..... 9

2. Gómez's Opinion Is Unreliable and Invites the Court to Violate the Act of State Doctrine ..... 12

a. Gómez's Opinion on the 2021 IFT Resolution Is Baseless and Contradicted by Events in Mexico ..... 12

b. Consideration of Gómez's Opinion on the July 2025 IFT Resolution Is Precluded by the Act of State Doctrine ..... 13

C. MSD's New Arguments for Excusing Its Contemptuous Conduct Are Meritless ..... 15

1. MSD's Attacks on Adequacy of Service to MDM Are Both Misguided and Baseless ..... 15

a. MDM Was Properly Served ..... 16

b. MSD's Contempt Arises from its Legal Identification with MDM ..... 20

c. Even Under an Aiding-and-Abetting Theory of Liability, MSD's Contempt Does Not Depend on Service to MDM ..... 21

2. The Timing of MSD's Acceptance of Service Is Irrelevant as MSD Indisputably Had Notice of the TRO ..... 21

3. MSD's Continued Pursuit of an Injunction After Receiving Notice of the TRO Constituted Contempt ..... 22

III. CONCLUSION ..... 23

CERTIFICATION PURSUANT TO S.D.N.Y. LOCAL CIVIL RULE 7.1(c) ..... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Absolute Nevada, LLC v. Grand Majestic Riverboat Co., LLC*,
2020 WL 5209730 (S.D.N.Y. Sept. 1, 2020), *aff'd in part, vacated in part on other grounds*, WL 350255 (2d Cir. Feb. 7, 2022) ....16

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
425 U.S. 682 (1976)....13

*Apple Computer, Inc. v. Formula Int'l, Inc.*,
549 F. Supp. 617 (C.D. Cal. 1984) ....9

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964)....13

*BP Prods. N. Am., Inc. v. Dagra*,
236 F.R.D. 270 (E.D. Va. 2006) ....17

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
814 F.3d 91 (2d Cir. 2016)....15

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) ....13, 14

*Chao v. Gotham Registry, Inc.*,
514 F.3d 280 (2d Cir. 2008)....9

*China Trade and Development Corp. v. M.V. Choong Yang*,
837 F.2d 33 (2d Cir. 1987)....11

*CKR Law LLP v. Anderson Invs. Int'l, LLC*,
525 F. Supp. 3d 518 (S.D.N.Y. 2021) (Rakoff, J.) ....18

*Convergen Energy LLC v. Brooks*,
2020 WL 4038353 (S.D.N.Y. July 17, 2020) ....18

*Curtis v. Beatrice Foods Co.*,
481 F. Supp. 1275 (S.D.N.Y. 1980), *aff'd*, 633 F.2d 203 (2d Cir. 1980) ....14

*F.T.C. v. PCCare 247 Inc.*,
2013 WL 841037 (S.D.N.Y. Mar. 7, 2013) ....18

*Forbes IP (HK) Ltd. v. Media Bus. Generators, S.A. de C.V.*,
2024 WL 1743109 (S.D.N.Y. Apr. 23, 2024)....23

*Gurung v. Malhotra*,
279 F.R.D. 215 (S.D.N.Y. 2011) ....18, 19

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Havens v. James*,
76 F.4th 103 (2d Cir. 2023) ....................20, 21

*In re South African Apartheid Litig.*,
643 F. Supp. 2d 423 (S.D.N.Y. 2009)....................18

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019)....................13, 14

*Levin v. Tiber Holding Corp.*,
277 F.3d 243 (2d Cir. 2002)....................20

*Live Brands Holdings, LLC v. Gastronomico Gracias a Dios*,
2021 WL 6064202 (S.D.N.Y. Dec. 21, 2021) ....................16, 17

*Maggio v. Zeitz*,
333 U.S. 56 (1948)....................11

*Next Investments, LLC v. Bank of China*,
12 F.4th 119 (2d Cir. 2021) ....................15

*Pearson Educ. Inc. v. Doe 1*,
2019 WL 6498305 (S.D.N.Y. Dec. 2, 2019) ....................18

*S.E.C. v. Anticevic*,
2009 WL 361739 (S.D.N.Y. Feb. 13, 2009)....................17, 19

*Spectacular Venture, L.P. v. World Star Int'l, Inc.*,
927 F. Supp. 683 (S.D.N.Y. 1996) ....................20

*Sulzer Mixpac AG v. Medenstar Indus. Co. Ltd.*,
312 F.R.D. 329 (S.D.N.Y. 2015) (Rakoff, J.)....................17, 18

*Taggart v. Lorenzen*,
587 U.S. 554 (2019)....................9, 10

*U.S. v. Rylander*,
460 U.S. 752 (1983)....................11

*W.R. Grace and Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers of Am.*,
461 U.S. 757 (1983)....................11

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*,
493 U.S. 400 (1990)....................13

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

**RULES**

Fed. R. Civ. P. 4 .....16

Fed. R. Civ. P. 4(f) .....16

Fed. R. Civ. P. 4(f)(3) .....16, 17, 18, 19

Fed. R. Civ. P. 4(h)(2) .....16

Fed. R. Civ. P. 65(d)(2) .....15, 22

Fed. R. Civ. P. 65(d)(2)(C) .....21

Loc. Civ. R. 83.6(a) .....16

**OTHER AUTHORITIES**

Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, available at: https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (accessed October 8, 2025) .....17

Hague Convention, Article 10 .....17, 18

# I. INTRODUCTION

Newly-procured evidence shows that the IFT has now—for the third time—explained plainly that the terms of MDM's license assignment agreement govern its dispute with Fox: (1) the plain text of the IFT's 2021 Resolution approving MDM's form license assignment agreement; (2) the IFT's July 2025 Resolution expressly reaffirming that the 2021 IFT Resolution approved the terms of MDM's license assignment agreement and reiterated that those terms governed the rights of the parties; and, now (3) the IFT's September 8, 2025 decision ("September 2025 Decision") rejecting Grupo Lauman Holding S. de R.L. de C.V.'s ("Grupo Lauman") petition to initiate compliance proceedings against Disney and Fox for alleged non-compliance with the 2019 IFT Resolution—in which the IFT stated that it must wait for a ruling from the relevant court (in Fox's case) or arbitration tribunal (in Disney's case) before evaluating whether a breach of its 2019 Resolution occurred. Declaration of Christopher T. Berg. ("Berg Decl.") ¶ 2 Ex. A1 at 15. MSD has argued over and over again that the IFT did not do what it has now repeatedly affirmed it has done: approved this Court's jurisdiction to adjudicate this matter and provide any necessary relief in doing so. That was clear in 2021 and made even clearer in July 2025. The IFT's September 2025 Resolution now shines the brightest of lights on how utterly untenable is MSD's position: that this Court ignore the IFT's plain language and rule that there was sufficient "fair ground for doubt" about the IFT's decisions to allow MSD to escape the consequences of its remarkable contempt for this Court's orders.

