UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOX CORPORATION, et al.,

      Plaintiffs,

  -v-

MEDIA DEPORTES MEXICO, S. de R.L. de C.V.,

      Defendant.

---

25-cv-6703 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

On August 29, 2025, the Court entered an Order (the "Contempt Order") holding nonparty Mexico Sports Distribution, LLC ("MSD"), along with other nonparties, in civil contempt for violating the Temporary Restraining Order ("TRO") that the Court entered in this case on August 14, 2025. See ECF Nos. 29 (TRO), 45 (Contempt Order). The Court imposed civil contempt sanctions of $200,000 per day, beginning September 6, 2025, and scheduled a hearing for September 5, 2025, to give MSD and its co-contemnors the opportunity to present any opposition to the Contempt Order. See ECF No. 45 at 1-2. In the event, MSD, but none of its co-contemnors, appeared on September 5, 2025, and moved to set aside the Contempt Order as to it. ECF No. 46. Subsequently, the Court stayed the effectiveness of the Contempt Order as to MSD, see ECF No. 48; received three rounds of briefing, see ECF Nos. 76-77, 88-90, 97, 100-01, 108-11, 120-22; and held three days of evidentiary hearings regarding various aspects of MSD's motion.

Upon careful consideration, the Court hereby denies MSD's motion.

1

For the reasons that follow, the Court reaffirms its decision that MSD is in civil contempt for violating the TRO and, therefore, lifts the stay of effectiveness of the Contempt Order as to MSD.

I.    Procedural History and Factual Background

The Court assumes familiarity with the underlying allegations and the procedural history of this action through September 23, 2025. See Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V., --- F. Supp. 3d ---, 2025 WL 2699470, at *1-4 (S.D.N.Y. Sept. 23, 2025). On that date, the Court issued an Opinion and Order denying MSD's first motion to set aside the Contempt Order. MSD's motion was, at that juncture, predicated solely on its argument that the Court could not properly exercise personal jurisdiction over it. The Court's September 23, 2025, Opinion and Order rejected that contention. See generally id. Nevertheless, during the evidentiary hearing that the Court held on September 18 and 19, 2025, MSD contended that there were other reasons why the Contempt Order must be set aside. To afford MSD the opportunity to present its additional arguments, the Court set a further briefing schedule and scheduled a further evidentiary hearing for September 26, 2025. At that hearing, the Court heard extensive argument from counsel, received further documents into evidence, and heard the testimony of an expert witness called by MSD, Juan Pablo Gómez Fierro. Certain legal questions remained outstanding at the hearing's conclusion, and

the Court invited a further round of briefing.[1] With plaintiffs' and MSD's written submissions now before the Court, MSD's motion to set aside the Contempt Order is ripe for final adjudication.

Much of this Opinion concerns litigation and regulatory activity that has occurred and/or is pending in both the United States and Mexico. The Court briefly re-summarizes the relevant facts for the convenience of the reader.[2] On March 11, 2019, Mexico's Federal Institute for Telecommunications ("IFT," for its initials in Spanish) issued a formal resolution concerning a proposed transaction by which The Walt Disney Company ("TWDC" or "Disney") intended to acquire certain assets of Twenty-First Century Fox, Inc. ("21CF" or "TFCF"). In section 8.4.12.4 of that resolution, the IFT provided that the transaction between TWDC and TFCF could not include "trademarks and trade names or service marks or names" for sports broadcasting that contain the name "Fox."[3] Instead, the IFT required that a license for the use of the name "Fox" in connection with sports broadcasting be offered to a purchaser to be identified. The IFT described that

---

[1] At MSD's request and after briefing had closed, the Court also authorized the parties to submit letter-briefs and documents regarding an evidentiary issue. See ECF Nos. 128, 130.

[2] Except where indicated by specific citations, this paragraph and the three paragraphs immediately following it summarize relevant portions of the Court's September 23, 2025, Opinion and Order. See Media Deportes Mexico, 2025 WL 2699470, at *2-4. Citations other than to newly referenced documents are omitted.

[3] Except where otherwise indicated, all quotations in this Opinion and Order omit citations, quotation marks, footnotes, brackets, ellipses, and other alterations in source material.

license, in Spanish, as one "de uso gratuita exclusiva para contenidos deportivos." The parties dispute whether this provision means an exclusive license for sports content or a license exclusively for sports content, but that dispute is not pertinent to the Court's resolution of the instant motion.

On May 21, 2021, an Equity Purchase Agreement, written in English, was executed between Fox Sports Mexico Distribution LLC and TFCF Latin American Channel LLC, both subsidiaries of TFCF, and Altener, S.A. de C.V., a subsidiary of Grupo Lauman Holding, S. de R.L. de C.V. ("Grupo Lauman"). Grupo Lauman is the indirect parent of both defendant Media Deportes Mexico, S. de R.L. de C.V. ("MDM") and MSD. The Equity Purchase Agreement provided that the parties would enter into a License Assignment Agreement "substantially in the form attached hereto" as an exhibit. Appended to the Equity Purchase Agreement was a model License Assignment Agreement that, among other things, provided (in one of its own exhibits, styled a "Trademark License Agreement") that Fox Corporation would grant TFCF "a non-exclusive . . . irrevocable and royalty-free license" to use certain trademarks; the Trademark License Agreement also contained a forum-selection clause specifying that the parties "irrevocably consent[ed] to the exclusive jurisdiction, forum[,] and venue" of this Court or of the Commercial Division of the Supreme Court of the State of New York, New York County. PX 110, ECF No. 12-26 at 0084-0113 (emphasis added). The model License Assignment Agreement provided that the license Fox had granted

4

TFCF via the Trademark License Agreement would be assigned to MDM. Id. at 0084. By a resolution dated June 7, 2021, the IFT approved the Equity Purchase Agreement, "including its ancillary agreements and annexes."

Then, on November 10, 2021, MDM and TFCF executed a License Assignment Agreement that contained as an exhibit, and incorporated by reference, a Trademark License Agreement. Both the License Assignment Agreement and the Trademark License Agreement were substantially similar to the model agreements that appeared as exhibits to the Equity Purchase Agreement. PX 103, ECF No. 11-27 at 0001-0002, 0013-0033. Like the versions of those documents that the IFT approved, the Trademark License Agreement was a contract between Fox and TFCF by which Fox assigned to TFCF a "non-exclusive . . . irrevocable[,] and royalty-free license to use" the Fox Sports Trademarks. Id. at 0019. The License Assignment Agreement was a contract between TFCF and MDM by which TFCF, in turn, assigned to MDM "all of [its] right, title[,] and interest in, under[,] and to the Fox Sports Trademarks . . . as the same were licensed to [TFCF] under the Trademark License Agreement." Id. at 0002.[4] The Trademark License

---

[4] Because the License Assignment Agreement provides that MDM would "undertake[], with respect to the Fox Sports Trademarks . . . , to meet all of the disclosed obligations of [TFCF] as set forth in" the Trademark License Agreement, PX 103 at 0002, MDM is TFCF's assignee. "[A]n assignee stands in the shoes of the assignor," Najjar Grp., LLC v. W. 56th Hotel LLC, 106 A.D.3d 640, 641 (1st Dep't 2013), which means that, by operation of the License Assignment Agreement, Fox and

Agreement contained assignment, choice-of-law, and forum-selection provisions that were identical to those in the model Trademark License Agreement that the IFT approved.

On April 28, 2025,[5] Fox Corporation submitted a request to the IFT seeking confirmation that, "pursuant to section 8.4.12.4 of the [IFT's 2019 resolution], the parties involved in the acquisition . . . offered and granted Grupo Lauman a non-exclusive, royalty-free license to use the Fox Sports Trademarks in Mexico solely for the operation of the Fox Sports Mexico Business." Fox Corporation also sought confirmation that it could "use the Fox Sports Trademarks for a new sports channel intended to be launched in Mexico." The IFT's response, dated July 14, 2025, was issued by the IFT's Economic Competition Unit (the "ECU"), rather than by the IFT in plenary session. See PX 107, ECF No. 11-53 at 0002. The ECU cited the IFT's 2019 and 2021 resolutions and wrote that "there is no need to issue a confirmation of the requests made by Fox . . . as they do not require an interpretation of the decisions issued by the [IFT]. In fact, Fox Corp[.], TFCF, and Grupo Lauman designed and implemented the compliance with section 8.4.12.4 of Resolution TWDC/TFCF through the License Agreement and the Sublicense Agreement, establishing its scope and assuming rights and

---

MDM are in contractual privity as to the Trademark License Agreement. Contra ECF No. 110 at 23-24.