MSD has argued that the IFT supports its position that MSD's alter ego MDM (who has still refused to appear) has an exclusive license to certain "Fox" marks. Fox has offered copious evidence making clear that the IFT has ruled that the private agreement between the parties (that is, the license assignment agreement between MDM and Fox Corporation, ECF No. 11-27)

governs—which shows MDM has a non-exclusive license and that this Court has exclusive jurisdiction to decide this dispute. At the September 26, 2025 hearing, yet another pronouncement by the IFT was referenced, one that was made in response to a request by MDM's parent, Grupo Lauman, that the IFT initiate compliance proceedings in response to alleged breaches of the 2019 IFT Resolution[1] by Disney and Fox. ECF No. 77-20 at 7–8. This Court asked MSD to produce the IFT's response. Even though MSD filed with this Court Grupo Lauman's submission to the IFT, ECF No. 77-20, MSD has claimed it has been unable to procure the IFT's response to Grupo Lauman's submission—which, incidentally, is a very bad document for MSD's position. Apparently, MSD can access documents from Grupo Lauman only when it believes the documents favor its litigation position.

Consequently, Fox had to obtain a copy of the IFT's September 2025 Decision in Mexico as a third party. The reason MSD wanted to conceal that document is clear: in it, the IFT affirmed for the third time that the parties must follow the terms of the License Assignment Agreement:

> [Fox], [Disney], and Grupo Lauman must adhere to the agreements, rights and/or obligations that they negotiated and signed through the EPA, including the License and Sublicense Agreement, which are private contracts between individuals that were approved by the IFT through the [2021 IFT Resolution], so the IFT, before evaluating possible breaches of paragraph 8.4.12.4 of the [2019 IFT Resolution], it would have to wait for decisions issued by competent courts [in Fox's case] and/or tribunals [in Disney's case] regarding breaches by [Fox] and/or [Disney] of the terms of the EPA, and in particular of the License Agreement and the Sublicense Agreement.

Berg Decl. ¶ 2 Ex. A1 at 15. As the IFT has once again made clear, the New York forum selection clause of MDM's License Assignment Agreement means that this Court is the

---

[1] Specifically, on August 28, 2025, Grupo Lauman submitted a letter to the IFT requesting that the IFT initiate its own compliance proceedings in light of Grupo Lauman's claim that the purported "exclusive use" condition—contained in paragraph 8.4.12.4 of the 2019 IFT Resolution—had been violated. *See* ECF No. 77-20 at 3, 7-8.

exclusive forum to adjudicate and order relief related to disputes arising under that agreement. *See* ECF No. 11-27 at 0029 ¶ 12.3.

During the September 26, 2025 hearing, the Court requested briefing in response to the testimony of MSD's purported expert, Juan Pablo Gómez Fierro ("Gómez"). That witness testified, incredibly, (1) that the 2021 IFT Resolution did not approve Exhibit B of the Equity Purchase Agreement ("EPA")—*i.e.*, the MDM License Assignment Agreement—even though the Resolution expressly stated it approved the exhibits of the EPA, and (2) that the Court should disregard the IFT's July 2025 Resolution, which, if credited by the Court, would eviscerate MSD's "fair ground for doubt" argument. The Court should disregard MSD's expert. That testimony was not only biased (Gómez testified he had served as regulatory counsel for Grupo Lauman, *see* Berg. Decl. ¶ 3 Ex. B (9/26/25 Tr.) at 61:8–15), it was wholly irrelevant to the issue of MSD's contempt and devoid of foundation. Gómez's invitation to ignore the July 2025 IFT Resolution would violate the act of state doctrine, which directs this Court to credit that foreign governments have done what their pronouncements say they have done. The Court should afford no weight to Gómez's testimony.

The Court also requested briefing on three arguments raised orally by MSD during the hearing: (i) whether MDM was properly served and whether adequacy of such service bears on MSD's contempt; (ii) whether MSD's contemptuous conduct that predated MSD's acceptance of service is relevant to MSD's contempt; and (iii) whether MSD's pursuit of the Mexico Injunction in August 2025, in violation of the TRO, was somehow excused because it was a continuation of existing litigation. As explained below, none of these insulate MSD from the consequences of its contempt.

## II. ARGUMENT

### A. The IFT's Rejection of Grupo Lauman's Complaint Further Confirms There Was No "Fair Ground For Doubt" About This Court's Jurisdiction

On August 28, 2025, Grupo Lauman requested that the IFT, *inter alia*, obtain and request information from Disney and Fox concerning "possible non-compliances [sic]" with what Grupo Lauman and its affiliates erroneously assert was a condition imposed by the IFT—that the license assigned to MDM be exclusive. Grupo Lauman requested that the IFT initiate compliance proceedings and prevent the author of the July 2025 IFT Resolution—the "Director General of Concentrations and Concessions," Juan Manuel Hernandez Perez, *see* ECF No. 11-53 (2025 IFT Resolution) at 0012—from participating in the requested proceedings. *See* ECF No. 77-20 at 7–8.