[5] The Court's previous Opinion and Order inadvertently stated that the date of this request was July 15, 2025. Media Deportes Mexico, 2025 WL 2699470, at *3.

obligations in accordance with their particular interests." The ECU continued: "Thus, Fox Corp[.] is instructed to comply with the decisions issued by the IFT . . . , as well as with the terms agreed upon between Fox Corp[.], TFCF, and Grupo Lauman in the Sublicense Agreement and the License Agreement, respectively."

Further evidence regarding these matters has been presented to the Court since the September 26, 2025, evidentiary hearing. Most relevant is a decision of the ECU, dated September 8, 2025, that plaintiffs have proffered. See ECF No. 109-2 at 1.[6] The ECU issued that decision in response to a letter that was filed on behalf of Grupo Lauman on August 28, 2025, and that informed the IFT "of possible breaches of the conditions imposed" in the 2019 resolution. Id. at 2.

---

[6] The parties vigorously dispute whether plaintiffs properly obtained two new documents, including this one. Plaintiffs submitted the declaration of a Mexican attorney who represents Fox Cable Network Services LLC, in which the attorney states that he obtained access to the documents after his client appeared in the action in which Grupo Lauman is challenging the September 8, 2025, decision of the ECU. See ECF No. 122 ¶ 3. MSD contends that the declarant was incorrect on this point -- and thus should not be believed on other points -- because an order issued by the relevant court states that Fox Cable was not allowed "access to the original written complaint" in that matter. See ECF No. 128-2 at 2. The Court is unpersuaded that the order that MSD has proffered calls into question the declarant's representations that he received "provisional access" to the specific documents before the Court. See ECF No. 122 ¶¶ 3-4. Moreover, as plaintiffs note, the Court is perplexed that MSD was able to obtain, apparently through Grupo Lauman, certain documents from the docket of the action Grupo Lauman brought but was unable to satisfy the Court's request to obtain a copy of Grupo Lauman's own submission to the IFT. See ECF No. 130 at 1-2. Finally, the Court notes that MSD does not contest the accuracy of the documents that plaintiffs have proffered. See id. For all these reasons, the Court receives the two challenged documents into evidence.

Specifically, Grupo Lauman alleged that Fox and its affiliates were in violation of section 8.4.12.4 of the IFT's 2019 resolution by infringing on the allegedly exclusive license held by Grupo Lauman and its subsidiaries. Id. at 4-9. The ECU responded, first, by rehearsing the history of the IFT's involvement in the transactions involving Fox, Grupo Lauman, and their respective subsidiaries. See id. at 12-14. Then, the ECU reiterated that the IFT had "approved the Equity Purchase Agreement, including its ancillary agreements and annexes." Id. at 14. The ECU stated that, "in compliance with the provisions of" the IFT's 2019 resolution, the Equity Purchase Agreement incorporated both the License Assignment Agreement and the Trademark License Agreement. Id. The ECU opined that these two documents, "being ancillary agreements and annexes incorporated in the [Equity Purchase Agreement], were contracts authorized by the IFT." Id. The ECU also explained that, after the IFT had approved the Equity Purchase Agreement and the parties had executed the License Assignment Agreement and Trademark License Agreement, the IFT "considered the conditions established in the Resolution to have been fulfilled." Id. Therefore, the ECU concluded its response to Grupo Lauman's request as follows:

> TFCF, TWDC, and Grupo Lauman must adhere to the agreements, rights[,] and/or obligations that they negotiated and signed through the [Equity Purchase Agreement], including the License [Assignment] Agreement and the [Trademark License] Agreement, which are private contracts between individuals that were approved by the IFT . . . , so the IFT, before evaluating possible breaches of paragraph 8.4.12.4 of the [2019] Resolution, it would have to wait for decisions issued by competent courts and/or tribunals regarding breaches by TFCF and/or TWDC of the terms of

the [Equity Purchase Agreement], and in particular of the License [Assignment] Agreement and the [Trademark License] Agreement.

Id. at 15 (emphasis added).[7]

At some point after September 8, 2025, Grupo Lauman challenged the ECU's decision via what is known as an "amparo" proceeding before Mexico's District Court in Administrative Matters, Specialized in Economic Competition, Broadcasting, and Telecommunications (the "Specialized Court"). See ECF No. 109-7.[8] An amparo proceeding, authorized by Article 107 of the Mexican Constitution, is a procedural mechanism by which parties claiming to be aggrieved by certain kinds of regulatory decisions made by Mexican agencies may challenge those decisions in court. See Mexico 1979 (rev. 2015) art. 107, Constitute Project, https://www.constituteproject.org/constitution/Mexico_2015. In bringing the amparo proceeding, Grupo Lauman contended that the ECU was incorrect, as a matter of Mexican law, to determine that the IFT "would have to wait for decisions issued by the competent courts and/or tribunals" regarding alleged violations of the 2019 resolution. See ECF No. 109-7 at 13, 15. Grupo Lauman argued that the ECU's decision had effectively abdicated the IFT's responsibility under the Mexican

---

[7] Grupo Lauman also complained that the ECU official who issued the July 14, 2025, response had a conflict of interest. See ECF No. 109-2 at 17. Although the ECU rejected the allegation of a conflict of interest, the ECU noted that its September 8, 2025, response was deliberately authored by a different official. Id. at 17-18.

[8] Grupo Lauman's amparo complaint is the second of the two documents whose admission MSD contests on procedural grounds. See supra n.6.

Constitution to ensure effective economic competition within the telecommunications and broadcasting sectors. See id. at 23. The present status of Grupo Lauman's amparo proceeding is unknown to the Court.

The parties have also provided the Court with documents recently filed in the Superior Court of Justice of Mexico City. On September 18, 2025, Fox Cable Network Services LLC ("Fox Cable") appealed the extended injunction that that court entered on August 27, 2025. See DX 201; ECF No. 109-9 at 1. MDM and MSD jointly responded to Fox Cable's appeal on September 25, 2025. See ECF No. 109-9 at 10. On appeal, Fox Cable argued that the Superior Court of Justice was without jurisdiction to enter injunctive relief against Fox and its affiliates; the matter, Fox Cable contended, belonged in the Specialized Court instead. See DX 201 at 14-15. Fox Cable also argued that certain disputes arising from the License Assignment Agreement must be arbitrated in London rather than be decided by any Mexican court. Id. at 18-23. MDM and MSD responded that "the simple fact that" the parties' dispute concerns an IFT resolution is insufficient reason for the dispute to be heard by either the IFT or the Specialized Court. ECF No. 109-9 at 1-2. MDM and MSD also disagreed that the dispute was required to be arbitrated, both because Fox Cable is not a party to the License Assignment Agreement and because Mexican law permits parties to obtain temporary injunctive relief even where an underlying dispute is committed to arbitration. Id. at 2-3. The present status of Fox Cable's appeal is unknown to the Court.

II. Legal Standards

A court may not hold a nonparty in contempt for violating an injunction except where the nonparty is either "legally identified" with an enjoined party or where the nonparty "abet[s] the enjoined party's violation of the injunction." Havens v. James, 76 F.4th 103, 111 (2d Cir. 2023).

A nonparty falling into one of these categories may be held in civil contempt "for failure to comply with a court order if '(1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner.'" Al Hirschfeld Found. v. Margo Feiden Galleries Ltd., 438 F. Supp. 3d 203, 207 (S.D.N.Y. 2020) (quoting CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91, 98 (2d Cir. 2016)).