The IFT rejected Grupo Lauman's requests. On September 8, 2025, well before the September 26 hearing with the Court, the IFT confirmed—for the third time—that the Equity Purchase Agreement, and the appended License Assignment Agreement, complied with the 2019 IFT Resolution. The IFT first confirmed that fact in a 2021 plenary session of the IFT, when it explicitly stated that "[t]he Equity Purchase Agreement, including its ancillary agreements and annexes . . . is hereby approved." Berg Decl. ¶ 4 Ex. C1 (PX157) at 1, 48. The IFT did so again in July 2025, when it explicitly stated that "Fox Corp, TFCF, and Grupo Lauman designed and implemented the compliance with section 8.4.12.4 [of the 2019 Resolution] through the License Agreement and the Sublicense Agreement[.]" ECF No. 11-53 at 0011. And then, in its September 2025 Decision, the IFT has for third time reiterated that "the EPA, which includes the License Agreement and the Sublicense Agreement . . . designed, interpreted, and materialized the fulfillment of the obligation established in numeral 8.4.12.4 of the [2019 IFT Resolution], setting its scope and assuming rights and obligations[.]" Berg. Decl. ¶ 2 Ex. A1 at 15.

The IFT also rejected Grupo Lauman's request that the IFT initiate its own compliance procedures. The IFT made clear again that the instant dispute concerns private contracts, stating that the IFT could not determine compliance with the 2019 IFT Resolution until competent courts determined whether the underlying contracts were breached. In other words, the IFT recognized that the parties' compliance with the 2019 IFT Resolution depended on whether the parties complied with the contracts:

> . . . TFCF, TWDC and Grupo Lauman must adhere to the agreements, rights, and/or obligations that they negotiated and signed through the EPA, including the License Agreement and the Sublicense Agreement, which are private contracts between individuals that were approved by the IFT . . . so the IFT, before evaluating possible breaches of paragraph 8.4.12.4 . . . would have to wait for decisions issued by competent courts and/or tribunals regarding breaches by TFCF and/or TWDC of the terms of the EPA, and in particular of the License Agreement and Sublicense Agreement.

*Id*. This Court is the competent court referenced by the IFT because of the New York forum selection clause in the License Assignment Agreement. *See* ECF No. 11-27 at 0029 ¶ 12.3.

The IFT also rejected that the author of the 2025 IFT Resolution had a conflict of interest. But, for avoidance of any doubt, the IFT's rejection of Grupo Lauman's request was authored by a different individual, the "head of the General Directorate of Competition Procedures." Berg. Decl. ¶ 2 Ex. A1 at 17–18.

Grupo Lauman's response to the IFT's September 2025 Decision demonstrates the unreliability of MSD's expert. Gómez testified that only decisions made by an IFT plenary session, not a lesser group like the Economic Competition Unit, can be challenged in an amparo proceeding:

> THE COURT: So, I have also been told that you can make, initially at least, a request to a lesser group such as the economic competition unit but that the responses at that level are not final and binding. Is that right?
>
> THE WITNESS: That is correct. In those terms.

> THE COURT: So are you required, before you go to those courts, to first go to the IFT and get a plenary decision?
>
> THE WITNESS: Yes.

Berg. Decl. ¶ 3 Ex. B (9/26/25 Hr'g Tr.) at 68:20–24; 89:15–18.

Grupo Lauman's conduct demonstrates that testimony is false. The IFT's September 2025 Decision was made by the Economic Competition Unit—not a plenary session of the IFT. *See* Berg Decl. ¶ 2 Ex. A1 at 1. And Grupo Lauman has initiated an amparo proceeding against the IFT's September 2025 Decision. Berg. Decl. ¶ 5 Ex. D1. This is a significant contradiction to Gómez's testimony because the IFT's July 2025 Resolution was also made by the IFT's Economic Competition Unit. *See* ECF No. 11-53 at 0001.

That revelation has serious import for MSD's conduct. Grupo Lauman's amparo proceeding against the IFT's September 2025 Decision by the Economic Competition Unit shows that the IFT's July 2025 Resolution by the Economic Competition Unit was a decision capable of challenge before an amparo court. By not challenging the IFT's July 2025 Resolution, Grupo Lauman (along with its co-contemnors MSD and MDM) acquiesced to the IFT's decision. That renders MSD's "fair ground for doubt" argument untenable. If Grupo Lauman, MDM, and MSD actually thought there was "ground for doubt" about whether the IFT had the authority to approve the License Assignment Agreement, including its forum selection

clause, as the IFT's July 2025 Resolution clearly asserted, then it was incumbent on them to challenge the IFT decision. They did not. That conduct demonstrates that there was no reasonable ground for doubt that the IFT had approved this Court's authority and that, therefore, the injunction issued by this Court applied to MSD's actions in Mexico.

### B. The Opinions of MSD's Expert Are Irrelevant, Without Foundation, and an Improper Invitation to this Court to Violate the Act of State Doctrine

At the September 26 hearing, MSD relied on the opinion of its second purported "IFT expert," after the Court struck the testimony of MSD's first purported expert (who testified at the hearing on September 18). This second purported IFT expert—Gómez—should also be disregarded. Gómez is a biased witness, who offered opinions that are irrelevant to the question of MSD's contempt and contradicted by the record, and invites the Court to deem the IFT's pronouncements a nullity, in violation of the act of state doctrine.[2]

#### 1. Gómez's Opinion Is Irrelevant

##### a. Neither the Injunction nor the Contempt Proceedings Rely on Interpretation of Conditions Imposed by the 2019 IFT Resolution

Gómez's opinion is irrelevant because it addresses an issue not present in this case—whether this Court can "supervise compliance with the conditions" in the 2019 IFT Resolution and "determine whether there is a breach" of those conditions. ECF No. 97-3 (Gómez Expert Opinion) at 6, 8–9; *see* ECF No. 97 at 6 (MSD's brief arguing that IFT "has retained jurisdiction over enforcement of the 2019 IFT Conditions"). As Gómez himself admitted, private contractual disputes do not fall within the exclusive jurisdiction of the IFT or the specialized Mexican courts merely because they arise out of transactions with IFT involvement. Berg. Decl. ¶ 3 Ex. B

[2] As noted above, the Court should place little, if any, weight on Gómez's testimony given his apparent bias. He admits that he has acted as counsel for Grupo Lauman in providing legal regulatory advice. *See* Berg. Decl. ¶ 3 Ex. B (9/26/25 Tr.) at 61:8–15.