As to the first of these elements, a court order is "clear and unambiguous" if it "leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." Next Investments, LLC v. Bank of China, 12 F.4th 119, 131 (2d Cir. 2021). Both "[a]mbiguities in the order's language" and "persisting questions about legal limits on the court's power" may render an order sufficiently unclear or ambiguous as to defeat a finding of contempt. See id. (collecting cases). Contempt may not be imposed where there is a "fair ground of doubt as to the wrongfulness of the alleged

11

contemnor's conduct," id., but a contemnor must have an objectively reasonable basis for believing that its conduct does not violate the order, see Taggart v. Lorenzen, 587 U.S. 554, 561 (2019) ("A party's subjective belief that she was complying with an order will ordinarily not insulate her from civil contempt if that belief was objectively unreasonable").

Accordingly, the mere existence of competing legal arguments is insufficient to establish a "fair ground of doubt." Rather, the kind of legal ambiguity sufficient to create such doubt typically arises in the context of a "novel" and "substantial" question of law that "was not the subject of an obvious answer." Chao v. Gotham Registry, Inc., 514 F.3d 280, 292 (2d Cir. 2008). A contemnor may not avoid contempt by the "mere pretext" of interpreting an injunction to create ambiguity where none exists. Id. (quoting Apple Computer, Inc. v. Formula Int'l, Inc., 594 F. Supp. 617, 623 (C.D. Cal. 1984)).

III. Analysis

MSD advances a host of arguments in opposition to the Contempt Order. See generally ECF Nos. 97, 110. Broadly, these fall into four categories. First, MSD contends that jurisdictional defects, including whether the Court may properly exercise personal jurisdiction over MDM and whether MSD may be held in contempt for its conduct prior to accepting service of the Contempt Order, preclude the Court from holding it in civil contempt. Second, MSD argues that because the TRO is (allegedly) ambiguous in various ways, including as to whether the

Court performed the appropriate analysis before entering an order containing an anti-suit provision, there is a "fair ground of doubt" as to the Court's legal authority to bar MDM and MSD from continuing to engage in litigation in Mexico. Third, and in contravention of the Court's direction that the parties' final round of supplemental briefing be confined to issues discussed at the September 26, 2025, evidentiary hearing, MSD raises a new issue concerning the enforceability of the forum-selection clause at issue in this case. Fourth, and finally, MSD objects to certain aspects of the sanctions contemplated by the Contempt Order and the Court's further Orders. The Court addresses each category of arguments in turn.

A.    Jurisdictional Matters

Separate from the arguments it previously made concerning the Court's exercise of personal jurisdiction over it, see generally Media Deportes Mexico, 2025 WL 2699470, MSD now contends that the Court lacks jurisdiction to hold it in civil contempt because (1) plaintiffs did not properly effectuate service on MDM; and (2) MSD did not accept service of the Contempt Order until September 5, 2025, which was after the last date when MSD engaged in any relevant conduct in Mexico. See ECF No. 110 at 4-13. Both arguments fail.

1.    Service on MDM

MSD argues that the Court may not hold it in civil contempt because plaintiffs have not properly served MDM. This, MSD contends, is for two reasons: first, electronic service on MDM, a Mexican entity,

is prohibited by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"); and, second, even if electronic service were permissible, plaintiffs served MDM electronically prior to receiving authorization from the Court to do so. Id. at 9-13.

    a.   The Hague Convention

As to the Hague Convention, MSD contends that Mexican citizens such as MDM "can only be served with documents in foreign civil matters via the Mexican Central Authority." Id. at 11. Plaintiffs respond that neither the Hague Convention nor any other relevant international agreement affirmatively forbids service of judicial documents on a Mexican citizen by electronic mail. ECF No. 108 at 16-20; ECF No. 120 at 5. Moreover, plaintiffs argue that, in the specific factual circumstances of this case, service by electronic mail was consistent with due process because plaintiffs electronically served MDM's known counsel and there is no question that MDM was on actual notice of the TRO. ECF No. 108 at 18-20.

This Court has previously held that the fact that certain countries, including Mexico, have formally objected to the specific "forms of service permitted by Article 10 of the Hague Convention, such as postal mail," does not preclude "service by other alternative means, including email." Sulzer Mixpac AG v. Medenstar Indus. Co. Ltd., 312 F.R.D. 329, 331 (S.D.N.Y. 2015). The Court reasoned, as numerous other courts have done, that a country's having objected to

the particular alternative forms of service that are enumerated in Article 10, without that country's having objected to other forms of service as well, is an insufficient basis for finding that those other forms of service are improper. See, e.g., FTC v. PCCare247 Inc., No. 12 Civ. 7189, 2013 WL 841037, at *4 (S.D.N.Y. Mar. 7, 2013); Gurung v. Malhotra, 279 F.R.D. 215, 219-20 (S.D.N.Y. 2011). Upon revisiting the issue, the Court reiterates its previous analysis. See Sulzer Mixpac, 312 F.R.D. at 331-32.

The Supreme Court's intervening decision in Water Splash, Inc. v. Menon, 581 U.S. 271 (2017), is not to the contrary. Although the Supreme Court there confirmed its teaching that, where the Hague Convention applies, it "pre-empts inconsistent methods of service," id. at 273 (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988)), the Court did not decide whether service by electronic mail is inconsistent with the Hague Convention. As a result, numerous post-Water Splash courts have continued to hold that courts may authorize service by electronic mail upon parties in countries, like Mexico, that have objected to service by postal mail under the Hague Convention. See, e.g., Live Brands Holdings, LLC v. Gastronomico Gracias a Dios, No. 20 Civ. 1213, 2021 WL 6064202, at *1 & n.1 (S.D.N.Y. Dec. 21, 2021); Peanuts Worldwide LLC v. P'ships & Uninc. Ass'ns Identified on Schedule "A", 347 F.R.D. 316, 327-31 (N.D. Ill. 2024); NBA Props., Inc. v. P'ships & Uninc. Ass'ns Identified in Schedule

"A", 549 F. Supp. 3d 790, 796-98 (N.D. Ill. 2021).[9] Needless to say, electronic service is vastly different from service by mail, and suffers from none of the uncertainties that service by mail may generate.

Thus, the Court concludes that it permissibly authorized electronic service on MDM. Moreover, the Court agrees with plaintiffs that electronic service on MDM, in the circumstances of this case, was consistent with due process. Such service must be "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." E.g., NYKCool A.B. v. Pac. Int'l Servs., Inc., 66 F. Supp. 3d 385, 391 (S.D.N.Y. 2014) (stating standard in context of authorizing electronic service). Here, plaintiffs effectuated electronic service on lawyers known to be MDM's legal representatives, using the email addresses listed on those lawyers' professional webpages. See ECF Nos. 67-4 (plaintiffs' communications to MDM's counsel), 109-10 (webpage of lawyers' firm); cf. In re South African

---

[9] The Court observes that whether service by electronic mail is permissible under the Hague Convention where a country has objected to service by postal mail is an open legal question as to which district courts around the nation have split, and that some courts have reached conclusions opposite to the Court's. See, e.g., Smart Study Co., Ltd. v. Acuteye-US, 620 F. Supp. 3d 1382, 1389-97 (S.D.N.Y. 2022); Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co., Ltd., 480 F. Supp. 3d 977, 982-84 (N.D. Cal. 2020); Anova Applied Elecs., Inc. v. Hong King Grp., Ltd., 334 F.R.D. 465, 470-72 (D. Mass. 2020). Binding guidance from the Supreme Court or Second Circuit to clarify this area of the law would undoubtedly be beneficial.