(9/26/25 Tr.) at 77:11-78:23; *see also* Berg Decl. ¶ 2 Ex. A1 at 15 (describing MDM's License Assignment Agreement as a "private contract[]").

Plaintiffs did not seek an injunction on the basis of the 2019 IFT Resolution, nor did they ever ask this Court to interpret or enforce conditions imposed by the IFT. Plaintiffs sought an injunction on the basis of a contractual forum-selection clause and the fact that MDM had obtained an injunction in Mexico in violation of that clause. *See* ECF No. 9 at 14.

It is MSD and its affiliates who invoke the 2019 IFT Resolution. *See, e.g.*, ECF No. 13-3 (MSD/MDM March 2025 injunction moving papers in Mexico court) at 0014 ("Notwithstanding the fact that the Fox/Disney License Agreement did not establish that the license was exclusive, in fact the license granted in favor of my principals is—and it cannot be otherwise—an exclusive use license, since that was the condition established by the IFT[.]"); ECF No. 76 at 8–9 (MSD's September 12, 2025 brief arguing that IFT required a grant of an exclusive license). And, in response to that argument, Plaintiffs correctly observed that the IFT has repeatedly approved the agreements containing a forum-selection clause and granting only a non-exclusive license. *See, e.g.*, ECF No. 9 at 17–18 (responding to MDM's argument that "the 2019 IFT Resolution required any license for the Fox Sports Trademarks to allow for exclusive use of the marks"). The fact that MSD has defended its improper use of the Fox Sports Trademarks in reliance on the 2019 IFT Resolution does not make this proceeding one subject to the exclusive jurisdiction of the IFT or the specialized amparo courts in Mexico.

In fact, as Plaintiffs have recently learned, MSD took that precise position before the Mexican appellate court in a submission filed the day before the hearing. *See* Berg. Decl. ¶ 6 Ex. E1. There, MSD argued that "the simple fact that one of the base documents" at issue in the Mexican proceeding "is [the 2019 IFT Resolution]" does not mean that the Mexican proceeding

was one subject to the "exclusive jurisdiction of the . . . District Judge in Administrative Matters Specialized in Economic Competition, Broadcasting, and Telecommunications." *Id.* at 1. Plaintiffs agree: the mere invocation of an IFT resolution in a proceeding does not bring the proceeding within the exclusive jurisdiction of the IFT or the specialty courts in Mexico.

b. The Opinions of MSD's Expert Are Irrelevant as MSD's Purported "Fair Ground of Doubt" Is Mere Pretext

Gómez's opinions are doubly irrelevant to the issue of MSD's contempt because MSD's claimed comity concerns, which gave rise to the purported "fair ground of doubt," are pretextual excuses for MSD's disobedience of the injunction. MSD relies on Gómez to argue that there exists a "fair ground of doubt" as to the wrongfulness of its conduct in Mexico, *see* ECF No. 97 at 2, suggesting that the TRO was not "clear and unambiguous" in proscribing MSD's conduct in Mexico. But a contemnor cannot avoid contempt when the contemnor's purported "fair ground of doubt" is mere pretext to avoid an injunction. *See Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008) (citing *Apple Computer, Inc. v. Formula Int'l, Inc.*, 549 F. Supp. 617, 623 (C.D. Cal. 1984)). There must have existed an objective basis for MSD's belief that the TRO did not extend to its conduct in Mexico. *See Taggart v. Lorenzen*, 587 U.S. 554, 561–62 (2019) (the fair ground of doubt standard "is generally an objective one . . . a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable," because the "absence of willfulness does not relieve from civil contempt") (quotation and citation omitted). No such basis existed here.

*First*, the language of the TRO could not have been clearer. The TRO explicitly stated that "Defendant and anyone acting in concert with Defendant" was "restrained from . . . (3) pursuing any legal or regulatory action relating to the Fox Sports Trademarks *in Mexico*." ECF No. 29 at 10 (emphasis added). There is no plausible reading of the TRO presenting a "fair

ground of doubt" as to whether the anti-suit injunction applied to conduct *in Mexico*. *See* ECF No. 97 at 2. The very impetus for the anti-suit injunction was MDM and MSD's prior pursuit of an injunction in Mexico relating to the Fox Sports Trademarks. *See* ECF No. 29 at 4–5.

*Second*, there was no objective basis for "fair ground of doubt." *See Taggart*, 587 U.S. at 561–62. By the time MSD sought an injunction in August 2025 (the "Mexico Injunction"), the IFT had twice affirmed that the Equity Purchase Agreement and its ancillary agreements (including both the non-exclusive license assignment and forum selection provision at issue here) complied with the 2019 IFT Resolution.

In the 2021 IFT Resolution, a plenary session of the IFT explicitly stated that "[t]he Equity Purchase Agreement, including its ancillary agreements and annexes . . . is hereby approved." Berg Decl. ¶ 4 Ex. C1 (PX157) at 1, 48. That Equity Purchase Agreement contained a model License Assignment Agreement—one of the "ancillary agreements" approved by the IFT's plenary session—which was identical in all relevant respects to the License Assignment Agreement ultimately executed. *See* ECF No. 96 at 8. In particular, both the model License Assignment Agreement approved by the IFT's plenary session and the executed License Agreement contained a forum-selection provision designating the United States District Court for the Southern District of New York (along with the Commercial Division of the Supreme Court of the State of New York, New York County) as the exclusive forum and venue for disputes with Plaintiffs related to the License Assignment Agreement. *Compare* ECF No. 11-27 at 0029 ¶ 12.3 *with* ECF No. 12-26 at 0109 ¶ 12.3.

Then, on July 15, 2025, the IFT confirmed that the License Assignment Agreement complied with the conditions imposed in the 2019 IFT Resolution. *See* ECF No. 11-53. The IFT issued a resolution from its Economic Competition Unit affirming that the 2021 Resolution

"approved the Equity Purchase Agreement, including its ancillary agreements and exhibits[.]" *Id.* at 0010; *see also id.* at 0011 ("Fox Corp, TFCF, and Grupo Lauman designed and implemented the compliance with section 8.4.12.4 . . . through the License Agreement and the Sublicense Agreement[.]").