Apartheid Litig., 643 F. Supp. 2d 423, 437-38 (S.D.N.Y. 2009)
(authorizing service on foreign counsel). Plaintiffs also served the
Contempt Order and associated documents on co-contemnor Manuel Arroyo,
who, as evidence before the Court shows, is chief executive officer
of Grupo Lauman, president of MSD, and president of the joint venture
known as "Fox Sports Mexico." See ECF No. 50; DX 55, ECF No. 77-30;
PX 167, ECF No. 42-1 at 1-2. Moreover, there is no question that MDM
had actual knowledge of this action and the TRO no later than August
18, 2025, when a press release was published under the names of "Fox
Sports Mexico," Grupo Lauman, and MDM. Cf. Gurung, 279 F.R.D. at 220
(finding alternative means of service appropriate where defendant was
on notice of litigation). That press release asserted, among other
things, that "MDM has never submitted to the jurisdiction and
competence of the federal courts of the United States of America";
that "foreign courts are not -- and should not be used as -- courts
of appeal for decisions validly issued by national courts"; and that
"MDM (Fox Sports Mexico) will continue to defend its rights before all
competent bodies." PX 118, ECF No. 36-2. Both because the specific
forms of electronic service that plaintiffs effectuated were
reasonably calculated to apprise MDM of the pendency of this action
and because evidence before the Court indicates that MDM plainly had
knowledge of this action within days of its commencement, the Court
concludes that the electronic service that plaintiffs effectuated on

MDM comports with due process.[10]

   b. Timing of Authorization of Electronic Service

  Next, MSD argues that, assuming electronic service on MDM is permissible under the Hague Convention, the Court did not authorize electronic service on MDM until September 5, 2025, and, thus, any electronic service that plaintiffs effectuated before that date was improper. ECF No. 110 at 11-13. MSD's argument depends on an incorrect factual premise. The Court, in fact, repeatedly authorized electronic service on MDM. It first did so on August 14, 2025, in connection with the issuance of the TRO. See ECF No. 29 at 10 (authorizing electronic service of complaint, TRO, and associated papers). It did so again on August 20, 2025, in connection with the issuance of an Order for MDM to show cause why it should not be held in contempt. See ECF No. 38 at 1. And it did so twice more when it modified the TRO and the Order to show cause. See ECF Nos. 39, 41. Hence, MSD is incorrect that the

---

[10] Although the Court is bound to decide this issue based on its interpretation of constitutional due process principles and the Hague Convention, the Court observes that considerations of policy warrant the same conclusion. A foreign party alleged to have infringed upon the rights of a domestic party under a contract containing a forum-selection clause that requires disputes to be adjudicated in the United States should not be able to avoid being haled into court by refusing to accept service other than through the Hague Convention, which can take months or longer. The expansive interpretation of Mexico's reservations to Article 10 of the Hague Convention that MSD presses would effectively permit MDM, in this time-sensitive matter, to delay becoming subject to the jurisdiction of the court to which it "irrevocably" consented, thereby depriving plaintiffs of the benefit of the forum-selection clause they negotiated. See PX 103 at 0029.

Court did not timely authorize electronic service.[11]

      2.   Service on MSD

Separate from the arguments that MSD advances regarding the service of papers on MDM, MSD contends that the Court may not hold it in civil contempt for any conduct in which it engaged prior to accepting service of the Contempt Order on September 5, 2025. See ECF No. 110 at 4-9. This argument rests on two premises: (1) that a court may not hold a nonparty in contempt for acts it committed before the court obtains personal jurisdiction over it; and (2) that MSD was not subject to this Court's personal jurisdiction before it accepted service on September 5, 2025. Both premises are faulty.

First, MSD fails to distinguish between contemptuous conduct and contempt proceedings. As plaintiffs point out, see ECF No. 120 at 2-3, MSD's argument that a nonparty contemnor may not be held in contempt

---

[11] MSD also argues, in a footnote, that the service plaintiffs effectuated on MDM was incomplete because plaintiffs did not immediately serve MDM with a copy of this Court's Local Rule 83.6. See ECF No. 110 at 13 n.8. To be sure, Plaintiffs did serve MDM with a copy of Local Rule 83.6 on September 8, 2025. See ECF No. 58. MSD provides no authority supporting the proposition that delayed service of a local rule is of jurisdictional consequence. Courts subject to Local Rule 83.6 have routinely excused failure to strictly comply with the obligation to serve a copy of the rule simultaneously with contempt papers. E.g., Absolute Nevada, LLC v. Grand Majestic Riverboat Co. LLC, No. 19 Civ. 11479, 2020 WL 5209730, at *6 (S.D.N.Y. Sept. 1, 2020) ("The failure to provide a copy of Local Rule 83.6 during service of the Order to Show Cause is a minor technical violation of Local Rule 83.6(a) not affecting the validity of the service of process"), aff'd in relevant part, No. 21-50-cv, 2022 WL 350255 (2d Cir. Feb. 7, 2022); cf. Giuliano v. N.B. Marble Granite, 2014 WL 2805100, at *9 n.13 (E.D.N.Y. June 20, 2014), report and recommendation adopted, No. 11 Misc. 753, ECF No. 21 (E.D.N.Y. July 15, 2014).

for conduct prior to the service of contempt filings on it would effectively immunize much contemptuous conduct. The law is clear that a nonparty may be punished for contemptuous conduct so long as the nonparty is either "legally identified" with a party or abets the contemptuous conduct of a party, and so long as the nonparty had "actual notice," whether by "personal service or otherwise," of the relevant court order. Havens, 76 F.4th at 111-12; see also Fed. R. Civ. P. 65(d); Eli Lilly & Co. v. Gottstein, 617 F.3d 186, 193 (2d Cir. 2010); Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc., 96 F.3d 1390, 1395 (Fed. Cir. 1996) ("[T]he prohibition against entering an injunction against non-parties does not mean that non-parties may not be held in contempt of court for violating injunctions directed at others."). Here, the Court has already determined that MSD is legally identified with, and has aided and abetted the conduct of, MDM. See Media Deportes Mexico, 2025 WL 2699470, at *4-7. MSD also had actual notice of the TRO no later than August 18, 2025. On August 17, 2025, plaintiffs served the TRO on MSD's counsel in both the United States and Mexico, and plaintiffs also served on MSD's Mexican counsel the complaint and underlying documents in this action. See ECF No. 59. Moreover, the press release that Grupo Lauman, MDM, and "Fox Sports Mexico" issued on August 18, 2025, is further evidence that MSD had actual notice of the TRO as of that date. See PX 112, ECF No. 13-3 at 0006; PX 118. As discussed above, the press release indicates that it was occasioned by media coverage of this action and evinces awareness

of the TRO. See PX 118.

Thus, MSD is liable to be held in contempt for its violations of the TRO. Of course, MSD is correct that the Court could not actually impose contempt sanctions on it until MSD had been served with, or accepted service of, the Contempt Order. That is the teaching of several of the cases that MSD erroneously cites for the proposition that it could not have even committed contempt until it was served. For instance, in Baliga ex rel. Link Motion Inc. v. Link Motion Inc., 385 F. Supp. 3d 212 (S.D.N.Y. 2019), the court held that "alleged contemnors -- including non-parties -- must receive proper service of process before contempt proceedings can begin." Id. at 219 (emphasis added).[12] That court notably did not hold that contemptuous conduct could not occur prior to service. Indeed, its references to "alleged contemnors" -- that is, those who engaged in conduct conceivably constituting contempt -- would make no sense if contemptuous conduct could occur only after service. See id.

_____

[12] Other cases on which MSD relies are no more helpful to its position. In First City, Texas Houston, N.A. v. Rafidain Bank, 281 F.3d 48, 55 (2d Cir. 2002), the Second Circuit held that a subpoena was properly served and contempt proceedings properly brought where, among other things, a defendant had actual knowledge of its obligations to the court. The relevant portions of United States v. Thompson, 921 F.3d 82, 87-88 (2d Cir. 2019), were decided under New York rather than federal law. Moreover, the court in Thompson addressed whether a defendant, rather than a nonparty, had been properly served. See id. at 88. Its holding -- that personal jurisdiction over the defendant was lacking because he was never properly served -- is inapposite to the facts of this case, where MSD does not deny accepting service and instead argues only about the timing of service.

Here, the Court took pains to ensure that service of the Contempt Order was effectuated on MSD. At the hearing held on September 5, 2025, the day that MSD appeared in this action, one of the first subjects into which the Court inquired was whether MSD had been served. See Tr. of H'rg, Sept. 5, 2025 ("9/5/25 Tr.") at 6:6-9. MSD's counsel confirmed that his client had actual notice of the Contempt Order. Id. at 7:21-23 ("Obviously, we know that the Court had issued its order last Friday [August 29, 2025]. We became aware of it and invited us to appear, so we took that invitation."). Then, after some discussion, MSD's counsel accepted service of the Contempt Order. Id. at 9:14-15.