MSD cannot reasonably claim that there was fair ground for doubt about a perceived conflict between the IFT and this Court's jurisdiction when MSD sought the second Mexico injunction on August 22, 2025, *see* ECF No. 42-1 at 4, given the IFT's Resolution issued in July 2025. At that point, the IFT had already unambiguously stated *twice* that the contracts at issue here—including the forum-selection provision—were compliant with the 2019 IFT Resolution.

*Third*, MSD's argument that the Court "should have engaged in a comity analysis," ECF No. 97 at 3 n.1, is so fundamentally flawed that MSD's argument can only be understood, not as a basis for a "fair ground of doubt," but as an impermissible attack on the legal basis underlying the TRO. *See U.S. v. Rylander*, 460 U.S. 752, 756–57 (1983) (party cannot challenge in contempt proceeding the "legal or factual basis of the order alleged to have been disobeyed") (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948)); *W.R. Grace and Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers of Am.*, 461 U.S. 757, 768 (1983) (even "erroneous[]" orders must be obeyed).

The Court *did* conduct a comity analysis under the relevant framework for anti-suit injunctions, as set forth in *China Trade and Development Corp. v. M.V. Choong Yang*, 837 F.2d 33 (2d Cir. 1987). *See* ECF No. 29 at 8 ¶ 5; *see also* ECF No. 9 at 32–35 (Plaintiffs' application of *China Trade* factors). In reality, MSD's complaint is that this Court did not come to the conclusion it wanted pursuant to the comity analysis. This is a naked attack on the legal underpinnings of the TRO.

2. Gómez's Opinion Is Unreliable and Invites the Court to Violate the Act of State Doctrine

Gómez's opinions should also be disregarded because they are unreliable and an improper invitation for this Court to violate the act of state doctrine. Gómez opines that the 2021 IFT Resolution did not constitute approval of the forum-selection provision and that the 2025 IFT Resolution did not confirm that the EPA's ancillary agreements complied with the 2019 IFT Resolution. ECF No. 97-3 at 6–8. Neither opinion withstands the slightest scrutiny.

a. Gómez's Opinion on the 2021 IFT Resolution Is Baseless and Contradicted by Events in Mexico

Gómez suggests that the IFT's approval of the EPA in the 2021 Resolution did not extend to the forum selection provision in the ancillary agreements attached to the EPA because the approval "did not imply that the IFT delegate[d] its exclusive power to determine whether there is a breach of the conditions established in IFT Resolution 2019 in favor of a foreign court." ECF No. 97-3 at 6. In other words, MSD posits that the IFT approved everything in the Equity Purchase Agreement and its exhibits except the forum selection clause.

Gómez points to nothing in the 2021 IFT Resolution that limited the IFT's approval of the relevant agreements and, instead, simply states that his preferred interpretation of the 2021 IFT Resolution better comports with the IFT's aim of "protect[ing] the well-being of consumers." *See* Berg Decl. ¶ 2 Ex. B (9/26/25 Tr.) at 75:1–12. But he failed to acknowledge that the IFT's September 2025 Decision rejected Grupo Lauman's request that the IFT "[e]nforce" MDM's purported right to exclusive use precisely because the IFT stated that it would not act before this Court reached a decision in this litigation. *See* ECF No. 77-20 at 8; Berg Decl. ¶ 2 Ex. A1 at 15. The IFT's September 2025 Decision definitively establishes that the IFT *did* approve the forum selection clause in MDM's license assignment agreement. Gómez's interpretation of the IFT's 2021 Resolution is unreliable because it contradicts the

IFT's July 2025 Resolution and September 2025 Decision.

b. Consideration of Gómez's Opinion on the July 2025 IFT Resolution Is Precluded by the Act of State Doctrine

In reliance on the Gómez's opinion, MSD asks this Court to ignore the IFT's July 2025 Resolution because the IFT cannot "waive[] [its] power" to determine whether there was a breach of the 2019 IFT Resolution and because the July 2025 IFT Resolution was not issued by plenary session. *See* ECF No. 97-3 at 8; *see also* Berg. Decl. ¶ 3 Ex. B (9/26/25 Tr.) at 73:14–16 (Gómez: "[I]t is not a regulatory decision, it is not legally binding, nor does it have any impact with the IFT."). Thus, MSD asks this Court to ignore the July 2025 Resolution, despite it reflecting the outcome of official Mexican proceedings. That is forbidden under the act of state doctrine.

The act of state doctrine is a rule of decision that "compels federal and state courts to treat foreign official acts as 'valid' in the sense that a court may not declare them 'null and void.'" *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 138 (2d Cir. 2022). "[A] foreign state's official acts executed within that state's territory are valid in that they have the legal effects . . . that they purport to have." *Id*. at 140. "To qualify as 'official,' an act must be imbued with some level of formality, such as authorization by the foreign sovereign through an official 'statute, decree, order, or resolution.'" *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976)). The act of state doctrine is grounded in the "'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)).

The actions of the IFT in its July 2025 Resolution resolve any doubt over whether the IFT approved the forum selection clause in MDM's license assignment agreement. The IFT did so when it explained that MDM's license assignment agreement "establish[ed the] scope" and defined the "rights and obligations" of Fox, Disney, and Grupo Lauman. ECF No. 11-53 at 0011.