The Court also took pains to ensure that MSD would not be subject to contempt sanctions until after service had been effectuated. It first did so by providing in the Contempt Order itself that sanctions would only begin to accrue on September 6, 2025, and that contemnors could present any opposition to the Contempt Order at the hearing on September 5, 2025. See ECF No. 45 at 1-2. Then, when MSD (unlike any of its co-contemnors) appeared and presented opposition to the Contempt Order, the Court promptly stayed the effectiveness of that order until MSD could be fully and fairly heard. See ECF No. 48. As discussed in detail supra, the Court subsequently invited MSD to set forth its arguments in several rounds of briefing and convened three days of evidentiary hearings at which MSD had every opportunity to present documents and testimony in support of its views. Accordingly, there is no question that the Court had jurisdiction to conduct contempt

proceedings following MSD's acceptance of service of the Contempt Order, even though those proceedings concerned MSD's conduct prior to accepting service of the Contempt Order.

Second, MSD maintains that it was not subject to this Court's personal jurisdiction until it accepted service of the Contempt Order on September 5, 2025. See ECF No. 110 at 5. This argument is foreclosed by the law of the case. Under the law-of-the-case doctrine, "when a court has ruled on an issue, 'that decision should generally be adhered to by that court in subsequent stages in the same case.'" United States v. Carr, 557 F.3d 93, 102 (2d Cir. 2009) (quoting United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002)). Only in "compelling circumstances" may a court reconsider its earlier decisions in a case, such as where there has been "(1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." Id.

As relevant here, the Court's extensive Opinion and Order of September 23, 2025, concluded that the Court may properly exercise personal jurisdiction over MSD for three "independent and legally sufficient" reasons. See Media Deportes Mexico, 2025 WL 2699470, at *4-9. One of those reasons applied long before September 5, 2025. Specifically, the Court concluded that MDM and MSD were joint venturers in the business known as "Fox Sports Mexico" and that, as a result, MDM bound MSD when it submitted to this Court's exclusive jurisdiction as to disputes arising in connection with the License Assignment

23

Agreement. Id. at *5. There is no evidence before the Court that MDM's and MSD's joint venture came into being recently. Nor have there been any relevant changes in controlling law. Accordingly, the Court reaffirms its holding that MSD is subject to its personal jurisdiction and, for that reason, again rejects MSD's argument that the Court lacked personal jurisdiction over it until September 5, 2025.

Summing up, the Court concludes that because service was properly effectuated on MDM, because MSD had actual notice of the TRO before engaging in its contemptuous conduct, because MSD accepted service of the Contempt Order prior to the date when any sanctions would be effective, and because MSD had ample opportunity to challenge the Contempt Order, the Court has jurisdiction to hold MSD in civil contempt.

B.    Elements of Civil Contempt

The next group of MSD's arguments has to do with whether plaintiffs have shown that MSD satisfies the elements of civil contempt. As to the first element, which concerns whether the Court's order was clear and unambiguous, MSD proffers several reasons why, in its view, there was a "fair ground of doubt" whether the TRO applied to its conduct in Mexico. As to the remaining elements, MSD argues that it was pursuing its independent interests when it participated in the litigation that it and MDM brought in Mexico City and that there is no evidence before the Court that MSD violated the TRO by using the disputed Fox Sports Trademarks. Id. at 3-4. The Court addresses each of MSD's arguments in turn.

1.    The Clarity of the Court's Contempt Order

The first element of civil contempt requires that a court's order be "clear and unambiguous." That is, the order must leave "no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." Next Investments, 12 F.4th at 131. The imposition of civil contempt is "inappropriate if there is a fair ground of doubt as to the wrongfulness of the alleged contemnor's conduct." Id. This standard is "generally an objective one" because "a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." Taggart, 587 U.S. at 561.

MSD argues there is a "fair ground of doubt" as to whether the Court's TRO applies to its conduct in Mexico. Primarily, MSD contends that there is doubt as to whether the TRO "establishes the Court's power to issue the anti-suit injunction," ECF No. 110 at 14-23, by which MSD means the provision of the TRO prohibiting MDM and those acting in "active concert or participation" with it from "pursuing any legal or regulatory action relating to the Fox Sports Trademarks in Mexico," ECF No. 29 at 8 ¶ 5, 9; see also ECF No. 41 (modified TRO).

At the outset, the Court observes that the TRO's language is plain on its face: it restrains MDM and "its agents, employees, attorneys, and any persons in active concert or participation within it" from, among other things, "using the Fox Sports Trademarks in

Mexico" and "pursuing any legal or regulatory action relating to the Fox Sports Trademarks in Mexico, including seeking to enforce the injunction issued on March 26, 2025 by Civil Department 42 of the Superior Court of Justice of Mexico City." ECF No. 29 at 10. As the Court noted above, the law of the case is that MSD is MDM's agent. See Media Deportes Mexico, 2025 WL 2699470, at *5. Because the TRO prohibits "using the Fox Sports Trademarks in Mexico" and "pursuing any legal or regulatory action . . . in Mexico," ECF No. 29 at 10 (emphases added), there can be no doubt that the TRO facially applies to MSD's conduct in Mexico.

MSD does not dispute these points. Instead, it contends that the Court was without power to impose the TRO's "anti-suit" provision because the requirements for issuing a foreign anti-suit injunction were not satisfied and because the Court failed to perform the proper inquiry into the anti-suit provision's implications for international comity. See ECF No. 97 at 2-6; ECF No. 110 at 13-21.

As the parties agree, whether a United States court may enjoin a party from litigating in a foreign forum is governed, at least in the Second Circuit, by the analysis set forth in China Trade and Development Corp. v. M.V. Choong Yong, 837 F.2d 33 (2d Cir. 1987). In that case, the Circuit held that an injunction prohibiting foreign litigation may issue where (1) the parties are substantially similar and (2) resolution of the case before the court issuing the injunction is dispositive of the litigation being enjoined. Id. at 36. If those

requirements are met, a court then balances five discretionary factors: "(1) frustration of a policy in the enjoining forum; (2) the foreign action would be vexatious; (3) a threat to the issuing court's in rem or quasi in rem jurisdiction; (4) the proceedings in the other forum prejudice other equitable considerations; or (5) adjudication of the same issue in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment." Am. Home Assur. Co. v. Ins. Corp. of Ireland Ltd., 603 F. Supp. 636, 643 (S.D.N.Y. 1984); see China Trade, 837 F.2d at 36 (adopting by reference the American Home Assurance Co. factors).

In issuing the TRO, the Court concluded that "[t]he parties to the proceeding from which the Mexico injunction issued are substantially similar to the parties in this action, and an injunction would be dispositive of the proceeding in the foreign forum. The evidence also shows that the China Trade factors weigh in favor of granting an anti-suit injunction." ECF No. 29 at 8 ¶ 5; cf. ECF No. 10 at 31-35 (plaintiffs' analysis of China Trade factors).

a.    China Trade Requirements

MSD does not dispute that the first of the China Trade requirements is satisfied. See ECF No. 110 at 14-18. It focuses instead on the second. MSD initially argues that the instant case "would not be dispositive of the independent tort claims MSD intends to bring in Mexico." Id. at 14. The Court need not decide whether this assertion is correct because China Trade directs the Court to look only at "the

enjoined action," 837 F.3d at 36, not any action that might subsequently be filed in the same foreign court. Thus, the fact that MSD intends to bring further litigation in Mexico against certain Fox entities and agents is irrelevant to whether this case would be dispositive of the action that is actually pending there.

MSD's second argument as to this China Trade requirement presents a more complex set of considerations. That argument is that the instant case cannot be dispositive of the action that MDM and MSD brought in Mexico because this Court lacks jurisdiction over what MSD represents to be "the underlying issue being litigated," namely, whether, under the IFT's 2019 resolution, the license for the use of the Fox Sports Trademarks that was granted to MDM must be exclusive, notwithstanding the contrary language of the Equity Purchase Agreement and its associated agreements. See ECF No. 110 at 14-18.