Gómez asks this Court to deem the IFT's actions in its July 2025 Resolution as having no bearing on whether the IFT approved this Court's jurisdiction.[3] That runs afoul of the act of state doctrine, which requires that federal courts "treat foreign official acts as 'valid' in the sense that a court may not declare them 'null and void.'" *Celestin*, 30 F.4th at 138 (citation omitted). The IFT stated in the July 2025 Resolution that the 2021 Resolution recognized that MDM's License Assignment Agreement complied with the conditions of the IFT's 2019 Resolution. That July 2025 Resolution constitutes an "official" act "imbued with some level of formality," for which deference is owed under the act of state doctrine. *Kashef*, 925 F.3d at 60. The official and formal nature of the July 2025 Resolution, which was issued by the IFT's Economic Competition Unit, is bolstered by Grupo Lauman's amparo proceeding against the IFT's September 2025 Decision, also an official and formal act by the IFT's Economic Competition Unit. That amparo proceeding shows that acts of the IFT's Economic Competition Unit, including acts that bear the appellation "Resolution," as the IFT's July 2025 Resolution does, demonstrates that the IFT's July 2025 Resolution should be afforded act-of-state deference. Gómez points to no official act

[3] This Court need not rely on expert testimony to "establish[] foreign law, and indeed, federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities." *Curtis v. Beatrice Foods Co.*, 481 F. Supp. 1275, 1285 (S.D.N.Y. 1980), *aff'd*, 633 F.2d 203 (2d Cir. 1980). This is especially true when the opinions are contradicted by the foreign authorities the purported experts claim to interpret.

by the IFT that supersedes the IFT's July 2025 actions.

### C. MSD's New Arguments for Excusing Its Contemptuous Conduct Are Meritless

MSD's arguments concerning the validity of service on MDM and the timing of its contemptuous conduct relative to MSD's acceptance of service are meritless. The same is true for the spurious claim that MSD's pursuit of a Mexico injunction, which occurred after MSD indisputably received notice of the TRO enjoining that conduct, was somehow excused because it was a continuation of existing litigation.[4]

#### 1. MSD's Attacks on Adequacy of Service to MDM Are Both Misguided and Baseless

MSD cannot avoid sanctions for its contempt by attacking the sufficiency of service to MDM of this Court's Order to Show Cause why MDM should not be held in contempt. *See* ECF No. 38. MSD does not, and could not, contest that it was bound by the TRO once it received notice of it. Federal Rule 65(d)(2) expressly states that a court order binds those acting "in active concert or participation" with an enjoined party so long as they "receive actual notice of it by personal service or otherwise." Rather, MSD says that even if it were bound by the TRO, this Court is powerless to enforce the TRO through contempt proceedings due to perceived

[4] MSD clouds the issue with persistent and vague references to the "fair ground of doubt" standard articulated by the Second Circuit in *Next Investments, LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021). But that standard does not create an opening for a contemnor to challenge each predicate element of a contempt holding. *See, e.g.*, Berg Decl. ¶ 3 Ex. B (9/26/25 Tr.) at 24:5–10, 25:1–3 (MSD counsel invoking standard as to whether MDM was properly served), 27:13-17 (invoking standard for whether MSD had notice of contempt order). Rather, the "fair ground of doubt" standard bears only on the question of whether an order was "clear and unambiguous." *See Next Invs.*. 12 F.4th at 131 ("fair ground of doubt" standard bears on whether order is "clear and unambiguous"); *see also CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016)("A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner.") (citation omitted).

deficiencies in service to MDM.

a. MDM Was Properly Served

Even if the Court permitted MSD to continue to litigate MDM's arguments against contempt—it should not—all contempt filings, including the Order to Show Cause, were properly served on MDM via email to MDM's Mexican counsel.

In a civil contempt proceeding, Local Civil Rule 83.6(a) requires that the potential contemnor be served with an order to show cause and the papers on which it is based "in the manner provided for by the Federal Rules of Civil Procedure for the service of a summons." Local Civil Rule 83.6(a) is satisfied when the Court authorizes service of those papers by email, as such service is permitted under Federal Rule of Civil Procedure 4. *See Absolute Nevada, LLC v. Grand Majestic Riverboat Co., LLC*, No. 19-cv-11479 (PKC), 2020 WL 5209730, at *4 n.1 (S.D.N.Y. Sept. 1, 2020) ("Courts operating under the aegis of Local Rule 83.6(a) have interpreted the personal service requirement to encompass methods of substitute service permitted by [FRCP] 4[.]") (collecting cases), *aff'd in part, vacated in part on other grounds*, No. 21-50-cv, 2022 WL 350255, at *3 (2d Cir. Feb. 7, 2022) (vacating and remanding issue of whether contempt sanction was excessive).

Federal Rule of Civil Procedure 4(f)(3) permits service by email to a foreign party because it is not prohibited by international agreement and because it comports with due process. *See Live Brands Holdings, LLC v. Gastronomico Gracias a Dios*, No. 20 Civ. 1213 (JPC), 2021 WL 6064202, at *1 & n.1 (S.D.N.Y. Dec. 21, 2021) (permitting e-mail service to Mexican company); *see also* Fed. R. Civ. P. 4(h)(2) (service may be made "at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)"); Fed. R. Civ. P. 4(f)(3) (foreign individual may be served "by [] means not prohibited by international agreement, as the court

orders”).

“A court is ‘afforded wide discretion in ordering service of process under Rule 4(f)(3).’” *S.E.C. v. Anticevic*, No. 05 CV 6991 (KMW), 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009) (quoting *BP Prods. N. Am., Inc. v. Dagra*, 236 F.R.D. 270, 271 (E.D. Va. 2006)). “The Rule ‘provides the Court with flexibility and discretion to empower courts to fit the manner of service utilized to the facts and circumstances of the particular case.’” *Id.* (quoting *BP Prods.*, 236 F.R.D. at 271).

Here, the Court authorized Plaintiffs to serve the Court’s Order to Show Cause regarding contempt against MDM via email. ECF No. 38. Plaintiffs accomplished that service by emailing the Order to Show Cause and its related papers to MDM’s Mexico litigation counsel. ECF Nos. 51, 52, 53, 54, 58. Such service was not prohibited by international agreement and comported with due process. *See Live Brands Holdings*, 2021 WL 6064202, at *1.