While plaintiffs and MSD advance divergent interpretations of the IFT's resolutions and their legal effect, at this juncture, the Court need not decide that issue. Rather, the question before the Court is a narrower one: whether there existed a "fair ground of doubt" that the Court's resolution of this action would be dispositive of the action that MDM and MSD brought in the Superior Court of Justice of Mexico City. See Next Investments, 12 F.4th at 131. While MSD's subjective views are relevant to this inquiry, MSD may not seek refuge in the "fair ground of doubt" doctrine based on views that are "objectively unreasonable." See Taggart, 587 U.S. at 562.

Plaintiffs contend that there is no such ground of doubt because the resolution of this case would clearly dispose of the litigation in Mexico City. Plaintiffs stress that their claim against MDM here is that, when MDM initiated the litigation in Mexico City, it did so in violation of the Trademark Assignment Agreement's forum-selection clause. See ECF No. 120 at 7. Thus, on plaintiffs' view, the Court need not now decide whether the IFT's 2019 resolution required that MDM's license for the Fox Sports Trademarks be exclusive. Instead, it would be sufficient to dispose of the litigation in Mexico City for this Court to decide that MDM violated the forum-selection clause and that the case in Mexico City should have (and could only have) been brought in New York. See id. at 8. Plaintiffs emphasize that the IFT has at least twice directed the parties to take their disputes to courts or arbitral bodies, rather than to the IFT itself. See id.

MSD responds by arguing that no decision by this Court could possibly dispose of the litigation in Mexico City because this Court lacks jurisdiction to decide whether the IFT's 2019 resolution required that an exclusive license be granted to MDM. See ECF No. 110 at 14-15. Moreover, MSD contends, if a ruling by this Court were dispositive of the Mexico City litigation, plaintiffs' counsel in that litigation would and should have mentioned -- but did not -- the proceedings that have been unfolding here. See id. at 15-18.[13]

_____

[13] At the evidentiary hearing held on September 26, 2025, MSD called as an expert witness a Mexican lawyer and former judge, Juan Pablo

The Court concludes that plaintiffs have the better of these arguments. <u>First</u>, the parties' underlying dispute -- whether the license assigned by Fox, through TFCF, to MDM was exclusive -- is one that has arisen "under or related to" the Trademark License Agreement. PX 103 at 0029. Accordingly, that agreement's forum-selection clause plainly applies. <u>See</u> <u>id.</u> (channeling to this Court or the relevant New York State court "any and all claims, disputes, controversies or disagreements . . . under or related to this Agreement"). <u>Second</u>, plaintiffs' Complaint in this action invokes the forum-selection clause in order to seek, among other things, "[a]n anti-suit injunction prohibiting MDM from seeking to enforce the Judicial Trademark Injunction and or [sic] seek any other relief in Mexico." ECF No. 1 at 37.[14] Such an injunction would plainly dispose of the litigation in Mexico City because it would preclude MDM from proceeding further

_____

Gómez Fierro. MSD's supplemental brief notably lacks reference to Gómez Fierro's testimony or expert report. <u>See generally</u> ECF No. 110. As plaintiffs point out, Gómez Fierro's view that a party that is dissatisfied with a decision made by an IFT unit, such as the ECU, must first "go to the IFT and get a plenary decision," is contradicted by Grupo Lauman's recent amparo challenge to the September 8, 2025, decision issued by the ECU. <u>See</u> ECF No. 108 at 6 (quoting Tr. of H'rg, Sept. 26, 2025 ("9/26/25 Tr.") at 89:15-18). Further undercutting MSD's position, Gómez Fierro also testified that contractual disputes between parties that are regulated by the IFT are normally resolved by courts rather than the IFT itself. <u>Id.</u> at 77:3-78:23. For these and other reasons, the Court does not give great weight to Gómez Fierro's expert testimony.

[14] Plaintiffs' Complaint in this action brings claims against MDM for breaching the forum-selection clause and another provision of the Trademark License Agreement. Notably, those claims do not depend on whether the license assigned to MDM was exclusive or non-exclusive. <u>See</u> ECF No. 1 at 30-32.

there. Third, the IFT has expressed no interest in adjudicating whether there has been a breach of the Equity Purchase Agreement or any of its associated agreements. When Fox requested, in April 2025, that the IFT confirm its 2019 and 2021 resolutions, the ECU responded that "there is no need to issue a confirmation" because "Fox Corp[.], TFCF, and Grupo Lauman designed an implemented the compliance with section 8.4.12.4" of the 2019 resolution through the License Assignment Agreement and the Trademark License Agreement. PX 107 at 0010. "Thus," the ECU stated, "Fox Corp[.] is instructed to comply with" the IFT's previous resolutions, "as well as with the terms agreed upon between Fox Corp[.], TFCF, and Grupo Lauman" in their various agreements. Id. In turn, when Grupo Lauman requested, in September 2025, that the IFT inquire into alleged breaches of the parties' agreements, the ECU again demurred. It stated that "TFCF, TWDC, and Grupo Lauman must adhere to the agreements, rights[,] and/or obligations that they negotiated and signed," and "the IFT, before evaluating possible breaches . . . would have to wait for decisions issued by competent courts and/or tribunals." ECF No. 109-2 at 15.

Because the parties' underlying dispute is covered by the Trademark License Agreement's forum-selection clause, because plaintiffs seek an injunction enforcing that provision, and because the IFT has not claimed jurisdiction, the Court concludes that there is no fair ground of doubt as to its capacity to enjoin MDM and those acting in concert with it from pursuing the Mexico City litigation.

MSD's arguments to the contrary are not objectively reasonable.

First, MSD contends that disputes regarding the license at issue in this case must be resolved by the IFT. See ECF No. 110 at 14-15. But as the Court just discussed, the IFT itself has not agreed. MSD's expert witness testified that relevant Mexican regulatory procedures distinguish between "private disagreements" between the parties, which are governed by the terms of their agreements, and issues that "implicate the broader anti-competitive rules laid down by the plenary resolutions" of the IFT, which "should be addressed by the regulator." 9/26/25 Tr. at 76:12-78:23. While MSD's expert opined that the parties' dispute here falls into the latter category, see id. at 82:1-7, the ECU has taken the contrary view. See, e.g., ECF No. 109-2 at 15 ("the IFT, before evaluating possible breaches of [the 2019 resolution] . . . would have to wait for decisions issued by competent courts and/or tribunals regarding breaches . . . of the terms of the" parties' agreements).

Second, even if MSD and its expert witness are correct that the IFT has the final word about the nature of the license at issue in this case, an injunction precluding MDM and MSD from litigating in the Superior Court of Justice would still dispose of the case pending in that court.[15]

---

[15] The Court recognizes that the TRO's anti-suit provision prohibits more than just the continued litigation of the case that MDM and MSD brought in the Superior Court of Justice. See ECF No. 29 at 10 (restraining MDM and those acting in concert with it from "pursuing

Third, MSD argues that plaintiffs and their affiliates have advanced contradictory arguments about the proper venue for these disputes. See ECF No. 110 at 15-18. But the evidence before the Court shows that plaintiffs have not taken contradictory positions. Instead, plaintiffs brought this lawsuit only after Fox Corporation unsuccessfully sought clarification from the IFT concerning the effect of its 2019 and 2021 resolutions. See PX 107 at 0010. While this action has been pending, litigation has continued in Mexico City, and one of plaintiffs' affiliates, Fox Cable, has defended the case there, at least in part, on the basis that the Superior Court of Justice lacks jurisdiction to grant MDM and MSD the relief that they are seeking. See DX 201, ECF No. 111-1 at 14-15. Far from being contradictory, Fox Cable's argument that the Superior Court of Justice lacks jurisdiction