*First*, service by electronic mail on MDM is not prohibited by international agreement. Mexico is a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (“Hague Convention”).[5] Although Mexico has objected to service pursuant to Article 10 of the Hague Convention, which prohibits, *inter alia*, service by postal channels, Article 10 does not address service via electronic mail. *See Live Brands Holdings*, 2021 WL 6064202, at *1 n.1; *Sulzer Mixpac AG v. Medenstar Indus. Co. Ltd.*, 312 F.R.D. 329, 331 (S.D.N.Y. 2015) (“[T]he Court finds more persuasive the reasoning of several courts that have declined to extend countries’ objections to specific forms of service

[5] *See* Hague Conference on Private International Law, “Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, available at: https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (accessed October 8, 2025).

permitted by Article 10 of the Hague Convention, such as postal mail, to service by other alternative means, including email.") (collecting cases) (Rakoff, J.); *F.T.C. v. PCCare 247 Inc.*, No. 12 Civ. 7189 (PAE), 2013 WL 841037, at *4 (S.D.N.Y. Mar. 7, 2013) ("Service by email . . . [is] not among the means listed in Article 10, and India has not specifically objected to them. Numerous courts have held that service by email does not violate any international agreement where the objections of the recipient nation are limited to those means enumerated in Article 10."); *Gurung v. Malhotra*, 279 F.R.D. 215, 219 (S.D.N.Y. 2011) ("Where a signatory nation has objected to only those means of service listed in Article X, a court acting under Rule 4(f)(3) remains free to order alternative means of service that are not specifically referenced in Article X."). The foregoing cases articulate an inescapable proposition: there is no international agreement that prohibits the service of Mexican entities via email. Accordingly, service by email "is not prohibited by international agreement" under Rule 4(f)(3), and thus the email service to MDM was proper here.

*Second*, "[s]ervice by email alone comports with due process where a plaintiff demonstrates that the email is likely to reach the defendant." *CKR Law LLP v. Anderson Invs. Int'l, LLC*, 525 F. Supp. 3d 518, 524 (S.D.N.Y. 2021) (Rakoff, J.) (quoting *Convergen Energy LLC v. Brooks*, No. 20-cv-3746 (LJL), 2020 WL 4038353, at *6 (S.D.N.Y. July 17, 2020)); *see Convergen Energy*, 2020 WL 4038353, at *6 ("Email service has also been repeatedly been found by courts to meet the requirements of due process.") (quoting *Pearson Educ. Inc. v. Doe 1*, No. 18-CV-7380 (PGG) (OTW), 2019 WL 6498305, at *3 (S.D.N.Y. Dec. 2, 2019)); *see also Sulzer Mixpac AG*, 312 F.R.D. at 332 (permitting service by email). Email service to a foreign defendant's foreign counsel constitutes adequate email service on the foreign defendant. *In re South African Apartheid Litig.*, 643 F. Supp. 2d 423, 437–38 (S.D.N.Y. 2009) (permitting service

to German defendant's counsel under FRCP 4(f)(3)).

Here, Plaintiffs served MDM in a manner likely to reach MDM—by emailing MDM's Mexican litigation counsel who represent MDM before the Mexican court that issued the injunction covered by this Court's TRO. MDM's moving papers for its original injunction list the following five attorneys as representing MDM in that Mexican litigation: Carlos D. Villasante Santoyo, Rogelio Arturo Islas Pérez, Mireya Martinez Gómez, Alan Said López Ríos, and Paulo Diez. *See* ECF No. 13-3 (MDM/MSD March 2025 Mexico Injunction moving papers) at 4. Plaintiffs provided service to MDM by emailing those attorneys this Court's Order to Show Cause and related moving papers. ECF No. 67-4. The email addresses that Plaintiffs used to send the Order to Show Cause were reasonably likely to reach those attorneys because those email addresses are the same email addresses listed on MDM's attorneys' professional websites. Berg Decl. ¶ 7 Ex. F. Sending email service to the email address of Paulo Diez (pdiez@dgt.com.mx) was also likely to reach Paulo Diez, and thus MDM, because Paulo Diez used that same email address to send Fox employees an email on March 28, 2025 notifying them of the original injunction obtained by MDM in Mexico. *See* ECF No. 36 ¶ 15.

Due process is also satisfied here because it cannot be reasonably disputed that MDM had actual notice of this litigation at the time of email service. Four days after the Court issued its TRO, MDM jointly issued a press release expressly denying this Court's jurisdiction. ECF No. 36-2 (August 18, 2025 Press Release). *See Gurung*, 279 F.R.D. at 220 (alternative means of service, including email service, likely to be effective where party to be served had actual notice of litigation); *Anticevic*, 2009 WL 361739, at *4 ("While actual knowledge is no substitute for service, Verinac's actual knowledge may increase the likelihood that published service will ultimately come to this attention, at minimum, through his increased awareness of and

attentiveness to any information about the lawsuit.”).

Plaintiffs served MDM via email—a method authorized by the Federal Rules of Civil Procedure and this Court. There is no basis for MSD to claim that MDM cannot be held in contempt because it was not properly served.

b. MSD’s Contempt Arises from its Legal Identification with MDM

The adequacy of service on MDM does not bear on MSD’s contempt because the Court has already held that MSD is legally identified and a joint venturer with MDM. During the September 26 hearing, MSD’s counsel argued that the issue of service on MDM was relevant to MSD’s contempt because “under [*Havens*] *v. James*, a non-party cannot be in contempt if the defendant is not in contempt as well. And if the defendant has not been properly served, they cannot be in contempt.” Berg. Decl. ¶ 3 Ex. B (9/26/25 Tr.) at 25:4–8. But the *Havens* court recognized two alternative bases for holding parties not directly enjoined in contempt: “The nonparty must *either* be ‘legally identified’ with the enjoined party or ‘abet’ the enjoined party’s violation of the injunction.” *Havens v. James*, 76 F.4th 103, 111 (2d Cir. 2023) (citation omitted) (emphasis added). And, in explaining the elements of aiding-and-abetting liability, the *Havens* court recognized that “a court must first conclude that ‘the party subject to the court’s mandate committed contempt.’” *Id.* at 112 (quoting *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002)).