---

any legal or regulatory action relating to the Fox Sports Trademarks in Mexico" (emphasis added)). The Court reserves judgment as to whether, if the IFT has jurisdiction to override certain aspects of the parties' agreements, the TRO's anti-suit provision is so broadly worded as to prohibit MDM, MSD, or other parties from ever having recourse to the IFT. The Court defers further consideration of that issue because the question before the Court with respect to MSD's motion to set aside the Contempt Order is whether there is a fair ground of doubt that the TRO's anti-suit provision would fail to dispose of the litigation actually brought in Mexico City, not whether that provision would also fail to dispose of any hypothetical future litigation brought by entities subject to the TRO. As the Court noted during the September 26, 2025, evidentiary hearing, none of the contemnors in this case requested the Court to clarify the TRO before MDM and MSD filed their August 22, 2025, motion in the Superior Court of Justice seeking expanded injunctive relief. See 9/26/25 Tr. at 21:18-20. At bottom, a contempt proceeding is not an appropriate venue to challenge the "legal or factual basis of the order alleged to have been disobeyed." United States v. Rylander, 460 U.S. 752, 756-57 (1983).

is consistent with the position that plaintiffs have taken in this case. And while Fox Cable has argued that the litigation in Mexico City should be channeled to the Specialized Court rather than this Court, see id. at 14-15, Fox Cable is not bound (as MDM and MSD have conceded in the Mexican litigation, see ECF No. 109-9 at 2) by the forum-selection clause at issue here.[16]

As the Court has acknowledged since proceedings regarding the Contempt Order began, the boundaries of the respective jurisdictions of the IFT, the Specialized Court, and the Superior Court of Justice, as well as the implications of the jurisdiction of those bodies for the enforcement of the parties' forum-selection clause, are not entirely clear. This case accordingly presents complex questions of first impression -- questions rendered all the more difficult by MDM's persistent refusal to appear in any respect. However, as to the narrow question immediately before the Court -- whether there was a fair ground of doubt as to whether this case would dispose of the case that MDM and MSD brought in the Superior Court of Justice -- the Court

_____

[16] MSD also faults Fox Cable's counsel for arguing, apparently in the alternative, that the litigation in Mexico City should be referred to arbitration. See ECF No. 110 at 17 n.10; DX 201 at 19-24. While the License Assignment Agreement contains an arbitration clause governing disputes "arising out of or in connection with" that agreement, PX 103 at 0007-0009, the parties' dispute about the nature of MDM's license for the Fox Sports Trademarks arises under the Trademark License Agreement, which contains the forum-selection clause in lieu of any arbitration provision, id. at 0029, rather than under the License Assignment Agreement. As the Court previously observed, references to arbitration appear to be a "fallback" position that Fox Cable has taken in the Mexico City litigation. See 9/26/25 Tr. at 12:24-13:9.

concludes that there is no such ground of doubt.

For these reasons, the Court reaffirms the assessment it reached in issuing the TRO's anti-suit provision: both of the threshold China Trade requirements are satisfied. See ECF No. 29 at 8 ¶ 5. The Court moreover reaffirms its assessment, which MSD does not contest, that the five discretionary China Trade factors weigh in favor of enjoining the litigation in Mexico City. Id.

        b.   International Comity

Separate from its arguments under China Trade, MSD contends that the Court failed to perform the proper inquiry into whether the TRO's anti-suit provision infringes upon international comity. ECF No. 110 at 18-21. Here, MSD primarily relies on the Second Circuit's decision in Next Investments, where the Circuit held that there was a "fair ground of doubt" as to whether a district court's asset-freeze orders could require Chinese banks to take steps arguably inconsistent with Chinese banking law. 12 F.4th at 131-32. In Next Investments, the Circuit observed that the district court did not engage in an international-comity analysis under Section 403 of the Restatement (Third) of Foreign Relations. Id. at 132. Because the "comity concerns are colorable and the district court had not decided the issue," the Circuit opined, there was a "reasonable" basis for the banks to doubt whether the asset-freeze orders applied to them. Id.

The Court is not persuaded. For starters, Next Investments is factually and legally distinguishable. That case presented a novel

legal question as to whether complying with the district court's asset-freeze orders would require the Chinese banks to violate Chinese law. Id. at 131-32. By contrast, this case involves an anti-suit injunction rather than an asset-freeze order. Cf. Gucci Am. v. Weixing Li, 768 F.3d 122, 140 (2d Cir. 2014) (noting that "[o]rdering compliance with an asset freeze . . . implicates different concerns from those implicated by" other orders). MSD has not suggested that complying with the TRO's anti-suit provision would require it (or MDM) to violate Mexican law. Moreover, in Next Investments the district court found that the plaintiffs had unreasonably delayed their request for relief against the banks. See 19 F.4th at 129-31. Only in passing has MSD made such arguments about plaintiffs' litigation behavior here, see ECF No. 110 at 4 n.1, and the complained-of delay was ten days, rather than six years as in Next Investments, see 12 F.4th at 129. And the Second Circuit has never held that a court issuing an anti-suit injunction must conduct a comity analysis under the Third Restatement as opposed to under China Trade. See Next Investments, 12 F.4th at 133; Gucci Am., 768 F.3d at 139 ("A comity analysis drawing upon [the Third Restatement] is appropriate before ordering a nonparty foreign bank to freeze assets abroad" (emphasis added)).

In addition, while MSD faults the Court for not engaging in its preferred comity analysis, its brief discussion of the Third Restatement factors is unconvincing. See ECF No. 97 at 4-6. For instance, MSD refers repeatedly to Mexico's interest in adjudicating

disputes pertaining to decisions made by the IFT, but MSD neither addresses the United States' interest in the enforcement of forum-selection clauses nor the fact that the IFT has at least twice declined to take up the parties' dispute. Cf. Gucci Am., 768 F.3d at 139 n.20 (listing Third Restatement factors). Hence, even if MSD were correct that an international-comity analysis under the Third Restatement was required, that analysis would likely not favor MSD.

For all these reasons, the Court concludes that the relevant provisions of the TRO were clear and unambiguous.

2.   MSD's Failure to Comply

The second element of civil contempt is that "a contemnor failed to comply with the court order, and proof of that non-compliance is clear and convincing." Al Hirschfeld Found., 438 F. Supp. 3d at 207. Clear and convincing evidence denotes "a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred." Levin v. Tiber Holding Corp., 277 F.3d 243, 250 (2d Cir. 2002).

As to this element, MSD makes two arguments. First, it contends that it may not be held in contempt because it has independent interests -- that is, interests that are separate from MDM's -- in pursuing the litigation in Mexico City. Therefore, MSD argues, the Court does not have clear and convincing proof that its participation in that litigation was for the purpose of aiding or abetting MDM. See ECF No. 97 at 6-7. Second, MSD contends that plaintiffs have not proven that it separately violated the TRO by using the Fox Sports Trademarks.

See ECF No. 110 at 3-4. Both arguments fail.

As to MSD's purported independent interests in the Mexico City litigation, the Court held in its September 23, 2025, Opinion and Order that "there is no evidence . . . that MSD's interests are meaningfully independent of those of MDM or 'Fox Sports Mexico'" and that "MDM and MSD jointly sought injunctive relief" allowing them to engage in the "'continuous and uninterrupted use' of the Fox Sports Trademarks." Media Deportes Mexico, 2025 WL 2699470, at *5. More broadly, the Court also held that, because MDM and MSD are joint venturers in "Fox Sports Mexico," they are each the principal and the agent of the other. See id. And it held that MSD aided and abetted MDM's contemptuous conduct. See id. at *6-7.

MSD's new arguments to the contrary are unpersuasive. MSD stresses that it has been a party to the litigation in Mexico City since it was filed, see ECF No. 110 at 8, but that fact indicates nothing about whether MSD's interests are independent of those of its co-plaintiff, MDM. Then, while MSD argues that its participation in the litigation in Mexico City is necessary "to preserve separate tort claims it plans to bring against" various Fox entities and employees, see id. at 8-9, MSD has not shown either that participating in the Mexico City litigation is a necessary prerequisite for bringing future tort claims or that any tort claims that MSD may have are independent of any such

claims that MDM might also have.[17] Absent any of these showings, the law of the case -- that MDM and MSD are joint venturers in "Fox Sports Mexico" and joint litigants pursuing common interests in Mexico City -- forecloses MSD's arguments.