Here, the Court need not resolve the issue of MDM’s contempt independently from MSD’s contempt: “MDM and MSD are [] ‘legally identified’ with each other[.]” ECF No. 96 at 15. There is no predicate requirement that MDM be separately held in contempt under the legal identification theory of nonparty liability. *See Spectacular Venture, L.P. v. World Star Int’l, Inc.*, 927 F. Supp. 683, 684 (S.D.N.Y. 1996) (“[N]o one disputes that defendant has failed to comply with the consent judgment or with any of the Court’s several subsequent orders . . . As a practical

matter, the defendant and Reynolds are one and the same. Accordingly . . . Reynolds is in contempt of the judgment and orders.”). Accordingly, MSD’s claim that MDM was improperly served has no bearing on whether MSD can be held in contempt as it is legally identified with MDM.

c. Even Under an Aiding-and-Abetting Theory of Liability, MSD’s Contempt Does Not Depend on Service to MDM

Even under the aiding-and-abetting theory of nonparty contempt liability, valid service of contempt proceedings on MDM is not a prerequisite to MSD’s contempt. The law requires only that the “party subject to the court’s mandate committed contempt” and that, with notice of the court order restraining such conduct, the nonparty aided and abetted the contemptuous act. *See Havens*, 76 F.4th at 111–112; Fed. R. Civ. P. 65(d)(2)(C).

The Court has already found MDM in contempt. *See* ECF No. 44. In fact, when the Court determined it possessed personal jurisdiction over MSD under the aiding-and-abetting theory, it acknowledged that it was required to first determine that MDM committed contempt and deemed that requirement satisfied. *See* ECF No. 96 at 17–18. That is all that is required for this Court to hold non-parties acting in concert with MDM in contempt. The law does not permit MSD to attack the basis for MDM’s contempt to avoid being held in contempt itself. The alternative reading proposed by MSD would wreak havoc on the courts’ ability to enforce their orders when the party named directly in an injunction circumvents service and is otherwise inconsistent with principles underlying aiding-and-abetting liability.

2. The Timing of MSD’s Acceptance of Service Is Irrelevant as MSD Indisputably Had Notice of the TRO

MSD’s argument concerning the timing of its acceptance of service is misplaced. MSD argues that the Court should vacate its contempt finding because MSD did not accept service until after its contemptuous act—its August 22, 2025 filing for a second injunction in Mexico.

Notice is the threshold requirement for contempt, not service. Federal Rule of Civil Procedure 65(d)(2) provides that a court order binds those acting in "active concert or participation" with a party named in the order upon receiving "actual notice of it by personal service *or otherwise*[.]" (emphasis added). MSD cannot contest that it was on actual notice of the TRO before it sought the Mexico injunction in August 2025. *Compare* ECF No. 43-1 (August 29, 2025 Declaration of Christopher T. Berg ("August 29, 2025 Berg Decl.") at ¶ 5 Ex. C at 47–60 (MSD's counsel replying to August 14, 2025 email providing copy of TRO) *with id.* at ¶ 3 Ex. A at 4–5 (MDM and MSD filed for injunction on August 22, 2025).

3. MSD's Continued Pursuit of an Injunction After Receiving Notice of the TRO Constituted Contempt

MSD's argument that its request to the Mexican court for a second injunction in August 2025 was not a "second" act is even more unfounded. The TRO unequivocally restrained MDM and those acting in concert with it from "*pursuing* any legal or regulatory action relating to the Fox Sports Trademarks in Mexico, including seeking to enforce the injunction issued on March 26, 2025 by Civil Department 42 of the Superior Court of Justice of Mexico City[.]" ECF No. 29 at 9 (emphasis added). The TRO was not limited to the initiation of new proceedings. Indeed, it specifically restrained "seeking to enforce the injunction" issued in March 2025. MDM and MSD's request for the August 2025 injunction did exactly that. In that filing—which was before Civil Department 42 of the Superior Court of Justice of Mexico City—MDM and MSD claimed that further injunctive relief was needed because of a violation of "the measures granted by Your Honor on March 26, 2025." ECF No. 43-1 (August 29, 2025 Berg Decl.) at ¶ 2 Ex. A at 7. Seeking a second injunction to expand the scope of the March 26, 2025 ruling plainly constitutes pursuing legal action in Mexico. The entire point of the Court's injunction was to halt MDM and its co-contemnors from continuing to pursue litigation before Civil

Department 42 of the Superior Court of Justice of Mexico City related to the Fox Sports Trademarks. That is precisely what MSD did, in concert with MDM. Courts routinely enjoin parties from further pursuing foreign litigation that has already been initiated, in precisely the same circumstances here. *See, e.g.*, *Forbes IP (HK) Ltd. v. Media Bus. Generators, S.A. de C.V.*, 23-CV-11168 (JGLC), 2024 WL 1743109, at *9 (S.D.N.Y. Apr. 23, 2024) (enjoining further pursuit of already-initiated foreign litigation and mandating that enjoined party dismiss the foreign litigation).

## III. CONCLUSION

For the foregoing reasons, the Court should confirm its contempt order against MSD.

Respectfully submitted,

Dated: New York, New York
October 8, 2025

ELLIS GEORGE LLP

By: *\/s/ Christopher T Berg*
Eric M. George
Katherine A. Petti, *Pro Hac Vice*
Christopher T. Berg, *Pro Hac Vice*

2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
egeorge@ellisgeorge.com
kpetti@ellisgeorge.com
cberg@ellisgeorge.com

Stephen P. Farrelly
ELLIS GEORGE LLP
Carnegie Hall Tower
152 West 57th Street, 28th Floor

New York, New York 10019
Telephone: (212) 413-2600
Facsimile: (212) 413-2629
sfarrelly@ellisgeorge.com

*Attorneys for Plaintiffs Fox Corporation, Fox Media LLC, and Fox Sports en Español LLC*

**CERTIFICATION PURSUANT TO S.D.N.Y. LOCAL CIVIL RULE 7.1(c)**

I, Christopher T. Berg, an attorney duly admitted Pro Hac Vice to practice in the Southern District of New York hereby certify that this memorandum is no longer than 25-double spaced pages and the text and footnotes are in 12 point type, which complies with Rule 2(e) of this Court's Individual Rules of Practice.

Dated: October 8, 2025

*/s/ Christopher T Berg*
Christopher T. Berg