The law of the case also forecloses MSD's separate contention that there is insufficient evidence connecting it to the use of the Fox Sports Trademarks, see ECF No. 110 at 3-4. Of course, MSD is correct that, to be held in contempt, a nonparty must engage in "active concert or participation" with a party that is subject to an injunction, either by aiding or abetting it or by being legally identified with it. See Havens, 76 F.4th at 111; Fed. R. Civ. P. 65(d). But the Court has found that, in relevant respects, MSD has just this kind of relationship with MDM. Moreover, MSD's counsel has conceded that it is a "'non-operational' entity that exists to hold certain contracts that are necessary for the operation of 'Fox Sports Mexico.'" Media Deportes Mexico, 2025 WL 2699470, at *5. Thus, MSD's role in "Fox Sports Mexico" is a clear form of "active . . . participation"

---

[17] Although MSD does not address the point in the most recent round of briefing, it previously contended that it participated in the August 22, 2025, joint request for the extension of the Mexico injunction because, on August 4, 2025, Fox issued a "press release announcing threats to MSD's independent interests." ECF No. 97 at 7 (citing ECF No. 97-7). But that press release does not so much as mention MSD, and the briefs that MDM and MSD have jointly filed in the Mexico City litigation do not distinguish between MDM and MSD in any manner consistent with MSD's argument. See PX 112, ECF No. 13-3 (brief supporting initial request for injunctive relief); PX 130, ECF No. 42-1 (brief supporting request for further injunctive relief); ECF No. 109-9 (answering brief on appeal).

in the "use" of the Fox Sports Trademarks. <u>Contra</u> ECF No. 110 at 3-4.[18]

Accordingly, the Court concludes that there is clear and convincing proof that MSD failed to comply with the TRO.

### 3.    Diligence

The third element of civil contempt is that "the contemnor has not diligently sought to comply with the court order in an objectively reasonable manner." <u>Al Hirschfeld Found.</u>, 438 F. Supp. 3d at 207. Here, this inquiry merges into the first two. As discussed above, MSD contends both that the Court lacked authority to issue the TRO's anti-suit provision and that MSD did not use the Fox Sports Trademarks. MSD does not argue that it somehow inadvertently violated the TRO despite its best efforts, or that it somehow had no choice but to violate the TRO given its other legal obligations. Because the Court concludes that MSD violated the TRO's anti-suit provision, as well as that MSD is actively in concert with MDM with regard to their joint venture's

---

[18] MSD cites <u>Doctor's Associates, Inc. v. Reinert & Duree, P.C.</u>, 191 F.3d 297, 304 n.5 (2d Cir. 1999), for the proposition that the mere existence of a principal-agent relationship (or its equivalent) is insufficient to establish that two entities are in active concert. But the Second Circuit expressly declined to apply that proposition beyond contexts "where the consequence would be to extend the injunction to cover the dominant party," such as an enjoined agent's principal. <u>See id.</u> Here, not only has the Court found that MSD is MDM's agent as well as its principal, <u>see Media Deportes Mexico</u>, 2025 WL 2699470, at *5, but the Court has also held that MSD and MDM are actively involved in the operation of "Fox Sports Mexico," the business that is allegedly misusing the Fox Sports Trademarks, <u>see id.</u>, and that MSD and aided and abetted MDM, <u>see id.</u> at *6-7.

use of the Fox Sports Trademarks, this element is satisfied.

In light of the foregoing analysis, the Court concludes that plaintiffs have established all three elements of civil contempt against MSD.

C.    Waiver of Forum Selection Clause

MSD's supplemental briefing raises an issue that it did not mention earlier in this litigation: that plaintiffs waived enforcement of the Trademark License Agreement's forum selection clause when they litigated in Mexico and in the Central District of California to prevent MDM, MSD, and other entities affiliated with Grupo Lauman from allegedly interfering with Fox's commercial interests. ECF No. 110 at 24-26 (discussing Fox Cable Network Servs. LLC v. Grupo Lauman Holding, S. de R.L. de C.V., No. 25 Civ. 2444 (C.D. Cal.)). MSD argues that this waiver, which it attributes to all three of the Fox entities that are plaintiffs in this action, creates another "fair ground of doubt about the legal limits on the Court's power to hold MSD in contempt for allegedly not abiding by the forum selection clause." Id. at 26.

At the outset, MSD's new argument is forfeited. When the Court ordered a final round of supplemental briefing at the conclusion of the evidentiary hearing on September 26, 2025, it specifically directed the parties not to introduce "new issues," as opposed to "new argument or new citations." 9/26/25 Tr. at 96:3-4. Because MSD did not previously argue that plaintiffs waived the forum selection clause, it should not have done so at this juncture.

41

But even were the Court to consider MSD's new argument, it plainly fails. The plaintiffs in the litigation in Mexico and the Central District of California are Fox Cable and Tubi, Inc. Plaintiffs do not deny that these entities are affiliates of Fox Corporation and TFCF, but it does not follow that these entities are "successors and assigns" for purposes of the forum-selection clause. PX 103 at 0029. Although MSD is correct that the forum-selection clause is broadly worded as to its subject matter, covering "any . . . disputes . . . under or related to this Agreement," the clause pertains only to such disputes that are "between the Parties or any of their respective successors and assigns." Id. Accordingly, the forum-selection clause does not apply to litigation brought by Fox Cable and Tubi, Inc., and those entities could not have waived it in connection with this case.

D.   Objections to Contempt Sanctions

Finally, MSD raises two objections to the contempt sanctions the Court has imposed. First, MSD argues that the fine of $200,000 per day is impermissibly punitive because, while the fine is based on plaintiffs' calculations of lost profits, there is no "connection between those estimated profits and the actual value derived from the use of the disputed trademarks." See ECF No. 97 at 10. MSD cites no authority for this argument other than a boilerplate statement of the rule that sanctions may not be punitive. Id. (citing Gucci Am., 768 F.3d at 144). Nor does MSD contest the substance of plaintiffs' calculations or offer calculations of its own. The Court overrules

42

MSD's objection because, as plaintiffs point out, the law does not require exacting precision in the calculation of compensatory contempt sanctions. E.g., King v. Allied Vision, Ltd., 65 F.3d 1051, 1063 (2d Cir. 1995) ("[T]he sanction should correspond to at least some degree with the amount of damages."); ECF No. 100 at 12-13.

Second, MSD argues that the provision of the Court's September 19, 2025, Order that enjoined "MSD, or any person or entity acting in concert with it, from transferring, conveying, or otherwise dissipating any assets," or engaging in related activities, exceeds the Court's jurisdiction. See ECF No. 97 at 10. For this argument, MSD relies on the Second Circuit's decision in Havens. See id. But, as relevant here, Havens concerned whether a court could enjoin a nonparty in the first place, which is a separate question from whether a court could hold such a nonparty in contempt. 76 F.4th at 111. In this case, the Court ordered MSD not to transfer or dissipate assets only after the Court had held MSD in contempt (and, for good measure, only after MSD had accepted service of the Contempt Order). See ECF No. 95. Moreover, the law is clear that district courts must have "broad discretion" in exercising their equitable jurisdiction to bring about compliance with contempt orders. E.g., Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 673 F.2d 53, 57 (2d Cir. 1982).

IV.  Conclusion

MSD has had ample opportunities to show why it should not be held in contempt. But over the course of three rounds of briefing and three

days of evidentiary hearings, MSD has consistently come up short. For all the reasons set forth above, the Court denies MSD's motion to set aside the Contempt Order as against it. The stay of effectiveness of the Contempt Order, which the Court interposed on September 5, 2025, is lifted, and MSD is hereby subject to the sanction set forth in the Contempt Order: a fine of $200,000 per day, for which MSD is jointly and severally liable with its co-contemnors. See ECF No. 45.

The Clerk of Court is respectfully directed to terminate the motion at docket number 42.

SO ORDERED.

New York, New York
October **30**, 2025

_____
JED S. RAKOFF, U.S.D.J.